Appellate Court Case No. 26-1757
Appellate Court Case No. 26-1859

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

PREPARED FOOD PHOTOS, INC. f/k/a ADLIFE MARKETING & COMMUNICATIONS CO. INC.,

Plaintiff-Appellee and Cross-Appellant,
v.

SHARIF JABER.,

Defendant-Appellant,

NOFAL, LLC d/b/a FOOD TOWN MART

Defendant-Cross Appellee,

On Appeal from the United States District Court
For the Eastern District of Wisconsin, Case No. 2:22-cv-00642-JPS

# APPENDIX OF APPELLEE/CROSS-APPELLANT PREPARED FOOD PHOTOS, INC.

**Daniel DeSouza, Esq.**
CopyCat Legal PLLC
3111 N. University Drive
Suite 301
Coral Springs, FL 33065
*Counsel for Appellee*

Dated: August 28, 2026

**CIRCUIT RULE 30(d) CERTIFICATION**

I CERTIFY that all of the materials required by 7th Circuit R. 30(a) are included in the appendix bound with Prepared Food Photos' brief. I FURTHER CERTIFY that this appendix includes all of the materials required by 7th Circuit R. 30(b).

Dated: August 28, 2026.

COPYCAT LEGAL PLLC
3111 N. University Drive
Suite 301
Coral Springs, FL 33065
Telephone: (877) 437-6228
dan@copycatlegal.com

By: /s/ Daniel DeSouza______
Daniel DeSouza, Esq.
*Counsel for Appellee/Cross-Appellant Prepared Food Photos*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and e-mailed to all counsel of record.

/s/ Daniel DeSouza___
Daniel DeSouza

## INDEX TO APPENDIX

**Short Appendix**
(bound with Prepared Food Photos' brief)



| **Document Description** | **Dist. Ct. DE No.** | **App'x Page No.** |
|---|---|---|
| Order Granting Jaber's Motion for Extension of Time *Nunc Pro Tunc* to File Motion for Attorney's Fees | 81 | PFP A1 |



**Appendix**



| **Document Description** | **Dist. Ct. DE No.** | **App'x Page No.** |
|---|---|---|
| Answer to Second Amended Complaint | 21 | PFP A8 |
| Prepared Food Photos' Bill of Costs | 62 | PFP A16 |
| Prepared Food Photos' Motion for Attorneys' Fees | 64 | PFP A31 |
| Motion for Fees Exhibit B – DeSouza Declaration | 64-2 | PFP A54 |
| Motion for Fees Exhibit E – Food Town Mart Responses to Interrogatories | 64-5 | PFP A66 |
| Motion for Fees Exhibit F – Food Town Mart/Jaber Responses to Requests for Admissions | 64-6 | PFP A71 |
| Motion for Fees Exhibit G – Notice of 30(b)(6) Deposition | 64-7 | PFP A89 |
| Motion for Extension of Time *Nunc Pro Tunc* to File Motion for Attorney's Fees | 76 | PFP A97 |
| Memorandum in Opposition to Motion for Extension of Time *Nunc Pro Tunc* to File Motion for Attorney's Fees | 77 | PFP A114 |
| Memorandum in Opposition Exhibit A – Declaration of Rebecca Jones | 77-1 | PFP A127 |
| Memorandum in Opposition to Jaber's Motion for Fees (with all exhibits) | 87 | PFP A130 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

PREPARED FOOD PHOTOS, INC. f/k/a
ADLIFE MARKETING & COMMUNICATIONS CO., INC.,

Plaintiff,

v. Case No.: 22-CV-642

NOFAL, LLC d/b/a FOOD TOWN MART and
SHARIF JABER,

Defendants.

---

DEFENDANTS, NOFAL LLC d/b/a FOOD TOWN MART AND SHARIF JABER'S
ANSWER AND AFFIRMATIVE DEFENSES

---

Now come the defendants, Nofal, LLC d/b/a Food Town Mart and Sharif Jaber, by their attorneys, Terschan, Steinle, Hodan & Ganzer, Ltd., by W. Timothy Steinle, as and for an answer to the Complaint, admit, deny, and assert as follows:

PARTIES

1. These answering defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained within paragraph 1 of the plaintiff's Second Amended Complaint and, therefore, denies.

2. These answering defendants admit the allegations contained within paragraph 2 of the plaintiff's Second Amended Complaint.

3. These answering defendants admit the allegations contained within paragraph 3 of the plaintiff's Second Amended Complaint.

JURISDICTION AND VENUE

4. The allegations contained within paragraph 4 of the plaintiff's Second Amended Complaint contain legal conclusions that can neither be admitted nor denied. To the extent a response is required, they must be deemed denied.

5. The allegations contained within paragraph 5 of the plaintiff's Second Amended Complaint contain legal conclusions that can neither be admitted nor denied. To the extent a response is required, they must be deemed denied.

6. The allegations contained within paragraph 6 of the plaintiff's Second Amended Complaint contain legal conclusions that can neither be admitted nor denied. To the extent a response is required, they must be deemed denied.

FACTS

7. These answering defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained within paragraph 7 of the plaintiff's Second Amended Complaint and, therefore, denies.

8. These answering defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained within paragraph 8 of the plaintiff's Second Amended Complaint and, therefore, denies.

9. These answering defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained within paragraph 9 of the plaintiff's Second Amended Complaint and, therefore, denies.

10. These answering defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained within paragraph 10 of the plaintiff's Second Amended Complaint and, therefore, denies.

11. These answering defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained within paragraph 11 of the plaintiff's Second Amended Complaint and, therefore, denies.

12. These answering defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained within paragraph 12 of the plaintiff's Second Amended Complaint and, therefore, denies.

13. These answering defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained within paragraph 13 of the plaintiff's Second Amended Complaint and, therefore, denies.

14. These answering defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained within paragraph 14 of the plaintiff's Second Amended Complaint and, therefore, denies.

15. Admit Nofal, LLC owns and operates a full-time grocery store in Milwaukee, Wisconsin under the trade name "Food Town Mart" and deny the remaining allegations contained within paragraph 15 of the plaintiff's Second Amended Complaint.

16. Admit Jaber is the sole member of Nofal, LLC but deny the remaining allegations contained within paragraph 16 of the plaintiff's Second Amended Complaint.

17. These answering defendants deny the allegations contained within paragraph 17 of the plaintiff's Second Amended Complaint.

18. These answering defendants deny the allegations contained within paragraph 18 of the plaintiff's Second Amended Complaint.

19. Admit that a screenshot of a website is attached to the Second Amended Complaint and labeled as Exhibit B, but assert these answering defendants are without knowledge or information sufficient to form a belief as to the remaining allegations contained within paragraph 19 of the plaintiff's Second Amended Complaint and, therefore, deny.

20. These answering defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained within paragraph 20 of the plaintiff's Second Amended Complaint and, therefore, denies.

21. These answering defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained within paragraph 21 of the plaintiff's Second Amended Complaint and, therefore, denies.

22. These answering defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained within paragraph 22 of the plaintiff's Second Amended Complaint and, therefore, denies.

23. These answering defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained within paragraph 23 of the plaintiff's Second Amended Complaint and, therefore, denies.

24. These answering defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained within paragraph 24 of the plaintiff's Second Amended Complaint and, therefore, denies.

COUNT 1 – COPYRIGHT INFRINGEMENT
(NOFAL LLC)

25. These answering defendants reasserts the answers contained within paragraphs 1 through 24 above as if pled in their entirety and with specificity.

26. These answering defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained within paragraph 26of the plaintiff's Second Amended Complaint and, therefore, denies.

27. These answering defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained within paragraph 27 of the plaintiff's Second Amended Complaint and, therefore, denies.

28. These answering defendants deny the allegations contained within paragraph 28 of the plaintiff's Second Amended Complaint.

29. These answering defendants deny the allegations contained within paragraph 29 of the plaintiff's Second Amended Complaint.

30. These answering defendants deny the allegations contained within paragraph 30 of the plaintiff's Second Amended Complaint.

31. These answering defendants deny the allegations contained within paragraph 31 of the plaintiff's Second Amended Complaint.

32. These answering defendants deny the allegations contained within paragraph 32 of the plaintiff's Second Amended Complaint.

33. These answering defendants deny the allegations contained within paragraph 33 of the plaintiff's Second Amended Complaint.

34. These answering defendants deny the allegations contained within paragraph 34 of the plaintiff's Second Amended Complaint.

35. The allegations contained within paragraph 35 of the plaintiff's Second Amended Complaint contain legal conclusions that can neither be admitted nor denied. To the extent a response is required, they must be deemed denied.

36. The allegations contained within paragraph 36 of the plaintiff's Second Amended Complaint contain legal conclusions that can neither be admitted nor denied. To the extent a response is required, they must be deemed denied.

37. The allegations contained within paragraph 37 of the plaintiff's Second Amended Complaint contain legal conclusions that can neither be admitted nor denied. To the extent a response is required, they must be deemed denied.

COUNT II – VICARIOUS COPYRIGHT INFRINGEMENT
(Jaber)

38. These answering defendants reassert the answers contained within paragraphs 1 through 24 above as if pled in their entirety and with specificity.

39. These answering defendants deny the allegations contained within paragraph 39 of the plaintiff's Second Amended Complaint.

40. These answering defendants deny the allegations contained within paragraph 40 of the plaintiff's Second Amended Complaint.

41. These answering defendants Admit the allegations contained within paragraph 41 of the plaintiff's Second Amended Complaint.

42. These answering defendants deny the allegations contained within paragraph 42 of the plaintiff's Second Amended Complaint.

43. These answering defendants deny the allegations contained within paragraph 43 of the plaintiff's Second Amended Complaint.

AFFIRMATIVE DEFENSES

1. The Second Amended Complaint fails to state a claim upon which relief can be granted.

2. The acts and/or allegations contained within the Second Amended Complaint were caused by those other than these answering defendants.
3. The claims of the plaintiff may be precluded by the application of the "fair use" doctrine.
4. The plaintiff has failed to mitigate their damages.

**DEMAND FOR JURY TRIAL**

The defendants, Nofal LLC d/b/a Food Town Mart and Sharif Jaber respectfully demands a trial by jury on all issues.

WHEREFORE, the defendants, Nofal LLC d/b/a Food Town Mart and Sharif Jaber demands judgment dismissing the complaint together with an award to these answering defendants of its costs, disbursements, and any other relief deemed just and equitable by the Court.

Dated at Milwaukee, Wisconsin this 20th day of February, 2023.

TERSCHAN, STEINLE, HODAN & GANZER, LTD.
Attorneys for the Defendants, Nofal LLC d/b/a Food Town Mart and Sharif Jaber

*Electronically signed by W. Timothy Steinle*
State Bar No.: 1003777
*Electronically signed by Amber L. Herda*
State Bar No.: 1057713

P.O. ADDRESS:
309 North Water Street, Suite 215
Milwaukee, WI 53202
T: (414) 258-1010
F: (414) 258-8080
timothy.steinle@tshglaw.com
amber@tshglaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 20, 2023, I electronically filed the foregoing document with the Clerk of Court using the ECF system. The ECF system will send notification of the filing to all attorneys of record.

AO 133 (Rev. 07/24) Bill of Costs

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

PREPARED FOOD PHOTOS, INC.
v.
SHARIF JABER and NOFAL, LLC, doir

Case No.: 2:22-cv-00642

## BILL OF COSTS

Judgment having been entered in the above entitled action on 11/7/2024 (*Date*) against 22-CV-642-JPS,

the Clerk is requested to tax the following as costs:

| | |
|---|---|
| Fees of the Clerk | $ 402.00 |
| Fees for service of summons and subpoena | 778.30 |
| Fees for printed or electronically recorded transcripts necessarily obtained for use in the case | 1,090.25 |
| Fees and disbursements for printing | 0.00 |
| Fees for witnesses *(itemize on page two)* | 0.00 |
| Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case. | 0.00 |
| Docket fees under 28 U.S.C. § 1923 | 0.00 |
| Costs as shown on Mandate of Court of Appeals | 0.00 |
| Compensation of court-appointed experts | 0.00 |
| Compensation of interpreters and costs of special interpretation services under 28 U.S.C. § 1828 | 0.00 |
| Other costs *(please itemize)* | 0.00 |
| TOTAL | $ 2,270.55 |

*SPECIAL NOTE:* Attach to your bill an itemization and documentation for requested costs in all categories.

### Declaration

I declare under penalty of perjury that the foregoing costs are correct and were necessarily incurred in this action and that the services for which fees have been charged were actually and necessarily performed. A copy of this bill has been served on all parties in the following manner:

☑ Electronic service ☐ First class mail, postage prepaid

☐ Other:

s/ Attorney: Daniel DeSouza

Name of Attorney: Daniel DeSouza

For: Prepared Food Photos, Inc. (*Name of Claiming Party*) Date: 4/18/2025

### Taxation of Costs

Costs are taxed in the amount of ______________ and included in the judgment.

*Clerk of Court* By: *Deputy Clerk* *Date*

# UNITED STATES DISTRICT COURT

| Witness Fees (computation, cf. 28 U.S.C. § 1821 for statutory fees) | | | | | | | |
|---|---|---|---|---|---|---|---|
| NAME , CITY AND STATE OF RESIDENCE | ATTENDANCE | | SUBSISTENCE | | TRAVEL | | Total Cost Each Witness |
| | Days | Total Cost | Days | Total Cost | Expenses/ Miles | Total Cost | |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | **TOTAL** | | $0.00 |

## NOTICE

**Section 1924, Title 28, U.S. Code (effective September 1, 1948) provides:**
"Sec. 1924. Verification of bill of costs."
"Before any bill of costs is taxed, the party claiming any item of cost or disbursement shall attach thereto an affidavit, made by himself or by his duly authorized attorney or agent having knowledge of the facts, that such item is correct and has been necessarily incurred in the case and that the services for which fees have been charged were actually and necessarily performed."

**See also Section 1920 of Title 28, which reads in part as follows:**
"A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree."

**The Federal Rules of Civil Procedure contain the following provisions:**
**RULE 54(d)(1)**

Costs Other than Attorneys' Fees.
Unless a federal statute, these rules, or a court order provides otherwise, costs — other than attorney's fees — should be allowed to the prevailing party. But costs against the United States, its officers, and its agencies may be imposed only to the extent allowed by law. The clerk may tax costs on 14 days' notice. On motion served within the next 7 days, the court may review the clerk's action.

**RULE 6**

(d) Additional Time After Certain Kinds of Service. When a party may or must act within a specified time after being served and service is made under Rule 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to), 3 days are added after the period would otherwise expire under Rule 6(a).

**RULE 58(e)**

Cost or Fee Awards:

Ordinarily, the entry of judgment may not be delayed, nor the time for appeal extended, in order to tax costs or award fees. But if a timely motion for attorney's fees is made under Rule 54(d)(2), the court may act before a notice of appeal has been filed and become effective to order that the motion have the same effect under Federal Rule of Appellate Procedure 4(a)(4) as a timely motion under Rule 59.

Print Save As Reset

AO 133 (Rev. 07/24) Bill of Costs

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

PREPARED FOOD PHOTOS, INC.
v.
SHARIF JABER and NOFAL, LLC, doir

Case No.: 2:22-cv-00642

## BILL OF COSTS

Judgment having been entered in the above entitled action on 11/7/2024 (*Date*) against 22-CV-642-JPS,

the Clerk is requested to tax the following as costs:

| | |
|---|---|
| Fees of the Clerk | $ 402.00 |
| Fees for service of summons and subpoena | 778.30 |
| Fees for printed or electronically recorded transcripts necessarily obtained for use in the case | 1,090.25 |
| Fees and disbursements for printing | 0.00 |
| Fees for witnesses *(itemize on page two)* | 0.00 |
| Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case. | 0.00 |
| Docket fees under 28 U.S.C. § 1923 | 0.00 |
| Costs as shown on Mandate of Court of Appeals | 0.00 |
| Compensation of court-appointed experts | 0.00 |
| Compensation of interpreters and costs of special interpretation services under 28 U.S.C. § 1828 | 0.00 |
| Other costs *(please itemize)* | 0.00 |
| TOTAL | $ 2,270.55 |

*SPECIAL NOTE:* Attach to your bill an itemization and documentation for requested costs in all categories.

### Declaration

I declare under penalty of perjury that the foregoing costs are correct and were necessarily incurred in this action and that the services for which fees have been charged were actually and necessarily performed. A copy of this bill has been served on all parties in the following manner:

☑ Electronic service ☐ First class mail, postage prepaid

☐ Other:

s/ Attorney: Daniel DeSouza

Name of Attorney: Daniel DeSouza

For: Prepared Food Photos, Inc. (*Name of Claiming Party*) Date: 4/18/2025

### Taxation of Costs

Costs are taxed in the amount of ______________________ and and included in the judgment.

______________________ By: ______________________ ______________
*Clerk of Court* *Deputy Clerk* *Date*

# UNITED STATES DISTRICT COURT

| Witness Fees (computation, cf. 28 U.S.C. § 1821 for statutory fees) | | | | | | | |
|---|---|---|---|---|---|---|---|
| NAME , CITY AND STATE OF RESIDENCE | ATTENDANCE | | SUBSISTENCE | | TRAVEL | | Total Cost Each Witness |
| | Days | Total Cost | Days | Total Cost | Expenses/ Miles | Total Cost | |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | **TOTAL** | $0.00 |

## NOTICE

**Section 1924, Title 28, U.S. Code (effective September 1, 1948) provides:**
"Sec. 1924. Verification of bill of costs."
"Before any bill of costs is taxed, the party claiming any item of cost or disbursement shall attach thereto an affidavit, made by himself or by his duly authorized attorney or agent having knowledge of the facts, that such item is correct and has been necessarily incurred in the case and that the services for which fees have been charged were actually and necessarily performed."

**See also Section 1920 of Title 28, which reads in part as follows:**
"A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree."

**The Federal Rules of Civil Procedure contain the following provisions:**
**RULE 54(d)(1)**

Costs Other than Attorneys' Fees.
Unless a federal statute, these rules, or a court order provides otherwise, costs — other than attorney's fees — should be allowed to the prevailing party. But costs against the United States, its officers, and its agencies may be imposed only to the extent allowed by law. The clerk may tax costs on 14 days' notice. On motion served within the next 7 days, the court may review the clerk's action.

**RULE 6**

(d) Additional Time After Certain Kinds of Service. When a party may or must act within a specified time after being served and service is made under Rule 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to), 3 days are added after the period would otherwise expire under Rule 6(a).

**RULE 58(e)**

Cost or Fee Awards:

Ordinarily, the entry of judgment may not be delayed, nor the time for appeal extended, in order to tax costs or award fees. But if a timely motion for attorney's fees is made under Rule 54(d)(2), the court may act before a notice of appeal has been filed and become effective to order that the motion have the same effect under Federal Rule of Appellate Procedure 4(a)(4) as a timely motion under Rule 59.

Print Save As... Reset

# ♦ L. JOHNS SERVICES ♦

**Bill for Service**

Client
Daniel De Souza Esq.
Copycat Legal PLLC
3111 North University Drive Suite 301
Coral Springs FL 33065

Date July 12, 2022________

Person Served: ______________________

Services

PREPARED FOOD PHOTOS, INC f/k/a ADLIFE MARKETING & COMMUNCATIONS CO INC

Case Number 2:22cv-642

VS

VILLARD FOODTOWN, LLC d/b/a FOODTOWN MART
3217 West Villard Street
Milwaukee WI 53209

Served at his home
8644 South River Terrance Dr
Franklin WI 53132

**Amount Due: $ 50.00**

---

**L. Johns Services**

230 East Oklahoma Ave
Milwaukee WI 53207

Phone: 414-236-1184
Fax: 414-483-6725
e-mail: lbjohns@att.net

Daughters
Reporting, Inc.
101 NE 3rd Avenue, Suite 1500 - Fort Lauderdale, FL 33301
Office 954.755.6401 - Fax 954.827.7778
daughtersreporting@gmail.com - daughtersreporting.com

# INVOICE

COPYCAT LEGAL PLLC
ATTN: Daniel DeSouza, Esq.
3111 N. University Drive, Suite 301
Coral Springs, FL 33065

**Invoice Number:** **315383**
Invoice Date: 09/28/2023

In Re: PREPARED FOOD PHOTOS, INC. f/k/a ADLIFE MARKETING & COMMUNICATIONS CO., INC. vs. NOFAL LLC d/b/a FOOD TOWN MART and SHARIF JABER
Case Number: 2:22-cv-00642-JPS
Witness(s): Sharif Jaber, Corporate Representative
Attendance Date: 09/26/2023, 1:00 p.m.
Reporter: Jamie Mackrell
Location: VIDEOCONFERENCE - via Zoom

| Description | Amount |
|---|---|
| **Deposition of Sharif Jaber** | |
| Attendance Fee via Zoom 1:00 - 2:26 p.m. | 190.00 |
| Original & One Copy - 60 pgs - 3-day dlvy | 528.00 |
| **Mini/Condensed transcript, no charge** | |
| **Transcript(s) emailed on 9/28/23** | |

Invoice Total: 718.00

**DAUGHTERS** HAS GONE **GREEN**!

Daughters Reporting works remotely and we are always available.
Email us for all your court reporter needs!!!

Thank you!

INVOICE DUE WITHIN 30 DAYS.
Tax ID: 46-4642885

*Please detach bottom portion and return with payment*

| | |
|---|---|
| Invoice Number: | 315383 |
| Invoice Date: | 09/28/2023 |
| Amount Due: | **$718.00** |
| Amount Enclosed: | $__________________ |

**CREDIT CARDS ACCEPTED**

VISA MasterCard American Express Cards

Cardholder`s Name:
Card Number:
Exp. Date: Phone:
Billing Address:
Zip: Security Code:
Signature:

**Swift Legal**
500 Allerton Street, Suite 105
Redwood City, CA 94063
(650) 364 9612
info@swiftlegal.com

# INVOICE

**BILL TO**
CopyCat Legal PLLC
3111 N University Dr Ste 301
Coral Springs, FL 33065
Attn: CopyCat Legal PLLC
Billing Code: Prepared Food Photos

**INVOICE #** 8370634
**DATE** 10/13/2023

| ACTIVITY | AMOUNT |
|---|---|
| **Service of Process, Routine, Urban Area**<br>Service of Process, Routine, Urban Area<br>Personally Served/Agent, 10/12/2023, Michelle Mok, Lead Securityauthorized To Accept<br>PARTY TO SERVE: Meta Platforms, Inc.<br>1601 Willow Rd, Menlo Park, CA 94025<br>Federal Subpoena To Produce Documents, Information, Or Objects Or To Permit Inspection Of Premises In A Civil Action | 80.00 |
| **Credit Card or ACH Processing Fee**<br>Payment Processing Fee | 2.40 |

PAID

BILLING CODE: Prepared Food Photos
CASE #: 222-cv-00642-JPS
CASE NAME: Prepared Food Photos, Inc. v. Nofal LLC

| | |
|---|---|
| SUBTOTAL | 82.40 |
| TAX | 0.00 |
| TOTAL | 82.40 |
| PAYMENT | 82.40 |
| BALANCE DUE | **$0.00** |

As of June 28, 2023 Swift Legal has a new billing system. All customers are asked to re-enter their payment information.
For more information on how to complete this, please visit www.swiftlegal.com/pricing

ATTORNEYS PROCESS SERVICE OF KANSAS, LLC
P.O. Box 781444
Wichita, KS 67278-1444
Phone: 316-634-0000 Fax: 855-WEFINDU

" Detection to Perfection "

| Date | Invoice # |
|---|---|
| 10/16/2023 | 20235339 |

Bill To

**COPYCAT LEGAL, PLLC**
**3111 N UNIVERSITY DR, SUITE 301**
**CORAL SPRINGS, FL 33065**

Member of National Assoc. of Professional Process Servers Since 1993

PLEASE RETURN THIS STUB WITH YOUR REMITTANCE. YOUR PAYMENT IS DUE UPON RECEIPT.

CLIENT: PREPARED FOOD PHOTOS. INC.

SHAWNEE COUNTY, KS
SPECIAL PROCESS SERVICE FEE: 100.00

SERVED: ASSOCIATED WHOLESALE GROCERS, INC.

C/O CT CORPORATION SYSTEM
AND ITS ADMIN. ASSISTANT
LINDSEY RALPH

AT: 112 SW 7TH ST, TOPEKA, KS

DATE AND TIME: OCTOBER 13, 2023 @ 2:28 P.M.

PAPERS: SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

*Thank you for the privilege of your business!* **Total $100.00**

Web Site www.kansasprocessservice.org E-mail dbranda@kansasprocessservice.org F.E.I.N. 45-4633030


PFP A24

South Shore Process Service
5970 S. Indiana Avenue
Cudahy, WI 53110

**INVOICE: 9762110**
Issued: Nov 13, 2023

**Copycat Legal, PLLC**
Efrosini Soula Cruz
3111 N. University Dr Suite 301
Coral Springs, FL 33065

PAY TO:
**South Shore Process Service**
**5970 S. Indiana Avenue**
**Cudahy, WI 53110**

| | | | |
|---|---|---|---|
| **Case:** | 2:22-cv-00642-JPS | **Plaintiff / Petitioner:** | Prepared Food Photos, Inc. |
| **Job:** | 9762110 | **Defendant / Respondent:** | Sharif Jaber, d/b/a Food Town Mart |

| Item | Description | Cost | Quantity | Total |
|---|---|---|---|---|
| Service of Process | Personal service to Amjad S. Hamed | $55.00 | 1 | $55.00 |
| Convenience Fee | Convenience Fee for Providing Company Check | $2.50 | 1 | $2.50 |
| Witness Fee Check | Provide Witness Fee Check For Client to Witness | $40.00 | 1 | $40.00 |

Net due upon receipt.

We now accept online payments through PayPal. Just go to:
paypal.me/southshoreprocess

Thank you for your business. We truly appreciate it.

Total: $97.50
Amount Paid: ($0.00)
**Balance Due: $97.50**

South Shore Process Service • 5970 S. Indiana Avenue, Cudahy, WI 53110

Call: 414-378-7693 • Email: southshoreprocess@gmail.com

Daughters
Reporting, Inc.
101 NE 3rd Avenue, Suite 1500 - Fort Lauderdale, FL 33301
Office 954.755.6401 - Fax 954.827.7778
daughtersreporting@gmail.com - daughtersreporting.com

# INVOICE

DESOUZA LAW
ATTN: Daniel Desouza, Esq.
3111 N. University Drive
Suite 301
Coral Springs, FL 33065

**Invoice Number:** **315997**
Invoice Date: 01/08/2024

In Re: PREPARED FOOD PHOTOS, INC. f/k/a ADLIFE MARKETING & COMMUNICATIONS CO., INC. vs. NOFAL LLC d/b/a FOOD TOWN MART and SHARIF JABER
Case Number: 2:22-cv-00642-JPS
Witness(s): Amjad S. Hamed
Attendance Date: 12/18/2023, 11:00 a.m.
Reporter: Jamie Mackrell
Location: VIDEOCONFERENCE - via Zoom

| Description | Amount |
|---|---|
| **Deposition of Amjad S. Hamed** | |
| Attendance Fee via Zoom 11:00 - 12:00 p.m. | 130.00 |
| Original & One Copy - 51 pgs | 242.25 |
| **Mini/Condensed transcript, no charge** | |
| **Transcript(s) emailed on 1/8/24** | |
| Invoice Total: | 372.25 |

**DAUGHTERS** HAS GONE **GREEN**!

Daughters Reporting works remotely and we are always available.
Email us for all your court reporter needs!!!

Thank you!

INVOICE DUE WITHIN 30 DAYS.
Tax ID: 46-4642885

*Please detach bottom portion and return with payment*

| | |
|---|---|
| Invoice Number: | 315997 |
| Invoice Date: | 01/08/2024 |
| Amount Due: | **$372.25** |
| Amount Enclosed: | $_________________ |

**CREDIT CARDS ACCEPTED**

Cardholder`s Name:

Card Number:

Exp. Date: Phone:

Billing Address:

Zip: Security Code:

Signature:

**South Shore Process Service**
5970 S. Indiana Avenue
Cudahy, WI 53110

**INVOICE: 11957493**
Issued: Oct 11, 2024

**Copycat Legal, PLLC**
Efrosini Soula Cruz
3111 N. University Dr Suite 301
Coral Springs, FL 33065

PAY TO:
**South Shore Process Service**
**5970 S. Indiana Avenue**
**Cudahy, WI 53110**

| | | | |
|---|---|---|---|
| **Case:** | 2:22-cv-00642-JPS | **Plaintiff / Petitioner:** | Prepared Food Photos, Inc. |
| **Job:** | 11957493 | **Defendant / Respondent:** | Sharif Jaber, d/b/a Food Town Mart |

| Item | Description | Cost | Quantity | Total |
|---|---|---|---|---|
| Witness Fee Check | Provide Witness Fee Check For Client to Witness | $60.90 | 1 | $60.90 |
| Convenience Fee | Convenience Fee for Providing Company Check | $2.50 | 1 | $2.50 |
| Rush Service | RUSH service requested by client | $40.00 | 1 | $40.00 |
| Service of Process | Personal service to Amjad S. Hamad | $55.00 | 1 | $55.00 |

Net due upon receipt.

We now accept online payments through PayPal. Just go to:
paypal.me/southshoreprocess

Thank you for your business. We truly appreciate it.

Total: $158.40
Amount Paid: ($0.00)
**Balance Due: $158.40**

**South Shore Process Service**
5970 S. Indiana Avenue
Cudahy, WI 53110

**INVOICE: 7567836**
Issued: Sep 8, 2022

**CopyCat Legal, PLLC**
Denise Sosa
3111 N University Dr
Coral Springs, FL 33065

PAY TO:
**South Shore Process Service**
**5970 S. Indiana Avenue**
**Cudahy, WI 53110**

| | | | |
|---|---|---|---|
| **Case:** | 2:22-cv-00642-JPS | **Plaintiff / Petitioner:** | Prepared Food Photos, Inc. |
| **Job:** | 7567836 | **Defendant / Respondent:** | Sharif Jaber, d/b/a Food Town Mart |

| Item | Description | Cost | Quantity | Total |
|---|---|---|---|---|
| Service of Process | Non-service to Sharif Jaber, d/b/a Food Town Mart - 6 attempts - Diligent - Willful evasion. | $55.00 | 1 | $55.00 |

| | | |
|---|---|---|
| Thanks for your business. Net due upon receipt. | Total: | $55.00 |
| | Amount Paid: | ($0.00) |
| | **Balance Due:** | **$55.00** |

South Shore Process Service • 5970 S. Indiana Avenue, Cudahy, WI 53110

Call: 414-378-7693 • Email: southshoreprocess@gmail.com

THE DAILY REPORTER

A Division of BridgeTower Media
P.O Box 745929
Atlanta, GA 30374-5929

| | |
|---|---|
| Invoice # | 745095370 |
| Invoice Date | 01/04/2023 |
| Customer | CopyCat Legal PLLC, ID: |
| Payment Terms | Net 30 |
| Due Date | 02/03/2023 |

**BILLING ADDRESS**
Denise Sosa
CopyCat Legal PLLC
3111 North University Drive Ste 301
Coral springs FL

**ADVERTISER**
CopyCat Legal PLLC, ID: 262503
3111 North University Drive Ste 301
Coral springs FL

| INVOICE REF | MEDIA | DATE | PO | EDITION | QTY | AD SIZE |
|---|---|---|---|---|---|---|
| 1006961122 | The Daily Reporter - Public Notice | 12/19/22 | | Legal - Statutory | 1 | Legal - Statutory Notices - |
| 1006966943 | The Daily Reporter - Public Notice | 12/27/22 | | Legal - Statutory | 1 | Legal - Statutory Notices - |
| 1006971962 | The Daily Reporter - Public Notice | 01/03/23 | | Legal - Statutory | 1 | Legal - Statutory Notices - |

Thank you for your business!
IOID: 2457596
Index: Individual and Family
Category: Civil Suits
Affidavit Reference: 2:22-cv-00642-JPS

| | |
|---|---|
| **Subtotal** | $235.00 |
| **Tax** | $0.00 |
| **Credits** | $0.00 |
| **BALANCE DUE** | $235.00 |

REMITTANCE STUB TO BridgeTower Media

| | | | | | |
|---|---|---|---|---|---|
| **Invoice #** | 745095370 The Daily Reporter - Public Notice | **Date** | 02/03/2023 | **Customer ID** | ID: 262503, CopyCat Legal PLLC |
| **Amount Enclosed:** | | | | | |

Acceptable Payment Methods

**PREFERRED METHOD**
**To Pay by ACH Transfer:**
Bank: Bank of America
Send ACH remittance email to
ar@bridgetowermedia.com
Account Number: 237025443017
Routing: 053000196

**OTHER METHODS**
**To Pay by Check use the following address:**
Please include invoice number on check
BridgeTower OpCo, LLC
P.O Box 745929
Atlanta, GA 30374-5929

**To Pay by Credit Card:**
Use the Click to Pay Online link located
on the email you received or Contact
Accounts Receivable: 866-802-8214
Please have your Invoice Number
and Credit Card Number Ready

**To Pay by Wire Transfer:**
Name: BridgeTower OpCo, LLC
Bank: Bank of America
Swift Code: BOFAUS3N
Bank Address: 100 North Tryon Street
Charlotte, NC 28255
Account Number: 237025443017
Routing: 053000196

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

Case No. 2:22-cv-00642-JPS

PREPARED FOOD PHOTOS, INC. f/k/a
ADLIFE MARKETING &
COMMUNICATIONS CO., INC.,

Plaintiff,

v.

NOFAL LLC d/b/a FOOD TOWN MART and
SHARIF JABER,

Defendants.

## INTRODUCTION

Plaintiff Prepared Food Photos, Inc. f/k/a Adlife Marketing & Communications Co., Inc. ("Plaintiff") is the prevailing party in this action. Following a jury trial, Plaintiff received a verdict in its favor on its claim for copyright infringement against defendant Nofal LLC d/b/a Food Town Mart ("Nofal LLC"). Pursuant to the Copyright Act, the Court "may" award attorneys' fees to the prevailing party (Plaintiff) if the relevant factors support such an award. As set forth herein, attorneys' fees should be granted.

## BACKGROUND

### *A. Events Leading to Lawsuit / Nofal LLC and Mr. Jaber as Defendants*

1. As the Court knows, this lawsuit concerns Nofal LLC's unauthorized display of a copyrighted photograph (the "Work") on Nofal LLC's alleged Facebook page.

2. Nofal LLC owns and operates a full-line grocery store located at 3217 W. Villard


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

Avenue, Milwaukee, WI 53209 under the trade name "Food Town Mart" and/or "Foodtown Mart.[1]

3. Defendant Sharif Jaber ("Mr. Jaber") is the manager, sole member, and person with exclusive control over the business activities of Nofal LLC.[2]

4. On November 22, 2021, Plaintiff (through counsel) sent a pre-suit letter to "Villard Foodtown, LLC" (the entity Plaintiff believed at the time to own the grocery store) with respect to the alleged infringement of the Work.[3]

5. On January 20, 2021, Plaintiff's counsel spoke telephonically with Mr. Jaber who denied that his store ever used the Work and further denied that his grocery store had any affiliation with/control over the Facebook page at issue.[4]

6. After the original Complaint was filed, Plaintiff's counsel interacted with an attorney for Villard Foodtown, LLC (which was determined to be the property owner rather than operator of the grocery store) which led to Plaintiff amending the Complaint to name Mr. Jaber (individually) as the defendant.[5]

7. After Mr. Jaber avoided service for several months (leading to Plaintiff seeking and receiving leave to serve him by publication), Plaintiff's counsel received a call from Timothy Steinle, Esq. (Defendants' counsel throughout this lawsuit) who informed that Nofal LLC was the

---

[1] See Deposition Transcript of Sharif Jaber, dated September 26, 2023 (the "Jaber Tr."), a true and correct copy of which is attached hereto as Exhibit "A," at 7:22 – 8:21.

[2] Id. at 8:4 – 8:18; 17:4 – 17:20.

[3] See Declaration of Daniel DeSouza, Esq., dated April 21, 2025 (the "DeSouza Decl."), a true and correct copy of which is attached hereto as Exhibit "B," at ¶ 3.

[4] Id. at ¶ 4.

[5] Id. at ¶¶ 6 – 8.


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

actual owner of the grocery store.[6] Plaintiff then filed its Second Amended Complaint [D.E. 19] (the governing pleading) on February 7, 2023.

***B. Nofal LLC Denies Infringement in its Answer***

8. The Second Amended Complaint contains multiple allegations with respect to Nofal LLC's alleged unauthorized display of the Work. As set forth below, Nofal LLC denied each of these allegations in its Answer [D.E. 21] to the Second Amended Complaint:

> 18. On September 28, 2020 (after Plaintiff's above-referenced copyright registration of the Work), NOFAL LLC published the Work on its business Facebook page (at https://www.facebook.com/villardfoodtown/photos/pcb.2818903505099367/2818895218433529 /https://iliria-foods.business.site/ - testimonials) in connection with the marketing of its business:
>
> 18. These answering defendants deny the allegations contained within paragraph 18 of the plaintiff's Second Amended Complaint.
>
> 29. NOFAL LLC reproduced, distributed, and publicly displayed the Work without authorization from Plaintiff.
>
> 29. These answering defendants deny the allegations contained within paragraph 29 of the plaintiff's Second Amended Complaint.

6 Id. at ¶¶ 9 – 10.


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

30. By his actions, NOFAL LLC infringed and violated Plaintiff's exclusive rights in violation of the Copyright Act, 17 U.S.C. § 501, by reproducing, distributing, and publicly displaying the Work for its own commercial purposes.

30. These answering defendants deny the allegations contained within paragraph 30 of the plaintiff's Second Amended Complaint.

9. Nofal LLC did not move to amend its Answer throughout the entirety of this lawsuit.

***C. Nofal LLC Continues to Deny Infringement in Discovery***

10. Given Nofal LLC's denials with respect to both the Facebook page and the infringement thereon, Plaintiff served written discovery (requests for production, interrogatories, and requests for admissions) on Nofal LLC on June 28, 2023.[7]

11. Importantly, each of the foregoing discovery requests contains the defined term "Facebook Page" meaning "the Facebook page located at https://www.facebook.com/villardfoodtown."

12. On or about August 17, 2023, Nofal LLC served its responses to Plaintiff's discovery requests.[8]

13. As with its Answer to the Second Amended Complaint, Nofal LLC's responses to

[7] A true and correct copy of Plaintiff's First Set of Interrogatories to Nofal LLC is attached hereto as Exhibit "C." A true and correct copy of Plaintiff's First Request for Admissions to Nofal LLC is attached hereto as Exhibit "D."

[8] A true and correct copy of Nofal LLC's responses to Plaintiff's First Set of Interrogatories is attached hereto as Exhibit "E." A true and correct copy of Nofal LLC's responses to Plaintiff's First Request for Admissions is attached hereto as Exhibit "F."

the First Set of Interrogatories (which are notarized and signed by Mr. Jaber) deny any use of the Work and further deny any affiliation with the Facebook page:

2. Identify each and every commercial use of the Work by you and, if such use involves publishing or displaying the Work on the Website, the Facebook Page, and/or any other social media page controlled by you, identify each sub-page thereof on which the Work was published and/or displayed.

ANSWER NO. 2: NOFAL LLC did not use the Work commercially on any social media page.

3. Identify all websites and/or social media pages controlled by you (including any websites and/or social media pages you have disabled, discontinued, and/or removed from public view).

ANSWER NO. 3: Food Town Mart and/or NOFAL LLC has never had a website and has never had any social media pages.

14. Nofal LLC's responses to the First Request for Admissions likewise denies the same matters:

8. Admit that the Facebook Page is controlled by NOFAL LLC.

Response 8: Deny that the Villard Foodtown Facebook page is controlled by NOFAL LLC.

9. Admit that, as of September 28, 2020, the Work was displayed on NOFAL LLC's Facebook Page.

Response 9: Deny that the Work was displayed on NOFAL LLC's Facebook page.

10. Admit that NOFAL LLC caused the Work to be displayed on its Facebook Page.

Response 10: Deny that NOFAL LLC caused the Work to be displayed on Villard Foodtown's Facebook page.



COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

12. Admit that NOFAL LLC published and/or displayed the Work on the Facebook Page.

Response 12: Deny that NOFAL LLC published and/or displayed The Work on Villard Foodtown's Facebook page.

15. Admit that the Facebook Page is utilized to market and/or advertise NOFAL LLC's business.

Response 15: Deny that the Villard Foodtown Facebook page is utilized to market and/or advertise NOFAL LLC's business.

16. Admit that the Work was displayed on the Facebook Page in connection with NOFAL LLC's efforts to market its business.

Response 16: Deny that the Work was displayed on Villard Foodtown's Facebook page in connection with NOFAL LLC's efforts to market its business.

15. Given Nofal LLC's continued refusal to acknowledge the Facebook page and/or its infringement, Plaintiff on August 21, 2023 served a Notice of Taking Deposition of the Corporate Representative of Nofal LLC d/b/a Food Town Mart (the "30(b)(6) Notice").[9]

16. As the Court knows, a corporate party "has a duty to make a good faith, conscientious effort to designate appropriate persons and to prepare them to testify fully and non-evasively about the subjects" identified in a Rule 30(b)(6) notice. Seaga Mfg. Inc. v. Intermatic Mfg. Ltd., No. 13-cv-50041, 2013 U.S. Dist. LEXIS 97903, 2013 WL 3672964, at *2 (N.D. Ill. July 12, 2013); see also Smithkline Beecham Corp. v. Apotex Corp., No. 98-cv-3952, 2000 U.S. Dist. LEXIS 667, 2000 WL 116082, at *8 (N.D. Ill. Jan. 24, 2000) ("Rule 30(b)(6) imposes

[9] A true and correct copy of the 30(b)(6) Notice of attached hereto as Exhibit "G."


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

a duty upon the named business entity to prepare its selected deponent to adequately testify not only on matters known by the deponent, but also on subjects that the entity should reasonably know.”).

17. Thus, whether Nofal LLC’s designee had personal knowledge about the matters identified in the 30(b)(6) Notice, it was required to adequately prepare and seek relevant information from others.

18. The bulk of the topics identified in the 30(b)(6) Notice pertain directly to the Facebook page and the circumstances by which the Work came to be displayed thereon. For example, the following topics are all included in the 30(b)(6) Notice:

1. The identity of the person purportedly responsible for uploading the Work to the Facebook Page and/or Website.

2. The relationship (if any) between Defendants and the person purportedly responsible for uploading the Work to the Facebook Page and/or the Website.

7. The factual circumstances by which the Work came to be published on the Facebook Page and/or the Website.

19. On September 26, 2023, Mr. Jaber appeared for deposition as the Rule 30(b)(6) designee of Nofal LLC on ***all*** topics identified in the 30(b)(6) Notice.[10]

20. Despite being the owner of Nofal LLC since 2017,[11] Mr. Jaber repeatedly testified

---

[10] See Jaber Tr., at 8:25 – 9:20.

[11] Id. at 11:8 – 11:10.


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

in his deposition that Nofal LLC/Food Town Mart ***does not*** have a Facebook page, that the Facebook Page is ***not*** controlled by Nofal LLC, that the photographs thereon depicting the store were apparently some other location he was not familiar with, and that the assortment of products displayed thereon (such as hookahs and speakers) were ***never*** sold in the store.[12] Mr. Jaber testified that he is at the Food Town Mart store at least 5 days per week consistently since 2017 and knows what is happening at and inside the store.[13]

21. Mr. Jaber's testimony was, to put it mildly, far-fetched. Despite being shown dozens (if not hundreds) of photographs/videos on the Facebook page depicting the inside of his store and/or products purportedly being sold therein,[14] Mr. Jaber maintained not only that the Facebook page was not for his store but that the shelving, signs, etc. depicting the inside of the store were unequivocally some other store and not his. He denied selling hookahs, speakers, etc. – all of which were prominently displayed on the Facebook page as being sold at the Food Town Mart store.

22. Mr. Jaber's testimony was so absurd that, almost immediately after the deposition on September 26, 2023, Plaintiff's counsel called Mr. Steinle (Defendants' counsel) to raise what appeared to be hours of perjury by Mr. Jaber. In response, Mr. Steinle stated (with such quote being memorialized in undersigned counsel's case management software immediately following

---

[12] Id. at 14:19 – 14:21; 15:1 – 15:2; 19:20 – 19:25; 22:20 – 23:4; 25:24 – 26:19; 30:14 – 31:2; 31:18 – 31:22; 31:23 – 32:8; 32:21 – 32:3; 33:22 – 34:7; 34:19 – 34:25.

[13] Id. at 45:21 – 46:7.

[14] A true and correct copy of a screenshot of the 'photos' tab of the Nofal LLC Facebook page (available at https://www.facebook.com/villardfoodtown/photos_by) is attached as Exhibit H hereto.

the call): "Dan, I'm an old fuck. And even I knew what was happening with his answers."[15]

23. On December 18, 2023, Plaintiff took the deposition of Amjad Hamed (Mr. Jaber's son), who was identified in response to a subpoena to Meta Platforms, Inc. (Facebook) for production of documents identifying the subscriber information/owner of the Facebook Page.[16]

24. At the time, Mr. Hamed lived with his parents, one of which is Mr. Jaber.[17] Mr. Hamed had worked for Food Town Mart for the last 3 years.[18] He was employed as Food Town Mart's "floor manager," meaning that he was in charge of ordering, in charge of opening the store, closing the store, and making sure everything is in order.[19]

25. Contrary to his father's testimony, Mr. Hamed testified that Food Town Mart ***does*** have a Facebook page and that he is the person in charge thereof, with his brother (Nofal) running the Facebook Page prior to Mr. Hamed taking over.[20] Mr. Hamed testified that he was the person who created the subject September 28, 2020 posting on the Facebook Page which utilized the Work to advertise the sale of pork chops.[21]

26. Mr. Hamed testified (contrary to Mr. Jaber's testimony) that Food Town Mart does sell hookahs and that the photographs of such on the Facebook Page were hookahs being sold in

---

15 See DeSouza Decl., at ¶¶ 12 – 13.

16 A true and correct copy of the deposition transcript of Amjad Hamed, dated December 18, 2023 (the "Hamed Tr.") is attached hereto as Exhibit "I."

17 See Hamed Tr., at 6:13 – 6:14.

18 Id. at 7:22 – 8:11.

19 Id. at 9:24 – 10:4.

20 Id. at 10:23 – 11:23; 15:1 – 15:16; 19:10 – 19:20.

21 Id. at 21: 19 – 22:21.


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

the store.[22] Mr. Hamed likewise testified that (again contrary to Mr. Jaber's testimony) that Food Town Mart does sell speakers and that the photographs of such on the Facebook Page were speakers being sold in the store.[23] He likewise testified (again contrary to Mr. Jaber's testimony) that the signs/shelves depicted in the photographs/videos on the Facebook page were from within the Food Town Mart store.[24] Indeed, Mr. Hamed confirmed that ***all*** of the postings on the Facebook Page depict or relate to items for sale at the Food Town Mart store or were otherwise promoting the store.[25]

27. Perhaps most interestingly, Mr. Hamed testified that Mr. Jaber was aware that Mr. Hamed was running Food Town Mart's Facebook Page:

> Q. Was your father aware that you were running the Facebook account for the store?
> A. Yes, sir.[26]

28. As indicated by the Hamed Tr., Mr. Steinle (Defendants' counsel) attended the deposition on behalf of Defendants.

29. Despite Mr. Hamed's testimony/admissions, Nofal LLC never amended the denials in its Answer and never amended its responses to the First Set of Interrogatories/First Request for Admissions.[27]

---

22 Id. at 31:19 – 32:8; 34:2 – 34:13; 36:23 – 38:1; 38:4 – 38:18.

23 Id. at 41:16 – 42:4.

24 Id. at 37:20 – 38:1.

25 Id. at 42:19 – 45:4.

26 Id. at 45:18 – 45:20.

27 See DeSouza Decl., at ¶ 14.


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

30. Nor did Nofal LLC, at any time pre-suit or during the course of this lawsuit, ever offer $.01 to resolve the alleged infringement at issue herein. Although Plaintiff made several settlement demands throughout the lawsuit, Mr. Steinle was never given authority by Nofal LLC to make any offer to resolve this matter.[28]

## ARGUMENT

### I. Legal Standard

#### *A. Fees Under the Copyright Act*

The Copyright Act explicitly provides that the Court may award "reasonable attorneys' fees" to the prevailing party. 17 U.S.C. § 505. A prevailing party is one who has "succeed[ed] on any significant issue in the litigation which achieves some of the benefit the parties sought in bringing suit." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983) (quoting Nadeau v. Helgemoe, 581 F.2d 275, 278–79 (1st Cir. 1978)). "The Supreme Court has held that a prevailing plaintiff under a statute so worded 'should ordinarily recover an attorney's fee unless special circumstances would render such award unjust.'" WB Music Corp. v. Royce Int'l Broad. Corp., 2018 U.S. Dist. LEXIS 227743, at *4 (C.D. Cal. July 9, 2018) (citing Hensley, 461 U.S. at 429).

"Four nonexclusive factors guide a district court's decision whether to award a prevailing party its fees: (1) the frivolousness of the suit; (2) the losing party's motivation for bringing or defending against a suit; (3) the objective reasonableness of the claims advanced by the losing party; and (4) the need to advance considerations of compensation and deterrence." Live Face on Web, LLC v. Cremation Soc'y of Illinois, Inc., 77 F.4th 630, 631 (7th Cir. 2023) (citing Fogerty

[28] Id. at ¶ 15.


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

v. Fantasy, Inc., 510 U.S. 517, 534 n.19 (1994)). The Seventh Circuit has explained that this list of factors is not exclusive, nor is any one factor determinative. See Timothy B. O'Brien LLC v. Knott, 962 F.3d 348, 350-51 (7th Cir. 2020). Rather, what matters is that the court be "sensitive to the facts before it," and the court may "consider any factor that advances the Copyright Act's purposes," as long as it applies those factors equally to plaintiffs and defendants alike. See Live Face on Web, LLC, 77 F.4th at 631.

***B. Fees Under Fed. R. Civ. P. 37(c)(2)***

Fed. R. Civ. P. 37(c)(2) provides that:

> If a party fails to admit what is requested under Rule 36 and if the requesting party later proves… the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that proof. The court must so order unless:
>
> (A) the request was held objectionable under Rule 36(a);
>
> (B) the admission sought was of no substantial importance;
>
> (C) the party failing to admit had a reasonable ground to believe that it might prevail on the matter; or
>
> (D) there was other good reason for the failure to admit.

"If a party believes a response to a request to admit is incorrect, the appropriate remedy under Rule 26 is to prove the matter at trial, and then apply to the court for reasonable expenses, including reasonable attorney fees, in making that proof." Climco Coils Co. v. Siemens Energy & Automation, Inc., No. 04 C 50342, 2006 U.S. Dist. LEXIS 19796, at *5 (N.D. Ill. Mar. 28, 2006).


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

## II. Plaintiff Should Recover Its Attorneys' Fees Under the Copyright Act

### *A. Plaintiff Prevailed on its Infringement Claim*

As a threshold issue, there is no question that Plaintiff prevailed on its infringement claim against Nofal LLC. Following a trial, the jury determined that Nofal LLC infringed upon the copyrighted material of Plaintiff, and awarded either $200.00 in actual damages or $1,000.00 in statutory damages (for which Plaintiff elected actual damages as it intended to pursue a motion for new trial). Although Plaintiff did not receive the damages award it intended, this was a total victory whereby Plaintiff succeeded on its claim against Nofal LLC and succeeded on Nofal LLC's affirmative defenses. See, e.g., Glacier Films (USA), Inc. v. Turchin, 896 F.3d 1033, 1038 (9th Cir. 2018) (holding that plaintiff achieved "total success," and that plaintiff's "complete victory" should have weighed in favor of granting fees). "Actual success in an infringement action involves establishing the defendant's liability." Id. at 1038 – 1039 (holding that $750.00 award to plaintiff was not relevant to whether plaintiff was entitled to fees as plaintiff unquestionably prevailed on liability under the Copyright Act); see also Stross v. NextLuxuryDotCom LLC, No. 2:21-cv-01181-JVS (AFMx), 2022 U.S. Dist. LEXIS 40271, at *8 (C.D. Cal. Feb. 3, 2022) ("[H]is suit against Cornwell was a success because the Court found that Cornwell infringed Stross's copyright. This amounts to 'actual success' in an infringement action."); Harrington v. Dugar, No. 2:22-cv-08230-HDV-E, 2024 U.S. Dist. LEXIS 155470, at *4-5 (C.D. Cal. Aug. 27, 2024) ("Defendant contends that Plaintiff obtained a limited degree of success because the jury did not find that Defendant's conduct was willful and because the damages award was lower than Plaintiff's prior requests. Nevertheless, Plaintiff established Defendant's liability and succeeded


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

in obtaining a jury award in her favor. This factor favors awarding fees.") (internal citations omitted).

### *B. Frivolity/Motivations/Objective Reasonableness*

The Supreme Court has unanimously endorsed "giving substantial weight to the objective (un)reasonableness of a losing party's litigating position." Kirtsaeng v. John Wiley & Sons, Inc., 579 U.S. 197, 205–08 (2016). Doing so "encourages parties with strong legal positions to stand on their rights and deters those with weak ones from proceeding with litigation." Id. at 205. This approach promotes the Copyright Act's purposes because it recognizes that "[t]he holder of a copyright that has obviously been infringed has good reason to bring and maintain a suit" and "the infringer with no reasonable defense has every reason to give in quickly, before each side's litigation costs mount." Id.

Here, an award of attorneys' fees is warranted where Nofal LLC forced this case to trial by taking wholly indefensible positions over and over and refused to accept its liability for infringement through trial. This ***should not*** have been a difficult case – there was no question that the Facebook page at issue contained dozens of photographs/videos from inside Nofal LLC's store, dozens of weekly ads, etc. There was likewise no question that Nofal LLC did not have a license to display the Work on the Facebook page or otherwise. That Mr. Jaber (the owner of Nofal LLC) purportedly failed to conduct ***any*** inquiry – reasonable or not – as to whether the Facebook page was being run by his adult children (themselves managers of the store) or any of his other handful of employees, is what led to this action being litigated until trial when Mr. Jaber finally admitted (2+ years later) that the Facebook page belonged to Nofal LLC. As the Court knows, "Rule 11 requires litigants to reasonably inquire into the law and facts before making legal and factual


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

contentions in a pleading or motion." White v. Brenner, No. 6:10-cv-134-Orl-28GJK, 2010 U.S. Dist. LEXIS 139294, at *5 (M.D. Fla. Dec. 15, 2010)

As set forth herein, Nofal LLC failed to conduct any inquiry into the facts – whether at the pleading stage, in responding to Plaintiff's discovery requests, or in preparing for its Rule 30(b)(6) deposition at which it ***repeatedly*** testified that the photographs/videos displayed on the Facebook page were not Nofal LLC's store (notwithstanding that Mr. Jaber works there 5 – 7 days a week, 8 hours/day). Throughout this lawsuit, Plaintiff provided Nofal LLC with every opportunity to simply admit that the Facebook page belonged to Nofal LLC and therefore admit infringement. Nofal LLC failed to do so at every turn. Even after Mr. Jaber's son (Amjad Hamed) unequivocally admitted Nofal LLC's ownership of the Facebook page, Nofal LLC ***never*** amended its pleading, interrogatory responses, or responses to Plaintiff's requests for admissions – ***all*** of which denied Nofal's ownership of the Facebook page and/or display of the Work thereon. Nofal LLC forced Plaintiff to proceed to trial to prove its claim and, only then, Mr. Jaber casually testified that yes, the Facebook page belonged to Nofal LLC.

Nofal LLC had every opportunity to simply admit to its infringement and submit the matter to the Court/jury for a determination of damages. Rather than do so, Nofal LLC concocted a story that it never had any factual or legal support for and which necessitated extensive amounts of discovery/expense to disprove. This factor ***strongly*** supports an award of fees. See, e.g., Werner v. Evolve Media, LLC, No. 2:18-cv-7188-VAP-SKx, 2020 U.S. Dist. LEXIS 126587, at *5 (C.D. Cal. June 22, 2020) (finding defendants' litigation positions to be unreasonable where they advanced defenses that were without factual or legal basis); WB Music Corp., 2018 U.S. Dist. LEXIS 227743, at *8 (holding a litigant objectively unreasonable where it continues to pursue a

claim when it "knew or should have known that the chance of success was slim to none"); Alchemist Evolution, LLC v. Smash, Inc., 2011 U.S. Dist. LEXIS 168346, at *3 (C.D. Cal. Mar. 1, 2011) (holding defendant acted unreasonably where it dragged out litigation by asserting meritless defenses).

Nor can the Court question Plaintiff's motivation in both bringing this lawsuit and proceeding to verdict. As the owner of the copyrighted work, Plaintiff had every right under the Copyright Act to bring an infringement action against an entity (Nofal LLC) that refused to acknowledge its infringement or even engage with Plaintiff pre-suit. See, e.g., Sadowski v. Shivley, 2019 U.S. Dist. LEXIS 208871, at *2 (D. Or. Dec. 4, 2019) ("Plaintiff is a professional photographer and the case was motivated, at least in part, by the need to protect his livelihood."); Star Fabrics, Inc. v. Millenium Clothing, Inc., 2015 U.S. Dist. LEXIS 182206, at *7–8 (C.D. Cal. Mar. 31, 2015) (fees warranted where there was no indication that the suit was brought maliciously, and plaintiff attempted to settle the case but defendant remained stubborn).

***C. The Need for Compensation and Deterrence***

"[C]ourts have viewed 'compensation and deterrence' as recognizing 'parties that must defend themselves against meritless claims' should be compensated while 'non-meritorious lawsuits' should be deterred." Great Am. Duck Races Inc. v. Kangaroo Mfg., No. CV-17-00212-PHX-ROS, 2019 U.S. Dist. LEXIS 202145, at *9 (D. Ariz. Nov. 21, 2019) (quoting Perfect 10, Inc. v. Giganews, Inc., No. CV 11-07098-AB SHX, 2015 U.S. Dist. LEXIS 53681, 2015 WL 1746484, at *12 (C.D. Cal. Mar. 24, 2015)).

Here, Nofal LLC's denials of liability/denials that it owned the Facebook page were meritless. Although Nofal LLC should have recognized this from the get-go, Plaintiff was forced


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

to bring this matter all the way to trial before it suddenly (and without warning) changed course and admitted its ownership of the Facebook page/display of the Work thereon. Here, an award of fees is needed to both encourage copyright owners to bring legitimate actions to enforce their rights (as no copyright owner would risk 2+ years of litigation for a $200.00 or $1,000.00 award) and to deter defendants (such as Nofal LLC) from continuing to proffer reckless assertions/defenses throughout a lawsuit/delaying proceedings.

### *D. Awarding Plaintiff Fees Would Promote the Appropriate Enforcement of Rights by Copyright Holders*

"Fee awards under § 505 should encourage the types of lawsuits that promote" the purposes of the Copyright Act. Kirtsaeng, 579 U.S. at 204. Plaintiff's enforcement efforts served a critical purpose of 17 U.S.C. § 505, which is to encourage copyright owners to enforce their rights. See, e.g., Lanard Toys Ltd. v. Dimple Child. LLC, 2020 U.S. Dist. LEXIS 128018, at *5 (C.D. Cal. May 4, 2020) (courts should remain "faithful to the purposes of the Copyright Act," which was intended to "discourage infringement and enrich the public through access to creative works."); Glacier Films (USA), Inc., 896 F.3d at 1041 ("Inherent in the Act's purpose is that 'a copyright holder has always had the legal authority to bring a traditional infringement suit against one who wrongfully copies.'") (quoting MGM Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 963 (2005)).

The "primary objective of the Copyright Act is to encourage the production of original literary, artistic, and music expression for the good of the public." Fogerty v. Fantasy, Inc., 510 U.S. 517, 524 (1994). That incentive is whittled away when parties such as Nofal LLC can drag out a lawsuit for years without being held accountable for their actions. If the Court does not award fees here, parties such as Plaintiff will be discouraged from pursuing legitimate claims when faced with an antagonistic infringer that makes wild/unsupported denials. The damages award in


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

this case pales in comparison to the amount of fees and costs that were incurred on Plaintiff's behalf in rebuffing Nofal LLC's denials. No plaintiff would invest the time and resources necessary to take a case to trial when the damages award is several factors less than the fees necessary to secure a favorable verdict.

**III. Plaintiff Should Recover its Attorneys' Fees for Nofal LLC's Failure to Admit**

Even if the Court was not inclined to award fees under the Copyright Act, the Court must award fees for Nofal LLC's failure to admit a multitude of Plaintiff's requests for admissions, unless the Court finds some good reason for the failure to admit. Here, even if Nofal LLC had a good reason to doubt the Facebook page was its own store (it did not), the fact remains that, after Mr. Hamed testified, there could not possibly be a good reason for Nofal LLC to maintain its denials. Mr. Hamad – who is both Mr. Jaber's son and the Nofal LLC floor manager – unequivocally testified that the Facebook page belonged to Nofal LLC, that the Work was displayed thereon by him, that the various photographs were of the store, etc. Other than continuing to delay these proceedings, there was no reason for Nofal LLC to maintain its denials at that point. Further, even going back to the date Nofal LLC's responses were served, Mr. Jaber's testimony makes clear that – if he was not perjuring himself throughout his deposition – he did ***nothing*** to investigate the Facebook page or discuss its contents with his employees (including his sons). These circumstances certainly justify an award of fees under Rule 37 in the full amount of fees Plaintiff was forced to incur from the date of service of the responses through trial.

**IV. The Attorneys' Fees Sought by Plaintiff are Reasonable**

Once it is determined that a fee award is appropriate, a court must then determine whether the fees requested are reasonable. To calculate reasonable attorneys' fees, courts generally use the

"lodestar" method by multiplying a reasonable rate by the hours reasonably expended. Johnson v. GDF, Inc., 668 F.3d 927, 929 (7th Cir. 2012). In determining a reasonable hourly rate, the prevailing party is presumptively entitled to the rate charged by and paid to its counsel. Gusman v. Unisys Corp., 986 F.2d 1146, 1150 (7th Cir. 1993); see also People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205, 90 F.3d 1307, 1310 (7th Cir. 1996) ("The attorney's actual billing rate for comparable work is presumptively appropriate to use as the market rate."). "The Court uses the lodestar method to calculate a reasonable fee, even where the attorney has a contingency fee agreement." McKinney v. Chi. Transit Auth., No. 20 C 6093, 2023 U.S. Dist. LEXIS 139556, at *3 (N.D. Ill. Aug. 10, 2023) (citing Pickett v. Sheridan Health Care Ctr., 664 F.3d 632, 639 (7th Cir. 2011)).

***A. The Rates of Plaintiff's Counsel are Reasonable***

A reasonable hourly rate is "one that is derived from the market rate for the services rendered." Pickett, 664 F.3d at 640 (internal quotation marks omitted). The Seventh Circuit has recognized the difficulty of determining the hourly rate of an attorney who uses contingent fee agreements and has advised district courts to rely on the "next best evidence," namely "evidence of rates similarly experienced attorneys in the community charge paying clients for similar work and evidence of fee awards the attorney has received in similar cases." Spegon v. Catholic Bishop of Chi., 175 F.3d 544, 555 (7th Cir.1999). Once an attorney provides evidence of his billing rate, the burden shifts to the defendant to present evidence establishing "a good reason why a lower rate is essential." People Who Care, 90 F.3d at 1313.

Plaintiff's counsel, CopyCat Legal PLLC ("CopyCat Legal") is a boutique intellectual property law firm with its principal offices in Florida, and its attorneys are skilled litigators with


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

many years of relevant experience.[29] Mr. DeSouza (CopyCat Legal's principal) has been practicing law since 2004 and is admitted to numerous state (Florida, New York, District of Columbia, New Jersey, and Pennsylvania) and federal courts (including three (3) courts of appeal and approximately twenty (20) district courts) across the country, has served as lead counsel in more than 500 commercial litigation and/or intellectual property lawsuits in federal district courts in numerous states/jurisdictions, and has likewise served as lead counsel in multiple state and federal jury/non-jury trials.[30]

CopyCat Legal establishes standard hourly rates, *consistent with the South Florida market*, for services provided by its attorneys.[31] Throughout this lawsuit, Mr. DeSouza's standard hourly rate was $450.00 - $500.00.[32] These rates are more than reasonable when compared to hourly rates awarded by courts in the Seventh Circuit for attorneys of similar levels of experience when accounting for inflation. See, e.g., Moffat v. Acad. of Geriatric Physical Therapy, No. 15-cv-626-jdp, 2017 U.S. Dist. LEXIS 152489 (W.D. Wis. Sep. 20, 2017) (in copyright infringement action, finding $540 rate which later increased to $580 reasonable for senior partner); Forest River, Inc. v. inTech Trailers, Inc., No. 3:21cv645 DRL, 2024 U.S. Dist. LEXIS 169207, at *19 (N.D. Ind. Sep. 19, 2024) (finding $595.14 blended rate for partners reasonable); Berglund v. Matthews Senior Hous. LLC, No. 21-cv-108-pp, 2024 U.S. Dist. LEXIS 32044, at *12 (E.D. Wis. Feb. 26, 2024) (approving $450 per hour rate for contingency class representation); Cooper v. InvestiNet, LLC, Civil Action No. 1:21-cv-01562-TWP-DML, 2022 U.S. Dist. LEXIS 76982, at *4 (S.D. Ind.

---

29 See DeSouza Decl., at ¶ 21.

30 Id. at ¶¶ 17 – 18.

31 Id. at ¶ 22.

32 Id. at ¶ 25.


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

Apr. 14, 2022) (finding rate of $500 per hour for attorney with 16 years of experience to be reasonable); Russell v. Walmart Inc., No. CV 19-5495-MWF (JCx), 2024 U.S. Dist. LEXIS 15631, at *14 (C.D. Cal. Jan. 2, 2024) (in copyright infringement action, finding rates ranging from $625 – $775 for partner with 23 years of experience to be reasonable); CNC Software, LLC v. Nvo MacHining, LLC, No. 8:22-cv-00089-JLS-ADS, 2023 U.S. Dist. LEXIS 127954, at *18 (C.D. Cal. May 31, 2023) (in copyright infringement action, finding $575 for partner with 23 years of experience to be reasonable); Cinq Music Grp., LLC v. Create Music Grp., Inc., No. 2:22-cv-07505-JLS-MAR, 2023 U.S. Dist. LEXIS 76599, at *11 (C.D. Cal. Apr. 26, 2023) (in copyright infringement action, finding rates ranging from $695 to $775 for attorney with 19 years of experience and rates ranging from $300 to $350 for attorney with 1 – 2 years of experience to be reasonable).

Plaintiff submits that, given undersigned counsel's experience and the above legal fee awards in actions for attorneys with similar experience, the Court should find CopyCat Legal's rates to be reasonable.

***B. The Number of Hours Expended Was Reasonable***

A "reasonable" number of hours equals "[t]he number of hours . . . [which] could reasonably have been billed to a private client." Gonzalez v. City of Maywood, 729 F.3d 1196, 1202 (9th Cir. 2013) (citations omitted). To assess this, Courts consider "whether the hours of work performed are reasonably necessary to achieve the results obtained." Kiva Health Brands LLC v. Goodvitamin Foods Pvt. LTD, 2023 U.S. Dist. LEXIS 103401, at *11 (D. Haw. May 19, 2023).



COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

As detailed in the accompanying DeSouza Decl. and the exhibits attached thereto, Plaintiff's counsel (inclusive of Mr. DeSouza and paralegals) billed 142.25 hours for which Plaintiff seeks fees. This work directly related to litigating Plaintiff's prevailing copyright claims from inception through trial. Notably, this time includes 0.0 hours for Jeffrey Leavell, Esq., who served as local counsel for Plaintiff but attended hearings, participated in conferences, etc. The lodestar is thus calculated by multiplying the reasonable rates of Plaintiff's counsel by the reasonable hours worked, which Plaintiff has calculated at $69,255.00.

To support the above, the DeSouza Decl. attaches itemized time records identifying the date worked, "timekeeper" performing the work, hourly rate, a description for the work performed, and time expended in connection therewith. These time records comprise an aggregate of the contemporaneous daily time records maintained by the attorneys and paralegals. See Gonzalez, 729 F.3d at 1202 ("[T]o determine whether attorneys for the prevailing party could have reasonably billed the hours they claim to their private clients, the district court should begin with the billing records the prevailing party has submitted.").

Plaintiff's counsel reviewed the billing entries prior to submitting them to the Court to ensure they were reasonable and not excessive, redundant, or otherwise unnecessary. All work reflected in the time records was necessary and justified to obtain a finding of liability with respect to Nofal LLC's infringement, and to address Nofal LLC's affirmative defenses. Plaintiff voluntarily excluded work in connection with intra-office communications between the attorneys and/or paralegals at CopyCat Legal (which was more than 30 hours), excluded any work concerning Plaintiff's post-trial motion for new trial/reconsideration, and excluded any work by Plaintiff's local counsel (Mr. Leavell).

**CONCLUSION**

In light of the foregoing, Plaintiff respectfully requests that the Court enter an Order: (a) granting this Motion; (b) finding that Plaintiff is entitled to an award of attorneys' fees as the prevailing party in this matter; (c) awarding fees consistent with the lodestar amount identified herein; and (d) for such further relief as the Court deems proper.

Respectfully submitted,

Dated: April 21, 2025.

COPYCAT LEGAL PLLC
3111 N. University Drive
Suite 301
Coral Springs, FL 33065
Telephone: (877) 437-6228
dan@copycatlegal.com

By: /s/ Daniel DeSouza___
Daniel DeSouza, Esq.
Florida Bar No. 19291

**CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will electronically serve all counsel of record.

By: /s/ Daniel DeSouza___
Daniel DeSouza, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

Case No. 2:22-cv-00642-JPS

PREPARED FOOD PHOTOS, INC. f/k/a
ADLIFE MARKETING &
COMMUNICATIONS CO., INC.,

Plaintiff,

v.

NOFAL LLC d/b/a FOOD TOWN MART and
SHARIF JABER,

Defendants.

**DECLARATION OF DANIEL DESOUZA**

Daniel DeSouza does hereby declare pursuant to 28 U.S.C. § 1746:

1. I submit this declaration in support of plaintiff Prepared Food Photos, Inc.'s ("Plaintiff") Motion for Attorneys' Fees (the "Motion"). This declaration and the facts stated herein are based upon my personal knowledge.

2. I am the principal of the law firm CopyCat Legal PLLC ("CopyCat Legal"), which has provided legal services to Plaintiff in this action throughout the pendency of this action.

## I. The Dispute/Lawsuit

3. Following its discovery of defendant Nofal LLC d/b/a Food Town Mart's ("Nofal LLC") unauthorized use of the photograph at issue in this lawsuit (the "Work"), Plaintiff retained CopyCat Legal who, on November 22, 2021, sent a pre-suit letter to "Villard Foodtown, LLC" (the entity Plaintiff believed at the time to own the grocery store) with respect to the alleged infringement of the Work.

4. On January 20, 2021, I spoke to defendant Sharif Jaber ("Mr. Jaber") telephonically

after an employee of CopyCat Legal called the Food Town Mart telephone number, got Mr. Jaber on the phone, and transferred him to me. During such call, Mr. Jaber denied that his store ever used the Work and further denied that his grocery store had any affiliation with the Facebook page at issue.

5. As a result, Plaintiff directed CopyCat Legal to initiate this lawsuit against Villard Foodtown, LLC (again, the entity believed at the time to be the correct defendant).

6. On July 26, 2022, I received a telephone call from David Bangert, Esq. Mr. Bangert explained that Villard Foodtown, LLC was the entity that owned the physical building but did not own/operate the grocery store thereat.

7. In August 2022, Mr. Bangert sent me an e-mail attaching the City of Milwaukee business license for the subject grocery store (which was held in the name of Mr. Jaber individually) and suggested that an amended Complaint be filed that removed Villard Foodtown, LLC and replaced it with Mr. Jaber (individually) as the party defendant.

8. As a result, on August 22, 2022, the First Amended Complaint was filed (naming Mr. Jaber individually as the defendant).

9. After months of Mr. Jaber evading/refusing to accept service, Plaintiff was forced to arrange for service by publication.

10. Ultimately, on January 25, 2023, I spoke with Tim Steinle, Esq. (Defendants' counsel throughout this lawsuit) who noted that he has represented the Jaber family for years and that Nofal LLC (rather than Mr. Jaber) was the actual entity that owned the grocery store.

11. Plaintiff therefore filed its Second Amended Complaint (which named both Mr. Jaber and Nofal LLC as defendants) on February 7, 2023.

12. On September 26, 2023, I took Nofal LLC's Rule 30(b)(6) deposition with Mr.

Jaber appearing as the designee on all topics identified in Plaintiff's 30(b)(6) notice. During the deposition, I showed Mr. Jaber (live on the internet) Nofal LLC's Facebook page, including dozens (if not hundreds) of photos and videos thereon depicting the inside of the grocery store and/or products being sold therein.

13. Immediately after the deposition (during which Mr. Jaber denied that the photos depicted his store or that he ever sold any of the products identified on the Facebook page), I called Mr. Steinle (Defendants' counsel) to raise what I believed was perjurious testimony. In response, Mr. Steinle stated "Dan, I'm an old fuck. And even I knew what was happening with his answers." I wrote down Mr. Steinle's quote in CopyCat Legal's case management software (MyCase) for this matter once we hung up our call.

14. At no time during this litigation did Nofal LLC seek to amend its Answer and/or its responses to the First Set of Interrogatories/First Request for Admissions.

15. Nor did Nofal LLC, at any time pre-suit or during the course of this lawsuit, ever offer $.01 to resolve the alleged infringement at issue herein. Although Plaintiff made several settlement demands throughout the lawsuit, Mr. Steinle was never given authority by Nofal LLC to make any offer to resolve this matter.

**II. Attorneys' Fees**

16. I am a 2004 graduate of the George Washington University Law School.

17. I have been a member in good standing of the New York Bar since 2005, the District of Columbia Bar since 2005, the Florida Bar since 2006, the New Jersey Bar since 2024, and the Pennsylvania Bar since 2024.

18. I am likewise admitted to several federal courts throughout the country, including: the United States Supreme Court; the United States Court of Appeals for the Eleventh Circuit; the United States Court of Appeals for the Eighth Circuit; the United States Court of Appeals for the

Tenth Circuit; the United States Court of Appeals for the Second Circuit; the United States District Court for the Southern District of Florida; the United States District Court for the Middle District of Florida; the United States District Court for the Northern District of Florida; the United States District Court for the Southern District of Texas; the United States District Court for the Eastern District of Texas; the United States District Court for the Southern District of New York; the United States District Court for the Eastern District of New York; the United States District Court for the Northern District of New York; the United States District Court for the Western District of New York; the United States District Court for the Western District of Arkansas; the United States District Court for the District of Nebraska; the United States District Court for the District of New Mexico; the United States District Court for the District of Colorado; the United States District Court for the Eastern District of Michigan; the United States District Court for the Western District of Michigan; the United States District Court for the Northern District of Illinois; the United States District Court for the District of Maryland; the United States District Court for the Western District of Texas; the United States District Court for the Eastern District of Missouri; the United States District Court for the District of Columbia; the United States District Court for the Eastern District of Oklahoma; the United States District Court for the District of New Jersey; the United States District Court for the Eastern District of Pennsylvania; the United States District Court for the Western District of Pennsylvania; the United States District Court for the Middle District of Pennsylvania; and the United States District Court for the Northern District of Indiana. I previously worked at Milbank, Tweed, Hadley & McCloy LLP (from 2004 – 2010) and Becker & Poliakoff, PA (from 2010 – 2014) before forming DeSouza Law, P.A. in 2014 and CopyCat Legal in 2019.

19. Since 2004, my practice has principally focused on business/complex commercial

and intellectual property litigation. During that time, I have served as counsel of record in hundreds of copyright infringement, trade secret, and trademark infringement lawsuits. In total, I have served as counsel of record in approximately 500 federal civil and/or bankruptcy actions and 250+ state court lawsuits in Florida/New York.

20. I have likewise served as lead counsel in multiple state and federal jury/non-jury trials.

21. CopyCat Legal is a boutique intellectual property law firm with its principal offices in Florida, and its attorneys are skilled litigators with many years of relevant experience.

22. CopyCat Legal establishes standard hourly rates for services provided by its attorneys which are reasonable within the South Florida market.

23. I am familiar with the services provided to Plaintiff in this action and the rates charged for such work.

24. The attorneys and paralegals at CopyCat Legal record the time spent on matters contemporaneously on electronic billing software/time sheets. Each time entry includes the date the work is performed, the client and matter numbers, the time spent, and a brief description of the nature of the work performed.

25. During the course of this lawsuit, my billable rate for copyright/intellectual property matters at CopyCat Legal was between $450.00 - $500.00 per hour, and the rate for paralegals was $125.00 per hour. These rates are within the range of rates charged by other lawyers in copyright and other cases in the Seventh Circuit and beyond with similar experience/background. See, e.g., See, e.g., Moffat v. Acad. of Geriatric Physical Therapy, No. 15-cv-626-jdp, 2017 U.S. Dist. LEXIS 152489 (W.D. Wis. Sep. 20, 2017) (in copyright infringement action, finding $540 rate which later increased to $580 reasonable for senior partner);

Forest River, Inc. v. inTech Trailers, Inc., No. 3:21cv645 DRL, 2024 U.S. Dist. LEXIS 169207, at *19 (N.D. Ind. Sep. 19, 2024) (finding $595.14 blended rate for partners reasonable); Berglund v. Matthews Senior Hous. LLC, No. 21-cv-108-pp, 2024 U.S. Dist. LEXIS 32044, at *12 (E.D. Wis. Feb. 26, 2024) (approving $450 per hour rate for contingency class representation); Cooper v. InvestiNet, LLC, Civil Action No. 1:21-cv-01562-TWP-DML, 2022 U.S. Dist. LEXIS 76982, at *4 (S.D. Ind. Apr. 14, 2022) (finding rate of $500 per hour for attorney with 16 years of experience to be reasonable); Russell v. Walmart Inc., No. CV 19-5495-MWF (JCx), 2024 U.S. Dist. LEXIS 15631, at *14 (C.D. Cal. Jan. 2, 2024) (in copyright infringement action, finding rates ranging from $625 – $775 for partner with 23 years of experience to be reasonable); CNC Software, LLC v. Nvo MacHining, LLC, No. 8:22-cv-00089-JLS-ADS, 2023 U.S. Dist. LEXIS 127954, at *18 (C.D. Cal. May 31, 2023) (in copyright infringement action, finding $575 for partner with 23 years of experience to be reasonable); Cinq Music Grp., LLC v. Create Music Grp., Inc., No. 2:22-cv-07505-JLS-MAR, 2023 U.S. Dist. LEXIS 76599, at *11 (C.D. Cal. Apr. 26, 2023) (in copyright infringement action, finding rates ranging from $695 to $775 for attorney with 19 years of experience and rates ranging from $300 to $350 for attorney with 1 – 2 years of experience to be reasonable).

26. Further, the hourly rates for both myself, CopyCat Legal's other attorneys, and for CopyCat Legal's paralegals have previously been found to be reasonable by multiple federal courts. See, e.g., Harrington v. Dugar, No. 2:22-cv-08230-HDV-E, 2024 U.S. Dist. LEXIS 155470, at *11 (C.D. Cal. Aug. 27, 2024) (finding that $600.00 per hour was a reasonable hourly rate for undersigned counsel following jury trial on copyright infringement claim); Sadowski v. Orion Healthcare Servs., Inc., No. 21-24475-CV-WILLIAMS, 2023 U.S. Dist. LEXIS 47811, at *2 (S.D. Fla. Mar. 21, 2023) (rejecting report and recommendation that undersigned counsel be

awarded fees at $385.00 per hour and instead finding that $450.00 per hour was reasonable rate for undersigned counsel); Markos v. The Big and Wild Outdoors LLC, No. 8:22-cv-1258-KKM-AEP, 2023 U.S. Dist. LEXIS 32023, at *25 (M.D. Fla. Feb. 24, 2023) (recommending that undersigned counsel be awarded $450.00 per hour as reasonable hourly rate) (report and recommendation adopted at 2023 U.S. Dist. LEXIS 43151); Sadowski v. Diverse New Media Corp, No. 22-61380-CIV, 2023 U.S. Dist. LEXIS 21791, at *20–21 (S.D. Fla. Jan. 13, 2023) ("The Court further finds that $450.00 is a reasonable hourly rate for Plaintiff's counsel (Daniel DeSouza), that $300.00 is a reasonable hourly rate for the junior associate attorney [Lauren Hausman], and that $125.00 is a reasonable hourly rate for the paralegal in this action given the complexity of the matter, the results obtained, and the experience of Plaintiffs' counsel which the Court found to be substantial."); Afford. Aerial Photography, Inc. v. Elegance Transp., Inc., No. 6:21-cv-1166-CEM-LHP, 2022 U.S. Dist. LEXIS 32586, at *29 (M.D. Fla. Feb. 23, 2022) (finding undersigned counsel's $450.00 hourly rate and paralegal's $125.00 hourly rate to be reasonable in copyright infringement case); Temurian v. Piccolo, No. 18-CV-62737-SMITH/VALLE, 2021 U.S. Dist. LEXIS 63144, at *6 (S.D. Fla. Mar. 30, 2021) (in commercial litigation case, finding undersigned counsel's $400.00 hourly rate reasonable for work performed from 2018 – 2020).

27. Through the entry of judgment in this case, I expended 142.25 hours and paralegal Efrosini (Soula) Cruz expended 0.3 hours, of time in prosecuting this matter on Plaintiff's behalf. I did not include any time in the foregoing for pursuing Plaintiff's post-judgment motion for a new trial/reconsideration. This includes the time spent from drafting an initial notice letter to Defendants through the jury trial. This does not include, however, intra-office communications between attorneys (which amounted to a substantial amount of time exceeding 30 hours).

28. I personally reviewed each of the billing entries prior to submitting them to the

Court to ensure they were reasonable and not excessive, redundant, or otherwise unnecessary. All work reflected in the time records was necessary and justified to obtain a finding of liability with respect to Nofal LLC's infringement, and to address Nofal LLC's affirmative defenses. All of these time entries are reflected in CopyCat Legal's billing records that are being provided in connection herewith as **Exhibit "1."**

29. I have calculated the lodestar by multiplying the respective rate for each of the above-referenced timekeepers by the hours expended by such timekeeper. This results in a lodestar of $69,255.00.

30. CopyCat Legal accepted this case on a pure contingency, meaning that Plaintiff did not pay ***any*** fees for the representation in this matter and CopyCat Legal absorbed all costs (taxable and non-taxable) (totaling over $7,500.00).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 21, 2025

/s/ Daniel DeSouza____
Daniel DeSouza

EXHIBIT "1"

**Copycat Legal PLLC**
3111 N University Drive
Suite 310
Coral Springs, FL 33065
877-437-6228

**Prepared Foods**
PO Box 943
Pawtucket, RI 02862
United States

| | |
|---|---|
| **Balance** | $76,861.26 |
| **Invoice #** | 00198 |
| **Invoice Date** | April 21, 2025 |
| **Payment Terms** | Due on Receipt |
| **Due Date** | April 21, 2025 |

**Prepared Food Photos, Inc. v. NOFAL LLC d/b/a Food Town Mart and Sharif Jaber (Villard Foodtown LLC)**

**Time Entries**

| DATE | EE | ACTIVITY | DESCRIPTION | RATE | HOURS | LINE TOTAL |
|---|---|---|---|---|---|---|
| 11/19/2021 | DD | Time | Review background materials provided by client and draft demand letter (1.4). | $450.00 | 1.40 | $630.00 |
| 01/20/2022 | DD | Time | Call w/ Sharif Jaber. | $450.00 | 0.20 | $90.00 |
| 05/27/2022 | DD | Time | Draft Complaint for filing in ED Wisconsin (2.6); review Facebook page for other photographs appearing thereon (.3). | $450.00 | 2.90 | $1,305.00 |
| 07/26/2022 | DD | Time | Call w/ David Bangert re Villard Foodtown involvement (.2). | $450.00 | 0.20 | $90.00 |
| 08/01/2022 | DD | Time | Draft/file stipulation for extension of time for Villard Foodtown to answer Complaint (.3). | $450.00 | 0.30 | $135.00 |
| 08/22/2022 | DD | Time | Draft First Amended Complaint naming Sharif Jaber as defendant (.8); review Milwaukee business and other records confirming Sharif Jaber involvement (.5). | $450.00 | 1.30 | $585.00 |
| 12/01/2022 | SC | Time | Draft motion for clerk default. | $125.00 | 0.30 | $37.50 |
| 12/09/2022 | DD | Time | Legal research re alternative service (1.6); draft motion for alternative service (.7). | $450.00 | 2.30 | $1,035.00 |
| 01/25/2023 | DD | Time | Call w/ Tim Steinle re Nofal LLC being proper defendant (.2). | $450.00 | 0.20 | $90.00 |
| 02/06/2023 | DD | Time | Draft unopposed motion for leave to file second amended complaint (.4). | $450.00 | 0.35 | $157.50 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 02/20/2023 | DD | Time | Review Defendants' answer to second amended complaint (.3). | $450.00 | 0.30 | $135.00 |
| 03/21/2023 | DD | Time | Draft joint scheduling report and confer w/ o/c re same (.9). | $450.00 | 0.90 | $405.00 |
| 06/23/2023 | DD | Time | Draft first request for production, first set of interrogatories, and first request for admissions (4,8); review Facebook page/photos thereon and other public information about Defendants re same (.7). | $450.00 | 5.50 | $2,475.00 |
| 08/17/2023 | DD | Time | Reviewed defendants' responses to written discovery requests (1.7). | $450.00 | 1.70 | $765.00 |
| 08/18/2023 | DD | Time | Draft 30(b)(6) deposition notice (1.2). | $450.00 | 1.20 | $540.00 |
| 08/31/2023 | DD | Time | Draft interim settlement report (.2). | $450.00 | 0.20 | $90.00 |
| 09/22/2023 | DD | Time | Draft motion to modify scheduling order re dispositive motions (.6). | $450.00 | 0.60 | $270.00 |
| 09/25/2023 | DD | Time | Draft deposition outline of Nofal LLC/Sharif Jaber (4.7); review potential exhibits for deposition (1.4). | $450.00 | 6.10 | $2,745.00 |
| 09/26/2023 | DD | Time | Continue preparation for S. Jaber deposition (1.8); take deposition of S. Jaber (1.5); call w/ T. Steinle re deposition (.2). | $450.00 | 3.50 | $1,575.00 |
| 10/02/2023 | DD | Time | Draft second motion for extension of scheduling order deadlines (.2). | $450.00 | 0.20 | $90.00 |
| 10/09/2023 | DD | Time | Draft subpoenas to Meta Platforms and to Associated Wholesale Grocers (2.5). | $450.00 | 2.50 | $1,125.00 |
| 10/12/2023 | DD | Time | Draft second request for production to Defendants (1.4). | $450.00 | 1.40 | $630.00 |
| 11/20/2023 | DD | Time | Correspond w/ Steinle re settlement demand (.2). | $450.00 | 0.20 | $90.00 |
| 12/09/2023 | DD | Time | Draft motion to compel responses to second request for production (1.7). | $450.00 | 1.70 | $765.00 |
| 01/05/2024 | DD | Time | Legal research and draft motion for summary judgment (4.8). | $500.00 | 4.80 | $2,400.00 |
| 01/06/2024 | DD | Time | Continue draft of motion for summary judgment (5.7). | $500.00 | 5.70 | $2,850.00 |
| 01/08/2024 | DD | Time | Continue draft of motion for summary judgment and declarations/legal research (5.4). | $500.00 | 5.40 | $2,700.00 |
| 01/15/2024 | DD | Time | Review responses to second request for production. | $500.00 | 0.60 | $300.00 |
| 02/09/2024 | DD | Time | Review defendants' response to motion for summary judgment (1.3). | $500.00 | 1.30 | $650.00 |
| 05/07/2024 | DD | Time | Review deposition transcripts re potential renewed motion for summary judgment (2.3). | $500.00 | 2.30 | $1,150.00 |
| 07/08/2024 | DD | Time | Review trial scheduling order (.3). | $500.00 | 0.30 | $150.00 |
| 09/05/2024 | DD | Time | Draft email to Steinle re trial prep/settlement (.1). | $500.00 | 0.10 | $50.00 |
| 09/12/2024 | DD | Time | Correspond w/ Steinle re trial prep/settlement (.2). | $500.00 | 0.20 | $100.00 |
| 09/18/2024 | DD | Time | Legal research re responsibility of employer for employee infringing acts (3.6). | $500.00 | 3.60 | $1,800.00 |
| 09/30/2024 | DD | Time | Draft final settlement report (.4). | $500.00 | 0.40 | $200.00 |
| 09/30/2024 | DD | Time | Draft Plaintiff's trial exhibit list and revise special verdict form (6.4). | $500.00 | 6.40 | $3,200.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 10/01/2024 | DD | Time | Review/revise joint pretrial report (1.6). | $500.00 | 1.60 | $800.00 |
| 10/02/2024 | DD | Time | Draft summaries of Jaber and Hamed depositions re trial prep (4.5). | $500.00 | 4.50 | $2,250.00 |
| 10/03/2024 | DD | Time | Meet w/ Steinle and Leavell re prep of trial documents (1.8). | $500.00 | 1.80 | $900.00 |
| 10/08/2024 | DD | Time | Begin draft of joint proposed jury instructions (5.3). | $500.00 | 5.30 | $2,650.00 |
| 10/09/2024 | DD | Time | Continue/finalize draft of joint proposed jury instructions (3.6). | $500.00 | 3.60 | $1,800.00 |
| 10/18/2024 | DD | Time | Draft joint memorandum re issues for trial (1.4). | $500.00 | 1.40 | $700.00 |
| 10/21/2024 | DD | Time | Zoom meeting with client re preparation for trial and to go over exhibits. | $500.00 | 3.20 | $1,600.00 |
| 10/22/2024 | DD | Time | Create trial demonstratives re preparation for trial (1.5). | $500.00 | 1.50 | $750.00 |
| 10/22/2024 | DD | Time | Draft trial outlines for Plaintiff, Sharif Jaber, and Amjad Hamed (7.9); review exhibits/demonstratives for trial prep (1.4). | $500.00 | 9.30 | $4,650.00 |
| 10/23/2024 | DD | Time | Continue trial prep/drafting of direct/cross outlines (6.8). | $500.00 | 6.80 | $3,400.00 |
| 10/24/2024 | DD | Time | Continue trial prep/organizing of exhibits/drafting of direct/cross outlines (9.5). | $500.00 | 9.50 | $4,750.00 |
| 10/26/2024 | DD | Time | Meet w/ Rebecca re trial prep and draft opening statement (5.7). | $500.00 | 5.70 | $2,850.00 |
| 10/28/2024 | DD | Time | jury trial - day 1 (in court and prep with client) (10.2). | $500.00 | 10.20 | $5,100.00 |
| 10/29/2024 | DD | Time | jury trial - day 2 (in court and prep) and drafting of closing argument (9.5). | $500.00 | 9.50 | $4,750.00 |
| 11/01/2024 | DD | Time | Draft notice of election of damages (.2); legal research re election of statutory/actual damages re preservation of right to appeal (1.6). | $500.00 | 1.80 | $900.00 |
| | | | | Totals: | **142.25** | **$69,255.00** |

**Expenses**

| DATE | EE | ACTIVITY | DESCRIPTION | COST | QUANTITY | LINE TOTAL |
|---|---|---|---|---|---|---|
| 05/31/2022 | LH | Complaint Filing Fee | Filed complaint in the Eastern District of Wisconsin | $402.00 | 1.0 | $402.00 |
| 07/25/2022 | HT | Process Server | Service of Process by L. Johns Services | $50.00 | 1.0 | $50.00 |
| 09/08/2022 | DS | Process Server | South Shore Process Service (Inv.#7567836) - First Amended Complaint | $55.00 | 1.0 | $55.00 |
| 11/02/2022 | DS | Federal Express | Service of First Amended Complaint on Sharif Jaber | $25.00 | 1.0 | $25.00 |
| 12/15/2022 | DS | Process Server | The Daily Reporter (Inv.# 745095370) (Service by Publication) | $235.00 | 1.0 | $235.00 |
| 05/16/2023 | DD | Expense | Local Counsel retainer fee | $2,500.00 | 1.0 | $2,500.00 |
| 09/29/2023 | SC | Deposition | Court reporter and transcript fee | $718.00 | 1.0 | $718.00 |
| 09/29/2023 | DS | Process Server | First Legal Process of WI (Photos of store taken on 9/26/23 & 9/27/23) | $150.00 | 1.0 | $150.00 |
| 09/29/2023 | DS | Federal Express | Overnight Check to First Legal Process of WI | $25.00 | 1.0 | $25.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 10/16/2023 | SC | Process Server | Subpoena on Associated Wholesale Grocers | $100.00 | 1.0 | $100.00 |
| 10/16/2023 | SC | Process Server | Subpoena on Meta Platforms | $82.40 | 1.0 | $82.40 |
| 11/27/2023 | SC | Process Server | Service of subpoena with witness fee check on Amjad S. Hamed - South Shore Process Servers, Invoice 9762110 | $97.50 | 1.0 | $97.50 |
| 01/08/2024 | SC | Deposition | Daughter's Invoice 315997 for Depo & Transcript of Amjad S. Hamed | $372.25 | 1.0 | $372.25 |
| 01/23/2024 | SC | Expense | Local Counsel Jeff Weavell Invoice 35060 | $1,336.80 | 1.0 | $1,336.80 |
| 10/07/2024 | SC | Federal Express | FedEx - Overnight Trial Exhibit Flash drives to OC | $34.48 | 1.0 | $34.48 |
| 10/14/2024 | SC | Process Server | South Shore Process Service Invoice 11957493 - Rush Subpoena - Amjad S. Hamad | $158.40 | 1.0 | $158.40 |
| 10/14/2024 | DD | Expense | taxi | $44.74 | 1.0 | $44.74 |
| 10/15/2024 | DD | Expense | flight - FLL/Milwaukee | $786.00 | 1.0 | $786.00 |
| 10/15/2024 | DD | Expense | taxi | $42.75 | 1.0 | $42.75 |
| 10/15/2024 | DD | Expense | lunch | $33.18 | 1.0 | $33.18 |
| 10/15/2024 | DD | Expense | hotel | $357.76 | 1.0 | $357.76 |
| | | | | | Expense Total: | **$7,606.26** |

| | |
|---|---|
| Time Entry Sub-Total: | $69,255.00 |
| Expense Sub-Total: | $7,606.26 |
| **Sub-Total:** | $76,861.26 |
| **Total:** | $76,861.26 |
| **Amount Paid:** | $0.00 |
| **BALANCE DUE:** | **$76,861.26** |

EXHIBIT "E"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

Case No. 2:22-cv-00642-JPS

PREPARED FOOD PHOTOS, INC. f/k/a
ADLIFE MARKETING &
COMMUNICATIONS CO., INC.,

Plaintiff,

v.

NOFAL LLC d/b/a FOOD TOWN MART and
SHARIF JABER,

Defendants.

---

**DEFENDANT, NOFAL LLC D/B/A FOOD TOWN MART'S ANSWERS TO INTERROGATORIES**

---

Defendant, Nofal LLC d/b/a Food Town Mart, by their attorneys, Terschan, Steinle, Hodan & Ganzer, Ltd., by W. Timothy Steinle, hereby respond to Plaintiff's First Set of Interrogatories as follows:

**INTERROGATORIES**

1. Please state the name, address and telephone number of any person preparing or aiding in the preparation of the answers to these Interrogatories.

ANSWER NO. 1: Sharif A. Jaber, 2041 East Drexel Avenue, Oak Creek, Wisconsin 53154.

2. Identify each and every commercial use of the Work by you and, if such use involves publishing or displaying the Work on the Website, the Facebook Page, and/or any other social media page controlled by you, identify each sub-page thereof on which the Work was published and/or displayed.

ANSWER NO. 2: NOFAL LLC did not use the Work commercially on any social media page.

3. Identify all websites and/or social media pages controlled by you (including any websites and/or social media pages you have disabled, discontinued, and/or removed from public view).

ANSWER NO. 3: Food Town Mart and/or NOFAL LLC has never had a website and has never had any social media pages.

4. Identify each member, shareholder, director, and/or manager of NOFAL LLC and, for each such person, identify all business entities that such person is currently a member or shareholder.

ANSWER NO. 4: Sharif A. Jaber, 2041 East Drexel Avenue, Oak Creek, Wisconsin 53154.

5. Describe the ownership structure of NOFAL LLC from November 22, 2021 through the date your responses to these requests are served, including but not limited to any sale of the assets and/or stock of NOFAL LLC and/or any change of ownership of NOFAL LLC.

ANSWER NO. 5: There were no changes in the ownership structure of NOFAL LLC.

6. Prior to November 22, 2021, did you license or purchase any photograph published and/or displayed on any page of the Website, the Facebook Page, and/or any other social media page controlled by Defendants? If yes: (a) identify all persons or entities from which you purchased or licensed such photograph(s) and (b) identify the amount of any monies paid with respect to such purchases or licenses.

ANSWER NO. 6: No.

7. Following November 22, 2021, did you remove any photograph from public display on the Website, the Facebook Page, and/or any other social media page controlled by Defendants (other than the Work)? If yes, then for each such photograph that was removed: (a) identify the photograph; (b) identify the sub-page on the Website/social media page such photograph previously appeared; and (c) describe in detail the reason(s) why such photograph was removed from public display.

ANSWER NO. 7: No.

8. Identify each and every sub-page of the Website, the Facebook Page, and/or any other social media page controlled by Defendants on which the Work was published and/or displayed.

ANSWER NO. 8: There were none.

9. Describe in detail how it is that the Work came to be published and/or displayed on the Website, the Facebook Page, and/or any other social media page controlled by Defendants. Your response should include, but not be limited to: (a) an identification of the first date on which the Work was published or displayed thereon; (b) an identification of what person(s) participated in the publishing or display of the Work thereon; and (c) an identification and description of the source from which the Work was found.

ANSWER NO. 9: The webpage that is the subject matter of this lawsuit was not controlled by NOFAL LLC or Sharif Jaber.

10. Do you contend that Defendants were authorized and/or licensed to display the Work on the Website, the Facebook Page, and/or any other social media page controlled by Defendants? If yes, describe in detail the factual basis for such contention.

ANSWER NO. 10: The webpage that is the subject matter of this lawsuit was not controlled by NOFAL LLC or Sharif Jaber.

11. Have you received any other notice of copyright infringement or letter alleging infringement with respect to any photograph? If yes: (a) identify the date of such notice/letter; (b) identify the person or entity from which such notice/letter was sent; and (c) describe the subject matter of such notice/letter.

ANSWER NO. 11: Neither NOFAL LLC nor Sharif Jaber have ever received any notice of copyright infringement. The first notice they received was when they received a copy of the Summons and Complaint in this action.

12. List any expenses incurred by Defendants in the operation/ownership of the Website, the Facebook Page, and/or any other social media page controlled by Defendants.

ANSWER NO. 12: There was no operation/ownership of the Website by NOFAL LLC or Sharif Jaber. There were no expenses.

13. Prior to November 22, 2021, did you license or purchase any photograph displayed on the Website, the Facebook Page, and/or any other social media page controlled by Defendants? If yes: (a) identify all persons or entities from which you purchased or licensed such photograph(s) and (b) identify the amount of any monies paid with respect to such purchases or licenses.

ANSWER NO. 13: No.

14. Describe in detail all policies, procedures, terms, and/or conditions implemented by you at the time the Work was published or displayed on the Website, the Facebook Page, and/or any other social media page controlled by Defendants with respect to intellectual property and/or ensuring that photographs published or displayed on the Website, the Facebook Page, and/or any other social media page controlled by Defendants were properly licensed.

ANSWER NO. 14.: As neither NOFALL LLC nor Sharif Jaber published or displayed the Work on the website, there were no policies, procedures, terms or conditions implemented.

15. Describe in detail all factual support for Defendants' contention, set forth in their First Affirmative Defense, that "The Second Amended Complaint fails to state a claim upon which relief can be granted."

ANSWER NO. 15: As neither NOFAL LLC nor Sharif Jaber published any Work, and did not control the publication of any Work on any social media outlet, we do not believe that any claims can be made against NOFAL LLC and therefore the Complaint does fail to state a claim upon which relief can be granted.

16. Describe in detail all factual support for Defendants' contention, set forth in their Second Affirmative Defense, that "The acts and/or allegations contained within the Second Amended Complaint were caused by those other than these answering defendants."

ANSWER NO. 16: As the allegations are that someone posted the Work on a social media outlet, someone other than NORFAL LLC or Sharif Jaber published the Work and therefore they may be responsible.

17. Describe in detail all factual support for Defendants' contention, set forth in their Third Affirmative Defense, that "The claims of the plaintiff may be precluded by the application of the "fair use" doctrine."

ANSWER NO. 17: As NOFAL, LLC, Sharif Jaber or Food Town Mart never used any copyrighted material on any website or social medica page, the Affirmative Defense of "fair use" doctrine will be withdrawn.

18. Describe in detail all factual support for Defendants' contention, set forth in their Fourth Affirmative Defense, that "The plaintiff has failed to mitigate their damages."

ANSWER NO. 18: As that all affirmative defenses need to be pled, or deemed waived, the plaintiff may have failed to mitigate their damages.

Dated this 17th day of August, 2023.

NOFAL LLC

By: ______________________
Sharif A. Jaber

Subscribed and sworn to before me this
17th day of August, 2023.

______________________
Notary Public, State of Wisconsin
My commission ~~expires~~: is permanent.

**EXHIBIT "F"**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

Case No. 2:22-cv-00642-JPS

PREPARED FOOD PHOTOS, INC. f/k/a
ADLIFE MARKETING &
COMMUNICATIONS CO., INC.,

Plaintiff,

v.

NOFAL LLC d/b/a FOOD TOWN MART and
SHARIF JABER,

Defendants.

---

**DEFENDANT NOFAL LLC D/B/A FOOD TOWN MART, RESPONSES TO PLAINTIFF'S REQUEST FOR ADMISSIONS**

---

The defendant, Nofal LLC d/b/a Food Town Mart, by their attorneys, Terschan, Steinle, Hodan & Ganzer, Ltd., by W. Timothy Steinle, hereby responds to Plaintiff's Request for Admissions as follows:

1. Admit that Jaber is the manager and sole member of NOFAL LLC.

Response 1: Admit.

2. Admit that the business license for NOFAL LLC is registered in Jaber's name individually.

Response 2: Admit.

3. Admit that Jaber, as the manager and sole member of NOFAL LLC, receives profit distributions and pays himself a salary from NOFAL LLC.

Response 3: Admit.

4. Admit that, as the manager and sole member of NOFAL LLC, Jaber controls the activities of NOFAL LLC.

Response 4: Admit.

5. Admit that NOFAL LLC does business as Food Town Mart.

Response 5: Admit.

6. Admit that, prior to doing business as Food Town Mart, NOFAL LLC did business as Villard Foodtown.

Response 6: Deny that at any time NOFAL LLC did business as Villard Foodtown.

7. Admit that the Website is controlled by NOFAL LLC.

Response 7: Deny that Villard Foodtown website is in any way controlled by NOFAL LLC.

8. Admit that the Facebook Page is controlled by NOFAL LLC.

Response 8: Deny that the Villard Foodtown Facebook page is controlled by NOFAL LLC.

9. Admit that, as of September 28, 2020, the Work was displayed on NOFAL LLC's Facebook Page.

Response 9: Deny that the Work was displayed on NOFAL LLC's Facebook page.

10. Admit that NOFAL LLC caused the Work to be displayed on its Facebook Page.

Response 10: Deny that NOFAL LLC caused the Work to be displayed on Villard Foodtown's Facebook page.

11. Admit that Jaber, acting as the manager and sole member of NOFAL LLC, caused the Work to be displayed on the Facebook Page.

Response 11: Deny that Jaber, in any capacity, caused the work to be displayed on Villard Foodtown's Facebook page.

12. Admit that NOFAL LLC published and/or displayed the Work on the Facebook Page.

Response 12: Deny that NOFAL LLC published and/or displayed The Work on Villard Foodtown's Facebook page.

13. Admit that Jaber, acting as the manager and sole member of NOFAL LLC, published and/or displayed the Work on the Facebook Page.

Response 13: Deny that Jaber, acting in any capacity for NOFAL LLC, published and/or displayed the Work on Villard Foodtown's Facebook page.

14. Admit that the Website is utilized to market and/or advertise NOFAL LLC's business.

Response 14: Deny that the Website is used to market and/or advertise for NOFAL LLC's business.

15. Admit that the Facebook Page is utilized to market and/or advertise NOFAL LLC's business.

Response 15: Deny that the Villard Foodtown Facebook page is utilized to market and/or advertise NOFAL LLC's business.

16. Admit that the Work was displayed on the Facebook Page in connection with NOFAL LLC's efforts to market its business.

Response 16: Deny that the Work was displayed on Villard Foodtown's Facebook page in connection with NOFAL LLC's efforts to market its business.

17. Admit that Jaber declined or failed to stop NOFAL LLC from causing the Work to be displayed on the Facebook Page.

Response 17: Pursuant to Rule 36(4) of the Federal Rules of Civil Procedure, the information known or readily available does not allow this responding defendant to either admit or deny Request No. 17 and therefore it must be deemed denied.

18. Admit that NOFAL LLC has never been licensed to use or display the Work.

Response 18: Admit.

19. Admit that Jaber has never been licensed to use or display the Work.

Response 19: Admit.

20. Admit that, to NOFAL LLC's knowledge, no person or entity has ever been licensed to use or display the Work on the Website, the Facebook Page, and/or any other social media page controlled by NOFAL LLC or Jaber.

Response 20: Pursuant to Rule 36(4) of the Federal Rules of Civil Procedure, the information known or readily available does not allow this responding defendant to either admit or deny Request No. 20 and therefore it must be deemed denied.

21. Admit that NOFAL LLC does not know what specific website it originally found the Work on.

Response 21: Pursuant to Rule 36(4) of the Federal Rules of Civil Procedure, the information known or readily available does not allow this responding defendant to either admit or deny Request No. 21 and therefore it must be deemed denied.

22. Admit that, after receipt of the Demand Letter, NOFAL LLC and/or Jaber removed at least five (5) photographs (other than the Work) from public display on the Website, the Facebook Page, and/or any other social media page controlled by NOFAL LLC.

Response 22: Pursuant to Rule 36(4) of the Federal Rules of Civil Procedure, the information known or readily available does not allow this responding defendant to either admit or deny Request No. 22 and therefore it must be deemed denied.

23. Admit that, as of November 22, 2021, NOFAL LLC and/or Jaber had never paid to license or display any photograph on the Website, the Facebook Page, and/or any other social media page controlled by NOFAL LLC and/or Jaber.

Response 23: Admit.

24. Admit that, as of November 22, 2021, NOFAL LLC and/or Jaber had never paid to license or display any photograph on the Website, the Facebook Page, and/or any other social media page controlled by NOFAL LLC and/or Jaber.

Response 24: Admit.

25. Admit that, in January 2020, Jaber, acting as the manager and sole member of NOFAL LLC, stated to the undersigned that the Work was not used on the Facebook Page.

Response 25: Admit.

26. Admit that, on a date after receipt of the Demand Letter, NOFAL LLC and/or Jaber changed the name of the Facebook Page from Villard Foodtown to Food Town Mart.

Response 26: Deny that at any time Jaber or any member of NORFAL LLC changed the name of the Villard Foodtown Facebook page from Villard Foodtown to Food Town Mart.

27. Admit that, prior to the date of these requests, NOFAL LLC was not licensed to use or display the following photograph, currently published at https://www.facebook.com/villardfoodtown/photos/pb.100022757634300.-2207520000./2302989003357489/?type=3:



Response 27: Admit.

28. Admit that, prior to the date of these requests, Defendant was not licensed to use or display the following photograph, currently published at https://www.facebook.com/villardfoodtown/photos/pb.100022757634300.-2207520000./2302987733357616/?type=3:



Response 28: Admit.

29. Admit that, prior to the date of these requests, Defendant was not licensed to use or display the following photograph, currently published at https://www.facebook.com/villardfoodtown/photos/pb.100022757634300.-2207520000./2140676156255442/?type=3:



Response 29: Admit.

30. Admit that, prior to the date of these requests, Defendant was not licensed to use or display the following photograph, currently published at https://www.facebook.com/villardfoodtown/photos/pb.100022757634300.-2207520000./1758387304484331/?type=3



:

Response 30: Admit.

31. Admit that, prior to the date of these requests, Defendant was not licensed to use or display the following photograph, currently published at https://www.facebook.com/villardfoodtown/photos/pb.100022757634300.-2207520000./1758389757817419/?type=3:




Response 31: Admit.

32. Admit that, at the time the Answer to the Complaint was filed in this lawsuit (February 20, 2023), NOFAL LLC was not aware of any facts evidencing or supporting that "The Second Amended Complaint fails to state a claim upon which relief can be granted," as asserted in Defendants' First Affirmative Defense.

Response 32: Deny and state that the affirmative defense that the Complaint fails to state a claim upon which relief can be granted as a meritorious defense.

33. Admit that, at the time the Answer to the Complaint was filed in this lawsuit (February 20, 2023), NOFAL LLC was not in possession of any documents evidencing or supporting that "The acts and/or allegations contained within the Second Amended Complaint were caused by those other than these answering defendants," as asserted in Defendants' Second Affirmative Defense.

Response 33: Deny and assert that the assent or allegations contained within the Second Amended Complaint were caused by those other than these answering defendants are a meritorious defense.

34. Admit that, at the time the Answer to the Complaint was filed in this lawsuit (February 20, 2023), NOFAL LLC was not aware of any facts evidencing or supporting that "The claims of the

plaintiff may be precluded by the application of the "fair use" doctrine," as asserted in Defendants' Third Affirmative Defense.

Response 34: Assert that NOFAL LLC was aware of "The claims of the plaintiff may be precluded by the application of the "fair use" 'doctrine".

35. Admit that, at the time the Answer to the Complaint was filed in this lawsuit (February 20, 2023), NOFAL LLC was not in possession of any documents evidencing or supporting that "The plaintiff has failed to mitigate their damages," as asserted in Defendants' Fourth Affirmative Defense.

Response 35: Pursuant to Rule 36(4) of the Federal Rules of Civil Procedure, the information known or readily available does not allow this responding defendant to either admit or deny Request No. 35 and therefore it must be deemed denied.

Dated this 15th day of August, 2023.

TERSCHAN, STEINLE, HODAN & GANZER, LTD.
Attorneys for the Defendant, Sharif Jaber

*Electronically signed by W. Timothy Steinle*
State Bar No.: 1003777

P.O. ADDRESS:
309 North Water Street, Suite 215
Milwaukee, WI 53202
(414) 258-1010

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

Case No. 2:22-cv-00642-JPS

PREPARED FOOD PHOTOS, INC. f/k/a
ADLIFE MARKETING &
COMMUNICATIONS CO., INC.,

Plaintiff,

v.

NOFAL LLC d/b/a FOOD TOWN MART and
SHARIF JABER,

Defendants.

---

**DEFENDANT, SHARIF JABER'S, RESPONSES TO PLAINTIFF'S REQUEST FOR ADMISSIONS**

---

The defendant, Sharif Jaber, by his attorneys, Terschan, Steinle, Hodan & Ganzer, Ltd., by W. Timothy Steinle, hereby responds to Plaintiff's Request for Admissions as follows:

1. Admit that Jaber is the manager and sole member of NOFAL LLC.

Response 1: Admit.

2. Admit that the business license for NOFAL LLC is registered in Jaber's name individually.

Response 2: Admit.

3. Admit that Jaber, as the manager and sole member of NOFAL LLC, receives profit distributions and pays himself a salary from NOFAL LLC.

Response 3: Admit.

4. Admit that, as the manager and sole member of NOFAL LLC, Jaber controls the activities of NOFAL LLC.

Response 4: Admit.

5. Admit that NOFAL LLC does business as Food Town Mart.

Response 5: Admit.

6. Admit that, prior to doing business as Food Town Mart, NOFAL LLC did business as Villard Foodtown.

Response 6: Deny that at any time NOFAL LLC did business as Villard Foodtown.

7. Admit that the Website is controlled by NOFAL LLC.

Response 7: Deny that Villard Foodtown website is in any way controlled by NOFAL LLC.

8. Admit that the Facebook Page is controlled by NOFAL LLC.

Response 8: Deny that the Villard Foodtown Facebook page is controlled by NOFAL LLC.

9. Admit that, as of September 28, 2020, the Work was displayed on NOFAL LLC's Facebook Page.

Response 9: Deny that the Work was displayed on NOFAL LLC's Facebook page.

10. Admit that NOFAL LLC caused the Work to be displayed on its Facebook Page.

Response 10: Deny that NOFAL LLC caused the Work to be displayed on Villard Foodtown's Facebook page.

11. Admit that Jaber, acting as the manager and sole member of NOFAL LLC, caused the Work to be displayed on the Facebook Page.

Response 11: Deny that Jaber, in any capacity, caused the work to be displayed on Villard Foodtown's Facebook page.

12. Admit that NOFAL LLC published and/or displayed the Work on the Facebook Page.

Response 12: Deny that NOFAL LLC published and/or displayed the Work on Villard Foodtown's Facebook page.

13. Admit that Jaber, acting as the manager and sole member of NOFAL LLC, published and/or displayed the Work on the Facebook Page.

Response 13: Deny that Jaber, acting in any capacity for NOFAL LLC, published and/or displayed the Work on Villard Foodtown's Facebook page.

14. Admit that the Website is utilized to market and/or advertise NOFAL LLC's business.

Response 14: Deny that the Website is used to market and/or advertise for NOFAL LLC's business.

15. Admit that the Facebook Page is utilized to market and/or advertise NOFAL LLC's business.

Response 15: Deny that the Villard Foodtown Facebook page is utilized to market and/or advertise NOFAL LLC's business.

16. Admit that the Work was displayed on the Facebook Page in connection with NOFAL LLC's efforts to market its business.

Response 16: Deny that the Work was displayed on Villard Foodtown's Facebook page in connection with NOFAL LLC's efforts to market its business.

17. Admit that Jaber declined or failed to stop NOFAL LLC from causing the Work to be displayed on the Facebook Page.

Response 17: Pursuant to Rule 36(4) of the Federal Rules of Civil Procedure, the information known or readily available does not allow this responding defendant to either admit or deny Request No. 17 therefore it must be deemed denied.

18. Admit that NOFAL LLC has never been licensed to use or display the Work.

Response 18: Admit.

19. Admit that Jaber has never been licensed to use or display the Work.

Response 19: Admit.

20. Admit that, to Jaber's knowledge, no person or entity has ever been licensed to use or display the Work on the Website, the Facebook Page, and/or any other social media page controlled by NOFAL LLC or Jaber.

Response 20: Pursuant to Rule 36(4) of the Federal Rules of Civil Procedure, the information known or readily available does not allow this responding defendant to either admit or deny Request No. 20 and therefore it must be deemed denied.

21. Admit that Jaber does not know what specific website he originally found the Work on.

Response 21: : Pursuant to Rule 36(4) of the Federal Rules of Civil Procedure, the information known or readily available does not allow this responding defendant to either admit or deny Request No. 21 and therefore it must be deemed denied.

22. Admit that, after receipt of the Demand Letter, NOFAL LLC and/or Jaber removed at least five (5) photographs (other than the Work) from public display on the Website, the Facebook Page, and/or any other social media page controlled by NOFAL LLC.

Response 22: : Pursuant to Rule 36(4) of the Federal Rules of Civil Procedure, the information known or readily available does not allow this responding defendant to either admit or deny Request No. 22 and therefore it must be deemed denied.

23. Admit that, as of November 22, 2021, NOFAL LLC and/or Jaber had never paid to license or display any photograph on the Website, the Facebook Page, and/or any other social media page controlled by NOFAL LLC and/or Jaber.

Response 23: Admit.

24. Admit that, as of November 22, 2021, NOFAL LLC and/or Jaber had never paid to license or display any photograph on the Website, the Facebook Page, and/or any other social media page controlled by NOFAL LLC and/or Jaber.

Response 24: Admit.

25. Admit that, in January 2020, Jaber, acting as the manager and sole member of NOFAL LLC, stated to the undersigned that the Work was not used on the Facebook Page.

Response 25: Admit.

26. Admit that, on a date after receipt of the Demand Letter, NOFAL LLC and/or Jaber changed the name of the Facebook Page from Villard Foodtown to Food Town Mart.

Response 26: Deny that at any time Jaber or any member of NORFAL LLC changed the name of the Villard Foodtown Facebook page to Food Town Mart.

27. Admit that, prior to the date of these requests, NOFAL LLC was not licensed to use or display the following photograph, currently published at

https://www.facebook.com/villardfoodtown/photos/pb.100022757634300.-2207520000./2302989003357489/?type=3:



Response 27: Admit.

28. Admit that, prior to the date of these requests, Defendant was not licensed to use or display the following photograph, currently published at https://www.facebook.com/villardfoodtown/photos/pb.100022757634300.-2207520000./2302987733357616/?type=3:



Response 28: Admit.

29. Admit that, prior to the date of these requests, Defendant was not licensed to use or display the following photograph, currently published at https://www.facebook.com/villardfoodtown/photos/pb.100022757634300.-2207520000./2140676156255442/?type=3:



Response 29: Admit.

30. Admit that, prior to the date of these requests, Defendant was not licensed to use or display the following photograph, currently published at https://www.facebook.com/villardfoodtown/photos/pb.100022757634300.-2207520000./1758387304484331/?type=3



:

Response 30: Admit.

31. Admit that, prior to the date of these requests, Defendant was not licensed to use or display the following photograph, currently published at https://www.facebook.com/villardfoodtown/photos/pb.100022757634300.-2207520000./1758389757817419/?type=3:




Response 31: Admit.

32. Admit that, at the time the Answer to the Complaint was filed in this lawsuit (February 20, 2023), NOFAL LLC was not aware of any facts evidencing or supporting that "The Second Amended Complaint fails to state a claim upon which relief can be granted," as asserted in Defendants' First Affirmative Defense.

Response 32: Deny and state that the affirmative defense that the Complaint fails to state a claim upon which relief can be granted as a meritorious defense.

33. Admit that, at the time the Answer to the Complaint was filed in this lawsuit (February 20, 2023), NOFAL LLC was not in possession of any documents evidencing or supporting that "The acts and/or allegations contained within the Second Amended Complaint were caused by those other than these answering defendants," as asserted in Defendants' Second Affirmative Defense.

Response 33: Deny and assert that the assent or allegations contained within the Second Amended Complaint were caused by those other than these answering defendants are a meritorious defense.

34. Admit that, at the time the Answer to the Complaint was filed in this lawsuit (February 20, 2023), NOFAL LLC was not aware of any facts evidencing or supporting that "The claims of the

plaintiff may be precluded by the application of the "fair use" doctrine," as asserted in Defendants' Third Affirmative Defense.

Response 34: Assert that NOFAL LLC was aware of "The claims of the plaintiff may be precluded by the application of the "fair use" doctrine."

35. Admit that, at the time the Answer to the Complaint was filed in this lawsuit (February 20, 2023), NOFAL LLC was not in possession of any documents evidencing or supporting that "The plaintiff has failed to mitigate their damages," as asserted in Defendants' Fourth Affirmative Defense.

Response 35: Pursuant to Rule 36(4) of the Federal Rules of Civil Procedure, the information known or readily available does not allow this responding defendant to either admit or deny Request No. 35 and therefore it must be deemed denied after reasonable inquiry.

Dated this 15th day of August, 2023.

TERSCHAN, STEINLE, HODAN & GANZER, LTD.
Attorneys for the Defendant, Sharif Jaber

*Electronically signed by W. Timothy Steinle*
State Bar No.: 1003777

P.O. ADDRESS:
309 North Water Street, Suite 215
Milwaukee, WI 53202
(414) 258-1010

**EXHIBIT "G"**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

Case No. 2:22-cv-00642-JPS

PREPARED FOOD PHOTOS, INC. f/k/a
ADLIFE MARKETING &
COMMUNICATIONS CO., INC.,

Plaintiff,

v.

NOFAL LLC d/b/a FOOD TOWN MART and
SHARIF JABER,

Defendants.

---

**NOTICE OF TAKING DEPOSITION OF THE CORPORATE**
**REPRESENTATIVE OF NOFAL LLC D/B/A FOOD TOWN MART**

**PLEASE TAKE NOTICE** that, pursuant to Federal Rule of Civil Procedure 30(b)(6), plaintiff Prepared Food Photos, Inc. f/k/a Adlife Marketing & Communications Co., Inc. will take the deposition of the corporate representative(s) of defendant NOFAL LLC d/b/a Food Town Mart which shall designate one or more officers, directors, managing agents, or other persons who will testify on its behalf and be examined regarding the matters set forth on **Exhibit "A"** attached hereto, at the place, date and time indicated below. The deposition will take place upon oral examination(s), before a Notary Public, or some other officer duly authorized by law to take depositions. The deposition(s) will continue from day to day until completed.

| DEPONENT | DATE AND TIME | LOCATION |
|---|---|---|
| Corporate Representative of NOFAL LLC d/b/a Food Town Mart | September 26, 2023, at 1:00 pm EST (12:00 pm CST) | Via Zoom (access information below) |

Join Zoom Meeting

https://us06web.zoom.us/j/87645478605?pwd=OXExWTZlM2RGUk0wVzg1MTZqOEhWZz09

Meeting ID: 876 4547 8605
Passcode: 728544

Dated: August 21, 2023.

COPYCAT LEGAL PLLC
3111 N. University Drive
Suite 301
Coral Springs, FL 33065
Telephone: (877) 437-6228
dan@copycatlegal.com

By: /s/ Daniel DeSouza______
Daniel DeSouza, Esq.

**CERTIFICATE OF SERVICE**

I hereby certify that on August 21, 2023, I served the foregoing document via e-mail to: Timothy Steinle, Esq. (timothy.steinle@tshglaw.com) and Amber L. Herda, Esq. (amber@tshglaw.com).

/s/ Daniel DeSouza___
Daniel DeSouza, Esq.

**EXHIBIT "A"**

**DEFINITIONS**

1. "Communication" means any oral or written utterance, notation or statement of any nature whatsoever, by and to whomsoever made, including correspondence, conversations, dialogues, discussions, e-mails, interviews, meetings, consultants, agreements, and other understandings between or among two or more people.

2. "Complaint" means the governing Complaint in the above-captioned action.

3. "Concerning" or "Regarding" means relating to, referring to, describing, evidencing, mentioning, affecting, showing, reflecting, touching on, bearing on or constituting.

4. "Document" is used in the broadest sense permitted under the Federal Rules of Civil Procedure and includes, but is not limited to, all originals, non-identical copies and copies with marginal notations or interlineations of any writing, e-mail, text message, computer data, sworn statement, deposition transcript, affidavit, recording, photograph, or other item containing information of any kind or nature, however produced or reproduced, whatever its origin or location, and regardless of the form maintained. The term "Document" also includes all Communications and all Electronically Stored Information.

5. "All Documents" means every document or group of documents or communication as above defined that are known to you or that can be located or discovered by reasonably diligent efforts.

6. "Electronically Stored Information" refers to all computer or electronically stored or generated data and information, and shall include all attachments to and enclosures with any requested item, and all drafts thereof. Electronically Stored Information includes (but is not limited to): e-mails; text messages; messages sent via messaging services/applications (such as

WeChat, WhatsApp, Messenger, Facebook Messenger, etc.); word-processing documents; electronic spreadsheets; electronic presentation documents; image files; sound files; and material or information stored in a database, or accessible from a database. Electronically Stored Information also includes all associated metadata that is maintained or saved, which includes: document title or name; file name; date and time of creation; date and time of last edit; identity of author; identity of owner; identities of editors; identities of recipients; changes; history of changes; e-mail header information; history of who viewed an e-mail and when; and e-mail routing information.

7. "Identify" means, when referring to a Person, to give, to the extent known, the Person's full name, job title, present or last known address and when referring to a natural Person, additionally, the present or last known place of employment.

8. "Identify" means, when referring to any other information, to give a full, complete, forthright and correct account of whatever is the subject of the inquiry.

9. "Including" shall mean including but not by way of limitation.

10. "Lawsuit" means the above-captioned case, currently pending in the United States District Court for the Eastern District of Wisconsin.

11. "Person" means any natural person, individual, proprietorship, partnership, corporation, association, organization, joint venture, firm, or other business enterprise, governmental body, group of natural persons or other entity.

12. "Defendants" refers to defendants NOFAL LLC d/b/a Food Town Mart and Sharif Jaber, and includes any agents, servants and other persons acting or purporting to act on their behalf, collectively.


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

13. "Demand Letter" refers to the November 22, 2021 letter (and any attachments thereto) sent to Defendant on behalf of Plaintiff.

14. "Facebook Page" refers to the Facebook page located at https://www.facebook.com/villardfoodtown.

15. "Jaber" refers to defendant Sharif Jaber and includes any agents, servants and other persons acting or purporting to act on Jaber's behalf.

16. "NOFAL LLC" refers to defendant NOFAL LLC d/b/a Food Town Mart and includes any agents, servants and other persons acting or purporting to act on Defendant's behalf.

17. "Plaintiff" refers to plaintiff Prepared Food Photos, Inc. f/k/a Adlife Marketing & Communications Co. and includes any agents, servants and other persons acting or purporting to act on Plaintiff's behalf.

18. "Website" refers to the website located at https://villard-food-town.business.site/.

19. "Work" refers to the photograph referenced and identified at ¶ 12 of the Complaint.

20. All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Complaint.

21. All words in the present tense include the past, and all words in the past tense include the present tense.

22. As used herein, the singular shall include the plural, the plural shall include the singular, and masculine, feminine, and neuter shall include each of the other genders.

**DEPOSITION TOPICS**

1. The identity of the person purportedly responsible for uploading the Work to the Facebook Page and/or Website.

2. The relationship (if any) between Defendants and the person purportedly responsible for uploading the Work to the Facebook Page and/or the Website.

3. The terms of any agreement between Defendant(s) and the person purportedly responsible for uploading the Work to the Facebook Page and/or the Website.

4. Defendants' involvement (if any) in the publishing of the Facebook Page and Website, the drafting of any of the text thereon, and/or the publishing of any photographs thereon.

5. Defendants' use of any third-parties to publish photographs and/or blogs to the Facebook Page and/or Website.

6. The location on the internet (or elsewhere) from which Defendant(s) obtained a copy of the Work.

7. The factual circumstances by which the Work came to be published on the Facebook Page and/or the Website.

8. The number of visits and/or clicks registered on the Website, in addition to the number of contact form inquiries submitted on the Website.

9. The factual basis for Defendants' contention, set forth in their First Affirmative Defense, that "The Second Amended Complaint fails to state a claim upon which relief can be granted."

10. The factual basis for Defendants' contention, set forth in their Second Affirmative Defense, that "The acts and/or allegations contained within the Second Amended Complaint were caused by those other than these answering defendants."

11. The factual basis for Defendants' contention, set forth in their Third Affirmative Defense, that "The claims of the plaintiff may be precluded by the application of the "fair use" doctrine."

12. The factual basis for Defendants' contention, set forth in their Fourth Affirmative Defense, that "The plaintiff has failed to mitigate their damages."


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

13. The factual basis for Defendant's denial of ¶¶ 4-14 of the Complaint.

14. The factual basis for Defendant's denial of ¶¶ 16-24 of the Complaint.

15. The factual basis for Defendant's denial of ¶¶ 26-37 of the Complaint.

16. The factual basis for Defendants' denial of ¶¶ 39-43 of the Complaint.

17. Defendants' practices and procedures (if any) of licensing and/or purchasing photographs for use on the Facebook Page, Website, or otherwise in connection with Defendant's business.

18. Your responses to Plaintiff's First Set of Interrogatories.

19. Your responses to Plaintiff's First Request for Admissions.

20. Your responses to Plaintiff's First Request for Production.

21. The identity of all members, shareholders, managers, officers, directors, and employees of NOFAL LLC, including a description of the management/employment role of such person(s).

22. Defendants' efforts (if any) to confirm whether any photograph displayed on the Facebook Page and/or Website was properly licensed and/or purchased.

23. The identity of any person from which Defendant(s) licensed and/or purchased any of the photographs displayed on the Facebook Page and/or Website.

24. The factual basis for any contention by Defendants that they are or were licensed to use or display the Work.

25. Defendants' efforts to search for and collect documents responsive to Plaintiff's First Request for Production.

26. Defendants' efforts (if any) to prevent copyrighted images from being published on the Facebook Page and/or Website.

27. Defendants' receipt of any letters, demands, or notices with respect to alleged copyright infringement on the Facebook Page and Website and disposition thereof.


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

28. Defendants' revenue and profits from January 1, 2018 through the present date.

29. Defendants' revenue and profits associated with the sale of any product for which the Work was utilized by Defendants.

30. Defendants' method and means by which they generate revenue and/or profits.

31. Defendants' expenses incurred in their operation and/or ownership of the Facebook Page and Website.

32. The identity and factual description of any other lawsuit in which Defendants were sued for alleged copyright infringement, vicarious copyright infringement, and/or any other intentional tort.


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

**UNITED STATES DISTRICT COURT**
**EASTER DISTRICT OF WISCONSIN**

**Case No. 22-cv-642-JPS**

PREPARED FOOD PHOTOS, INC.,

Plaintiff,

v.

SHARIF JABER and
NOFAL, LLC,
d/b/a Food Town Mart,

Defendants.

---

**DEFENDANT SHARIF JABER'S MOTION FOR EXTENSION OF TIME *NUNC PRO TUNC* TO FILE MOTION FOR ATTORNEY'S FEES**

Defendant Sharif Jaber, pursuant to Fed. R. Civ. P. 6, moves for an extension of time *nunc pro tunc*, on an expedited basis under Local Rule 7(h), to file a motion for attorney's fees as a prevailing defendant.

Given the co-pending briefing on plaintiff Prepared Food Photos, Inc.'s motion for attorney's fees and the judicial economy that will result by having near-simultaneous briefing on defendant Sharif Jaber's motion for attorney's fees, Jaber requests that the Court also enter an order shortening the briefing schedule on the instant motion for extension of time.[1]

[1] Although this motion is not brought pursuant to Civil L. R. 7(h) given that its full exposition requires more than three pages (and supporting declaration more than two pages), Jaber nevertheless requests the Court consider expedited briefing on this motion.

## TABLE OF CONTENTS

Page


I. INTRODUCTION .......... 3

II. FACTS & PROCEDURAL HISTORY .......... 3

III. ARGUMENT .......... 5

A. Legal framework for extensions of time after a deadline has passed .......... 5

B. The *Pioneer* factors .......... 6

1. *There is no danger of prejudice to Prepared Food Photos* .......... 6

2. *The impact of an extension on these post-judgment proceedings is minimal* .......... 8

3. *The delay in filing Jaber's fees motion was the result of a combination of factors related to the representation* .......... 9

4. *Jaber's prior counsel acted in good faith* .......... 12

C. Weighing the *Pioneer* factors .......... 12

IV. CONCLUSION .......... 13

## I. INTRODUCTION

This motion seeks to invoke the Court's equitable powers to provide defendant Jaber, a prevailing party in this action, with an extension of time to file a motion for attorney's fees under Rule 54(d)(2)(B)(i).

During the time that the deadline occurred, prior defense counsel, W. Timothy Steinle, was unable to reach the defendants. Decl. of Steinle, DE 65-1. Because he could not reach the defendants to obtain their instructions following trial, and did not immediately recognize that the judgment was a split outcome for the two defendants, the deadline was missed. However, newly-appearing defense counsel was recently able to reach defendant Jaber, who then authorized the undersigned to proceed with preparing and filing a motion for attorney's fees as the prevailing party.

Prepared Food Photos would not agree to an extension of time *nunc pro tunc*, and therefore Jaber brings the present motion. The Court would not abuse its discretion in granting this motion.

## II. FACTS & PROCEDURAL HISTORY

On November 7, 2024, the Court entered judgment on the jury's verdict, after plaintiff obtained $200 in actual damages in this copyright infringement case. DE 54. That event began a 14-day deadline for the prevailing parties to file any motion for attorney's fees pursuant to Rule 54(d)(2)(B)(i). The verdict was a split decision, with Prepared Food Photos prevailing on its claim against Nofal, but losing with respect to is claim against Jaber.

One day before the deadline, Prepared Food Photos filed a Rule 59 motion for new trial and/or to amend the judgment, arguing that "there was no rational/reasonable basis for the jury's $200.00 actual damages award." DE 56 at 1. The Court denied that motion on April 7, 2025. DE 61. Fourteen days later, Prepared Food Photos filed its motion for attorney's fees. DE 64.

However, following the trial in this action on November 4, 2024, prior defense counsel, Mr. Timothy Steinle, was unable to reach either of the defendants to address post-judgment proceedings. Over the course of months, Attorney Steinle repeatedly sought to address these matters with his clients, but was unsuccessful. As a result of what appeared to be a client gone missing, he then filed a motion to withdraw, DE 65, supported by his affidavit, DE 65-1. He testified that he was unable to reach defendant Jaber starting the day after the trial, and which continued to the date of his motion to withdraw on May 1, 2025. DE 65-1 at ¶¶ 3-12. In disposing of that motion, the Court recognized that Attorney "Steinle attempted to contact Jaber on twelve occasions since trial and has heard nothing in return." DE 68. Consequently, the Court granted Attorney Steinle's withdrawal. DE 68.

Having been served with plaintiff's fees motion and becoming aware that Attorney Steinle had withdrawn, defendants Jaber and Nofal then engaged the undersigned counsel on June 5, 2025. Upon making contact with defendant Jaber, the undersigned discussed the post-judgment proceedings with him, and obtained his informed consent and authorization to proceed with seeking his attorney's fees from Prepared Food Photos. The undersigned also obtained defendant Nofal LLC's authorization to proceed with opposing plaintiff's request for fees. The undersigned then appeared in the action on June 11, 2025. DE 73.

While defendant Nofal was able to obtain plaintiff's consent to an extension of time to file its opposition to Prepared Food Photos' fees motion, plaintiff would not consent to an extension of time for defendant Jaber to file his fees motion. This motion follows.

## III. ARGUMENT

### A. Legal framework for extensions of time after a deadline has passed

Where "the time has expired" for complying with a deadline, "the court may, for good cause, extend the time" on motion "if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B).

Courts consider various factors in determining whether a party's delay was the result of excusable neglect, including: (1) the danger of prejudice to the other party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith. Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P., 507 U.S. 380, 388 (1993).

The Supreme Court has said there is a "flexible understanding" to the meaning of "excusable neglect." Pioneer, 507 U.S. at 389. In Pioneer, where the Court addressed the meaning of "excusable neglect" as found in Federal Rule of Bankruptcy Procedure 9006(b)(1), it noted the differing policies between Chapter 11 and Chapter 7 of the bankruptcy code. Id. In doing so, it has empowered district judges to follow "differing policies" that might underlie an equitable analysis of excusable neglect. Cf. id. The Court ultimately held that excusable neglect "is not limited to situations where the failure to timely file is due to circumstances beyond the control of the filer," Pioneer, 507 U.S. at 386, but embodies "a somewhat 'elastic concept.'" Id. at 392. Courts are therefore "permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness" *in addition to* "circumstances beyond the party's control." Id. at 388. It also observed that bankruptcy "Rule 9006(b)(1) was patterned after Rule 6(b) of" [the Federal] Rules [of Civil Procedure]," id. at 391, and the Seventh Circuit follows Pioneer in the Rule 6(b) context, Raymond v. Ameritech Corp., 442 F.3d 600 (7th Cir. 2006) ("Pioneer applies whenever 'excusable neglect' appears in the federal procedural rules).

In comparison to "good cause" under Rule 6(a), "excusable neglect" under 6(b) is a less difficult standard because the "former 'implies justification rather than excuse (negligence can be excused but not justified).'" Bowman v. Korte, 962 F.3d 995, 998 (7th Cir. 2020) (quoting CFTC v. Lake Shore Asset Mgmt. Ltd., 646 F.3d 401, 404 (7th Cir. 2011)). And while the Pioneer factors apply whenever "excusable neglect" appears in the federal procedural rules," Raymond, 442 F.3d at 606, "district courts enjoy wide latitude in determining whether a litigant's explanation for missing a deadline amounts to … 'excusable neglect,'" Nartey v. Franciscan Health Hosp., 2 F.4th 1020, 1024 (7th Cir. 2021).

The Seventh Circuit would review this Court's decision to extend the time for abuse of discretion. See Blue v. Hartford Life & Accident Ins. Co., 698 F.3d 587, 593 (7th Cir. 2012). Under this standard, it will only disturb the district court's decision if it has "acted unreasonably." Id.

### B. The Pioneer factors

When the Pioneer factors are applied to the facts here, equity weighs in favor of granting defendant Jaber an extension of time. Granting such an extension would not be unreasonable or an abuse of discretion.

#### *1. There is no danger of prejudice to Prepared Food Photos*

First, there is no danger of prejudice to plaintiff Prepared Food Photos, a serial litigant that is routinely accused of copyright trolling.[2] This is the first time Jaber has requested an extension,

[2] E.g., https://clpblog.citizen.org/is-prepared-food-photos-running-a-scam-notjust-a-scheme-to-extract-excessive-rents/; https://clpblog.citizen.org/preparedfood-photos-faces-financial-repercussions-from-copyright-trolling/; https://clpblog.citizen.org/new-trolls-on-the-block-prepared-food-photos-anddaniel-desouza-copycat-legal/. It has filed over 300 copyright infringement lawsuits (including at least five in this District alone), and pursued an untold number of accused with form demand letters. Even its amended complaint reveals evidence of its boilerplate, incorrectly identifying "Little Pine" as a defendant in this action, which its counsel claimed ignorance of the error during the deposition of Sharif Jaber. DE 64-1 at 17:9-17:17.

and he does not anticipate a further one would be necessary beyond the proposed deadline of June 30, 2025.

Earlier, Prepared Food Photos itself extended the post-judgment proceedings by filing a Rule 59 motion for new trial, and elected to wait until after that motion was disposed of to file its motion for attorney's fees, which it did on April 21, 2025. Nor did it oppose withdrawal of prior defense counsel, Attorney Steinle, or oppose the additional time for Nofal to obtain counsel. DE 66. Specifically, Prepared Food Photos did "not oppose the motion … for an extension of time so long as any extension is 'reasonable.'" Id. at 1. Similarly, it did not oppose an extension of time with respect to co-defendant Nofal to oppose plaintiff's fee motion after the appearance of new defense counsel. DE 74. Clearly, plaintiff has conceded that June 30, 2025, is a reasonable extension of time for Nofal, but contends that a similar extension for co-defendant Jaber is not. Plaintiff's opposition appears motivated not by any prejudice but rather by its desire to avoid fees liability. And Jaber, as the "prevailing defendant[] in [a] copyright case [is] presumptively entitled (and strongly so) to recover attorney's fees." Live Face on Web v. Cremation Soc'y of Ill., 77 F.4th 630, 632 (7th Cir. 2023).

Allowing Jaber to file a fees motion would not be an abuse of discretion given the "asymmetric recoveries" between defendants and plaintiffs in copyright actions. Id.; see also Allegrini v. De Angelis, 68 F. Supp. 684, 684-85 (E.D. Penn. 1946) (awarding fees to the defendant under the 1909 Copyright Act even though he sought those fees more than a year post-judgment, finding that "[t]he delay did not prove prejudicial to the plaintiffs' cause"). Here, "the best" Jaber "can hope for is to break even—to recover his attorney's fees." Id. That is because absent an award of fees, "a defendant faces pressure to abandon his meritorious defenses and throw in the towel because the cost of vindicating his right (his attorney's fees) will exceed the private benefit he

receives from succeeding." Id.

In sum, Prepared Food Photos cannot claim prejudice respecting one party (Jaber) when it has been more than forthcoming with respect to additional time for another party (Nofal) on essentially the same post-judgment issue. The difference? It stands to benefit from being gracious respecting its motion for fees, but stands to lose by being equally gracious respecting Jaber's motion. Clearly, plaintiff's current refusal simply seeks to invoke a procedural basis alone to avoid the consequences of its failed litigation against one of the two defendants.

### 2. *The impact of an extension on these post-judgment proceedings is minimal*

For the same reasons, plaintiff's currently-pending motion for attorney's fees concerning defendant Nofal means that there will be little temporal impact on these post-judgment proceedings if defendant Jaber is allowed to file a motion for attorney's fees as another successful party besides Prepared Food Photos. The current briefing schedule for plaintiff's motion includes a further extension of time for Nofal to file its opposition which would be June 30, 2025, if the Court so orders based on the currently-pending unopposed motion for extension of time. Pursuant to Local Rule 7(c), Prepared Food Photos would thereafter have a further 14 days to file a reply, if any (July 14, 2025).

In comparison, the additional time required to brief Jaber's motion for attorneys fees would result in a maximum of an additional 21 days. Jaber proposes to file its fees motion by the same date as Nofal's opposition (June 30). Thereafter, Prepared Food Photos would have 21 days to respond, (July 21) and Jaber then have up to 14 days to reply (August 4). Civil L.R. 7.3. The total difference between the briefing schedules would thus be 21 days. And there are no other matters

to address in this action other than attorney's fees and costs.[3] Moreover, CopyCat Legal frequently labors under a 14-day opposition timeframe,[4] and may well submit its opposition before then. Similarly, Jaber anticipates it would be able to submit a reply brief within seven days after plaintiff's opposition. Were that to occur, it is entirely plausible that the difference in briefing the competing fees motions could be a mere seven days.

Without briefing complete, the Court has also not set oral argument on plaintiff's fee motion. Consequently, oral argument, should the Court determine it prefers to convene a hearing, could address both of the competing fees motions simultaneously, and also thereafter dispose of them simultaneously. Apart from the separate bill of costs,[5] there are no other deadlines running after the fees briefing, and the matter would be submitted for the Court to dispose of according to its own schedule.

The impact of permitting Jaber to file his fees motion out of time is minimal, and equity weighs in favor of extending the time.

***3. The delay in filing Jaber's fees motion was the result of a combination of factors related to the representation***

The reason for Jaber's delay in filing a motion for attorney's fees as a prevailing defendant was the result of the confluence of a number of factors all combining to result in missing the deadline.

---

[3] And the time for appeal of the merits has also expired, with no party seeking such an appeal. Defendant Nofal expects to satisfy the $200 judgment shortly, thus obviating any proceedings supplemental.

[4] For example, CopyCatl Legal is frequently counsel of record for copyright plaintiffs in the Southern District of Florida, whose local rules provide for a 14-day deadline, and a 7-day deadline for the movant's reply brief.

[5] Which defendant Nofal anticipates it would not oppose, pending its new counsel's further investigation.

First, Attorney Steinle and Jaber did not initially recognize the final judgment, DE 54, embodied *two* prevailing parties. The obvious party that prevailed at trial was plaintiff Prepared Food Photos, given its $200 damages award—but less obvious was the fact that Jaber too was a prevailing defendant *in addition to Prepared Food Photos*. That conclusion was obscured by the fact that Jaber is the sole owner of Nofal LLC, see Tr. of Trial, DE 64-1 at 7:18-8:18, and both he and his company defended against plaintiff's action jointly throughout the proceedings. E.g., Ans. To Am. Compl., DE 21. That is not uncommon, where a proprietor and his closely-held business are often assumed and viewed as one. And so the ultimate result "seemed like" it ran only in favor of Prepared Food Photos, but in fact it did not. It was technically a split decision. Prepared Food Photos obtained a favorable verdict overshadowed the fact that Jaber, individually, had also won, because he *appeared* to have lost through the $200 liability ascribed to his business, albeit an indirect loss to him as the business's owner.

Consequently, Attorney Steinle proceeded to counsel Jaber and Nofal of the post-judgment proceedings with a view towards preserving the jury's small damages award, and opposing Prepared Food Photos' motion for new trial. Decl. of Steine, ¶ 5. That focus resulted in Attorney Steinle drafting a memorandum in opposition to plaintiff's Rule 59 motion, but again overshadowed the fact that Jaber too was a victor, entitled to seek his attorney's fees just as Prepared Food Photos was seeking its own. Not realizing the judgment split the defendants into one loser and one winner, Jaber and his prior counsel thus neglected to timely file a motion for attorney's fees. Id. at ¶¶ 6-8.

The focus on preserving the judgment also came at the expense of a breakdown in communication between Attorney Steinle and Jaber. DE 65-1; see also Decl. of Steinle, ¶ 7. While Steinle diligently sought to discuss the post-trial matters, Jaber was, as a result of Attorney

Steinle's focus, unaware that he was a prevailing party and could seek reimbursement of the fees that his attorneys were requesting be paid. Attorney Steinle's, and thus Jaber's conduct might rightly be characterized as neglect, but it is excusable neglect pursuant to Pioneer.

As a result of Pioneer, the Seventh Circuit retreated from its earlier narrow definition of excusable neglect and its decisions that precluded a finding of excusable neglect unless there were circumstances beyond the movant's control. See Robb v. Norfolk & W. Ry. Co., 122 F.3d 354, 359 (7th Cir. 1997) (recognizing that Pioneer abrogated, among other cases, In re Danielson, 981 F.2d 296 (7th Cir. 1992) (which held that "sloth, ignorance and other negligence" did not qualify as "excusable neglect")); id. at 361 ("'excusable neglect' has a new and broader meaning").

Here, Attorney Steinle repeatedly tried, but failed, to reach Jaber prior to the time when a fees motion was due DE 65-1 at ¶¶ 3-12. The Court recognized that communication problem implicated Wisconsin Supreme Court Rule 20:1.4: "[r]easonable communication between the lawyer and the client is necessary for the client effectively to participate in the representation." Order, DE 68 at 3. Consequently, Attorney Steinle's ability to pursue a fees motion without Jaber's input and authorization was compromised, even if he had earlier recognized Jaber was a prevailing party besides Prepared Food Photos.

Indeed, the right to attorney's fees is not that of the lawyer, but of the client. See Allegrini, 68 F.Supp at 684 (characterizing fees under the Copyright Act as "a substantive right" of the party); accord Zeisler v. Neese, 24 F.3d 1000, 1002 (7th Cir. 1994) ("the entitlement to attorney's fees belongs to the [client], not to [the] lawyer" which is consistent with "the pattern set by other attorney's fee statutes") (collecting cases); Maddrix v. Dize, 153 F.2d 274 (4th Cir. 1946) (the Fair Labor Standards Act's fees entitlement provision "does not confer the right to compensation upon the attorney but upon his client"); see also Betz v. Diamond Jim's Auto Sales, 849 N.W.2d 292,

303 (Wis. 2014) ("it is the client's right to recover statutory attorney's fees"). Given Jaber's lack of response over months, Attorney Steinle's ethical ability to invoke the judicial machinery to seek affirmative relief from Prepared Food Photos was clouded and questionable, even if he had recognized Jaber had prevailed.

***4. Jaber's prior counsel acted in good faith***

Jaber's prior counsel acted in good faith in seeking to traverse an ethically fraught situation—seeking to do only that which he felt he could do without being able to reach his client.

Attorney Steinle's diligent and continuous efforts to contact his client over a period of months is the exact opposite of intentional delay. To the contrary, he attempted to ensure that his clients' interests were protected without overextending his authority to act in his representative capacity and invoke a right held by his client but for which he did not have express authorization to pursue—direct affirmative post-judgment monetary relief from a party-opponent.

However, now that the undersigned successfully contacted Jaber and was retained and instructed by him to seek reimbursement of his attorney's fees, the proposed June 30 deadline to review an entire case file through to judgment and prepare the corresponding fees motion is more than reasonable, and is in good faith. This motion was filed promptly upon counsel being able to reach Jaber as well conferral with counsel for Prepared Food Photos, who has opposed the relief sought herein.

**C. Weighing the Pioneer factors**

"A district court best knows the impact" that a party's deadline "error has on the court's operation and calendar[,] … the attorney and his motives, the circumstances of the case and the judicial economy of excusing the neglect." United States v. Brown, 133 F.3d 993, 997 (7th Cir. 1998). Here, the impact of extending the deadline to permit two competing fees motions is a

practical one: Jaber's motion would have the potential to effectively offset any fees judgment in favor of Prepared Food Photos. While an order granting plaintiff's fees motion would run against Nofal, an order granting Jaber's motion would run against Prepared Food Photos. Because Nofal is owned by Jaber, the net effect of potential dueling fees obligations between the three parties might produce a net zero (or minimal) ultimate obligation. But more fundamentally, allowing Jaber to file a fees motion could facilitate potential voluntary settlement of the competing fees dispute without the need for the court to dispose of either motion.

Ultimately, the Pioneer factors weigh in favor of granting the extension of time *nunc pro tunc*. Equity weighs in favor of allowing defendant Jaber to file his motion for attorney's fees given that he was unreachable when still represented by counsel, and the judgment practically runs against Jaber indirectly through his business, Nofal, although he did, in fact, prevail. The Seventh Circuit also favors awards to successful defendants: "fees are proper for the defendant who rebels against [a copyright] troll's efforts" because he is, in effect, "a private attorney general, combating a disreputable business practice—a form of extortion extortion—and he [seeks his fees] not to obtain a reward but merely to avoid a loss." Live Face on Web, 77 F.4th at 634 (quoting Riviera Distribs., Inc. v. Jones, 517 F.3d 926, 929-30 (7th Cir. 2008)). Preventing Jaber from pursuing a fee award would run counter to the fee award policy embodied in the Copyright Act. Consequently, the Court would not abuse its discretion in granting the extension.

## IV. CONCLUSION

The Court should grant this motion for extension of time, and permit defendant Jaber to file his motion for attorney's fees as a prevailing defendant under the Copyright Act.

**WHEREFORE**, defendant Sharif Jaber requests the Court enter an order:

a) granting this motion;

b) shorten the time for a response to this motion, and require plaintiff Prepared Food Photos to submit its opposition memorandum within seven days (June 23, 2025);

c) exercise its equitable discretion and allow Jaber to file a fees motion out of time;

d) set the deadline for filing Jaber's fees motion as June 30, 2025, or fourteen days after the instant motion for extension of time is disposed of (whichever is later); and

e) for such further relief as the Court deems just and proper.

**CERTIFICATE OF COUNSEL**

Counsel for the movant certifies that he conferred with all parties or non-parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and has been unable to do so.

/s/ Griffin Klema
Griffin C. Klema, Esq.
Fla. Bar No. 100279
Griffin@KlemaLaw.com
**Klema Law, P.L.**
PO Box 172381
Tampa, FL 33672
420 W. Kennedy Boulevard
Tampa, FL 33606
Telephone: 202-713-5292

**UNITED STATES DISTRICT COURT**
**EASTER DISTRICT OF WISCONSIN**

**Case No. 22-cv-642-JPS**

PREPARED FOOD PHOTOS, INC.,

Plaintiff,

v.

SHARIF JABER and
NOFAL, LLC,
d/b/a Food Town Mart,

Defendants.

---

**DECLARATION OF W. TIMOTHY STEINLE, ESQ.**

I, W. Timothy Steinle, Esq., declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 of the following is true and correct:

1. I am an attorney duly licensed to practice law in the State of Wisconsin. I submit this declaration in support of the defendant Sharif Jaber's motion for extension of time *nunc pro tunc* to file his motion for attorney's fees.

2. I was retained as counsel by Nofal, LLC and its sole member, Mr. Jaber, in this action. I withdrew from representation pursuant to the Court's order on May 12, 2025, because post-trial, communications with Mr. Jaber ceased.

3. Throughout the lawsuit, Mr. Jaber had been my sole point of contact for matters respecting Nofal, LLC because Mr. Jaber is the only member (owner) of Nofal. For all practical purposes, this lawsuit was defended by them jointly and identically so. During the proceedings I viewed them as a singular client when making strategic and tactical decisions. For example, the answer and affirmative defenses to plaintiff's second amended complaint was submitted on behalf

of both defendants. They did not separately respond to matters or take differing positions throughout the proceedings. Plaintiff Prepared Food Photos, Inc.'s action was based on a single photograph on a single Facebook post, and so the case appeared as a relatively straightforward claim.

4. At trial, I argued that plaintiff's damages were minimal, and urged the jury to return a verdict of zero damages. Following the jury's deliberations and return of the verdict, my focus (as well as Mr. Jaber's focus), was on the amount of the jury's award, which both Mr. Jaber and I felt was an excellent result in the case given that plaintiff had demanded $150,000 in damages, and $90.000 just prior to trial. Again, Mr. Jaber was essentially Nofal as far as I was concerned as counsel of record.

5. After the conclusion of trial and with the understanding that Prepared Food Photos had won its lawsuit—albeit a low figure—I then submitted additional invoices for work that had been done in the action. I also provided counsel to Nofal/Jaber respecting post-judgment matters, and had anticipated that plaintiff would seek its attorney's fees as the prevailing party. Again, for purposes of this case, I viewed Mr. Jaber and Nofal, LLC as essentially one client, and did not have any other point of contact other than Mr. Jaber. I concluded that my clients had lost the lawsuit on the merits, although the outcome of a $200 judgment I felt was success when the damages demanded by plaintiff prior to suit were $30,000.

6. Because I defended Nofal and Mr. Jaber throughout this action as essentially a singular client, I overlooked the fact that Mr. Jaber, in his individual capacity, had actually succeeded against Prepared Food Photos' claim of vicarious liability, even though Nofal, LLC had lost. Nofal's loss in the form of a $200 judgment appeared to be Mr. Jaber's obligation, as he was and continues to be the only owner of the grocery store. Based on my decades of civil litigation

practice, I normally view vicarious liability as an *alternative* theory of recovery for a singular wrong for which the plaintiff can recover only once. And so the fact that Prepared Food Photos succeeded in its lawsuit gave the impression that Mr. Jaber had also lost because *he* would have to satisfy that judgment, though indirectly through his wholly-owned company, Nofal, LLC.

7. Compounding the difficulty of timely addressing matters post-judgment is the fact that Mr. Jaber stopped responding to my communications after the trial. I had communicated to him there were matters that still needed to be attended to, including my expectation and warning that Prepared Food Photos was likely going to seek its attorney's fees as the successful party. Despite many repeated efforts which I outlined in my prior affidavit, DE 65-1, Mr. Jaber did not communicate with me, and to this date still has not responded to any of my calls or emails.

8. Ultimately, the reason Mr. Jaber did not timely file a motion for attorney's fees was the fact that the last time I spoke to him was on November 4, 2024, combined with the appearance that Prepared Food Photos was the prevailing party in its action against what was, for practical purposes, a singular defendant.

9. I recently concluded, however, that Mr. Jaber, could be a prevailing party, even though he has lost indirectly to plaintiff through his business Nofal. While I regret not having identified that possibility earlier, the circumstances of this case led to an oversight: Nofal LLC and Jaber being viewed as one, and subsequent communications difficulties.

W. Timothy Steinle

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

Case No. 2:22-cv-00642-JPS

PREPARED FOOD PHOTOS, INC. f/k/a
ADLIFE MARKETING &
COMMUNICATIONS CO., INC.,

Plaintiff,

v.

NOFAL LLC d/b/a FOOD TOWN MART and
SHARIF JABER,

Defendants.

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO JABER'S MOTION FOR EXTENSION OF TIME *NUNC PRO TUNC* TO FILE MOTION FOR ATTORNEY'S FEES**

Plaintiff Prepared Food Photos, Inc. f/k/a Adlife Marketing & Communications Co., Inc. ("Plaintiff") hereby files this memorandum in opposition to defendant Sharif Jaber's ("Jaber") Motion for Extension of Time Nunc Pro Tunc to File Motion for Attorney's Fees (the "Motion for Extension of Time") [D.E. 76].

## INTRODUCTION

The Motion for Extension of Time seeks to excuse Jaber's failure to timely file a prevailing party motion for attorneys' fees following the verdict in his favor on Plaintiff's claim for vicarious liability. In support, the Motion for Extension of Time seeks to blame former counsel for purportedly misunderstanding that Jaber and co-defendant Nofal LLC d/b/a Food Town Mart ("Nofal LLC") were separate parties against which separate claims had been alleged, marginalizes the extreme prejudice to Plaintiff if Jaber was allowed to move for fees long after the deadline to appeal has passed, and completely fails in explaining why Jaber paid zero attention to this case



COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

post-trial. As set forth herein, ***none*** of the factors the Court must consider favors granting the relief sought by Jaber.

**BACKGROUND**

1. As the Court knows, this action was submitted to a jury trial October 28, 2024 – October 29, 2024 with the jury ultimately returning a verdict in favor of Plaintiff on its copyright infringement claim against defendant Nofal LLC d/b/a Food Town Mart ("Nofal LLC") and a verdict in favor of Jaber on Plaintiff's claim for vicarious liability.

2. On November 7, 2024 (after Plaintiff elected to receive the jury's finding of actual damages), the Court entered an Order [D.E. 53] summarizing and specifying the jury's findings – namely, that Plaintiff prevailed against Nofal LLC and that Plaintiff's vicarious liability claim was dismissed with prejudice:

> Based on the jury's findings, the Court will dismiss with prejudice Plaintiff's claim of vicarious liability against Jaber. ECF No. 19 at 8–9.

> **IT IS ORDERED** that Plaintiff Prepared Food Photos, Inc.'s claim of vicarious liability for copyright infringement against Defendant Sharif Jaber, ECF No. 19 at 8–9, be and the same is hereby **DISMISSED with prejudice**;

3. The Court subsequently (on the same day) entered Judgment [D.E. 54] in this action, again repeating that Plaintiff's ***claim*** of vicarious liability was "DISMISSED with prejudice":


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

> **IT IS FURTHER ORDERED AND ADJUDGED** that Plaintiff Prepared Food Photos, Inc.'s claim of vicarious liability for copyright infringement against Defendant Sharif Jaber (ECF No. 19 at 8–9) be and the same is hereby **DISMISSED with prejudice** (ECF No. 53);

4. On November 20, 2024, Plaintiff filed a Motion for New Trial and/or to Amend Judgment (the "Motion for New Trial") [D.E. 56]. The Motion for New Trial contained an independent section (titled "Vicarious Infringement") which argued that "[t]he jury's verdict with respect to Plaintiff's vicarious infringement claim against Jaber was likewise unsupported."[1]

5. On December 4, 2024, Defendants filed their Response in Opposition to Plaintiff's Motion for a New Trial and/or To Amend the Judgment (the "Opposition to Motion for New Trial") [D.E. 59]. That opposition memorandum likewise contained an independent section (titled "The Jury's Verdict Finding No Vicarious Infringement Was Appropriate") in which Defendants argued Plaintiff failed to prove its "***vicarious copyright infringement claim***."[2]

6. In any event, the filing of the Motion for New Trial operated to stay the 14-day deadline for any prevailing party to file a motion for attorneys' fees under Fed. R. Civ. P. 54(d)(2)(B)(i).

7. On April 7, 2025, the Court entered its Order [D.E. 61] denying the Motion for New Trial. That Order extensively discusses Plaintiff's vicarious liability claim against Jaber and the Court's reasons for not disturbing the jury's verdict with respect to such.

8. On April 21, 2025 (the new deadline for filing a motion for fees), Plaintiff filed its Motion for Attorneys' Fees [D.E. 64], seeking fees as the prevailing party against Nofal LLC on

---

[1] See D.E. 56, at pp. 12 – 13.

[2] See D.E. 59, at pp. 5 – 6 (emphasis added).


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

Plaintiff's copyright infringement claim. Jaber did not timely file his own motion for fees.

9. On May 1, 2025, W. Timothy Steinle, Esq. ("Mr. Steinle") filed a motion to withdraw as counsel for Defendants [D.E. 65], detailing his numerous efforts to contact Defendants following conclusion of trial, all of which were apparently ignored.

10. On May 12, 2025 (after Mr. Steinle served a copy of the motion to withdraw on Defendants), the Court entered an Order [D.E. 68] granting Mr. Steinle's motion to withdraw. That Order likewise required Plaintiff to serve a copy of the Motion for Fees (and Defendants' opposition) on Defendants and file a certificate of service (which Plaintiff filed proof of such on May 13, 2025).

11. On June 11, 2025, Griffin Klema, Esq. entered his appearance in this action on behalf of Defendants.

12. On June 16, 2025 – ***57 days after the statutory deadline to file a motion for fees*** – Jaber filed the Motion for Extension of Time.

## ARGUMENT

### I. Legal Standard

As set forth in the Motion for Extension of Time, the Court must evaluate the factors identified in Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380 (1993) in deciding whether to allow Jaber to file a motion for fees nearly 2 months after the deadline. "Under Pioneer, the excusable neglect inquiry must consider all relevant circumstances surrounding the party's omission. These include… the danger of prejudice…, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." Drippe v.


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

Tobelinski, 604 F.3d 778, 785 (3d Cir. 2010) (alterations in original) (internal quotation marks omitted); see also Shicks v. DCS, No. 1:21-CV-224-HAB, 2022 U.S. Dist. LEXIS 85954, at *4 (N.D. Ind. May 12, 2022) ("In determining whether Plaintiff has demonstrated excusable neglect, the Court ***must follow the standard*** set forth in Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380 (1993), which ***requires*** that the Court consider the danger of prejudice to the [defendant], the length of the delay and its potential impact on judicial proceedings, the reasons for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." (emphasis added) (internal quotation marks omitted).

## II. The Pioneer Factors

As set forth herein, ***none*** of the Pioneer factors support granting the Motion for Extension of Time. As a result, the Motion for Extension of Time should be denied.

### *A. Danger of Prejudice*

The Motion for Extension of Time first argues there is no danger of prejudice in allowing Jaber to file his own motion for fees 2 months after the deadline for doing so passed. In support, Jaber cites a single blog (written by a single attorney who, like Mr. Klema, regularly solicits defendants sued by Plaintiff and/or undersigned counsel) for the proposition that Plaintiff is "a serial litigant that is routinely accused of copyright trolling." It is unclear why aspersions cast by an attorney drumming up business are somehow relevant to the prejudice inquiry, nor is it clear how Plaintiff filing a motion for new trial, agreeing to Mr. Steinle's withdrawal, and/or agreeing to an extension for Nofal LLC to oppose Plaintiff's motion for fees have ***anything*** to do with the inquiry.

What ***is*** relevant, however, is the fact that Jaber waited until ***after*** the deadline for Plaintiff to appeal the Judgment to seek permission to file his own motion for fees. As set forth in Rui Tong v. Henderson Kitchen, Inc., No. 17-1073, 2020 U.S. Dist. LEXIS 158681, at *14 (E.D. Pa. Sep. 1, 2020):

> First, Defendants have suffered prejudice because Plaintiffs filed their Motion for Attorney's Fees long after the time to appeal had lapsed. This deprived Defendants of notice of Plaintiffs' claim for attorney's fees, which may have affected Defendants' decision to appeal. See Franlogic Scout Dev., LLC v. Scott Holdings, Inc., No. CV 16-5042, 2018 U.S. Dist. LEXIS 72751, 2018 WL 2002203, at *3-4 (E.D. Pa. Apr. 30, 2018) ("Petitioners would suffer prejudice if Respondent was permitted to file its Motion for Attorneys' Fees" because "[o]ne purpose of the fourteen-day deadline in Rule 54(d)(2)(B) is to provide notice to the opposing party of the claim for attorneys' fees before the time to appeal has lapsed."); Hardin v. SEPTA, No. Civ. A. 91-7434, 1998 U.S. Dist. LEXIS 33, 1998 WL 54713, at *4 (E.D. Pa. Jan. 6, 1998) ("The purpose of Rule 54(d)(2)(B) is to provide the opposing party and the court with notice of the motion for fees.").

Indeed, the 1993 Advisory Committee Notes to Fed. R. Civ. P. 54 specifically state: "Subparagraph (B) provides a deadline for motions for attorneys' fees—14 days after final judgment unless the court or a statute specifies some other time. One purpose of this provision is to assure that the opposing party is informed of the claim before the time for appeal has elapsed."

Here, the deadline for any prevailing party to file a motion for fees was April 21, 2025 and the deadline for any party to file an appeal of the Judgment was May 7, 2025 (30 days after the Court's denial of Plaintiff's Motion for New Trial). With Plaintiff having filed its own Motion for Attorneys' Fees and knowing that Jaber did not, Plaintiff chose to forego an appeal of the judgment in Jaber's favor and instead simply pursue prevailing party fees against Nofal LLC. Had undersigned counsel known that Jaber would pursue prevailing party fees (the reason that Rule


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

54(d)(2)(B)(i) exists), Plaintiff would have pursued an appeal in this matter.[3] Jaber's delay in waiting until long after the time to appeal expired thus materially prejudices Plaintiff as it is now stuck with a verdict in Jaber's favor and can no longer appeal such verdict. This factor clearly favors denial of the Motion for Extension of Time.

### *B. Length of Delay and Impact on These Proceedings*

Jaber's 2-month delay in seeking to file his own motion for attorneys' fees is, at best, a neutral factor. As set forth above, Jaber's delay greatly impacted Plaintiff's decision to appeal the Judgment. And while granting the Motion for Extension of Time will not materially extend these proceedings,[4] "there must be finality in litigation, and reopening the case to allow a motion for attorneys' fees would have some adverse impact on the judicial proceedings." See Franlogic Scout Dev., LLC v. Scott Holdings, Inc., No. 16-5042, 2018 U.S. Dist. LEXIS 72751, at *13 (E.D. Pa. Apr. 30, 2018) (finding a 2-month delay to be a neutral factor as compared to a 1-year delay).

### *C. Reason for the Delay / Good Faith*

The third and fourth Pioneer factors are where the Motion for Extension of Time truly falls apart at the seams. Here, the Motion for Extension of Time ***inexplicably*** argues that Mr. Steinle somehow did not understand there were separate claims against Nofal LLC and Jaber, with Mr.

---

[3] See Exhibit "A," a true and correct copy of the June 24, 2025 Declaration of Rebecca Jones (the "Jones Decl."), at ¶¶ 4 – 5.

[4] Mr. Klema volunteers that CopyCat Legal "frequently labors under a 14-day opposition timeframe, and may well submit its opposition before" the deadlines set forth in the Local Rules. While undersigned counsel appreciates the vote of confidence, the point remains that undersigned counsel (like most practicing attorneys) has an extraordinarily busy schedule, with cases pending in Florida and across the country, each of which has filing deadlines for which courts expect compliance. And given that undersigned counsel does occasionally enjoy seeing his family and/or going on a summer vacation, allowing Jaber to further multiply these proceedings with yet another motion that requires briefing will certainly impact this case and undersigned counsel's other proceedings.


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

Steinle (per his declaration) viewing Defendants "as a singular client when making strategic and tactical decisions." Such argument, however, is nonsensical.

As identified in the Background section above, the Court's November 7, 2024 Order [D.E. 53], the Judgment [D.E. 54], and the proceedings on Plaintiff's Motion for New Trial were all ***unequivocally*** clear that Jaber had prevailed on Plaintiff's claim for vicarious liability. None of Jaber, his prior counsel, or his current counsel can – with a straight face – assert there was anything unclear about the Judgment or Jaber's status as a prevailing party. Setting aside for the moment that the Second Amended Complaint [D.E. 19] includes a "COUNT I – COPYRIGHT INFRINGEMENT" claim against "NOFAL LLC" and a "COUNT II – VICARIOUS COPYRIGHT INFRINGEMENT" against "Jaber," the record here is replete with references to the separate nature of these claims. For example, the parties' ***Joint*** Proposed Jury Instructions [D.E. 42] contain a specific instruction (12.6.1) on "DERIVATIVE LIABILITY – VICARIOUS INFRINGEMENT." Defendants' ***unilateral*** pre-trial report (filed on April 11, 2024) [D.E. 38] likewise recognized there were two, separate claims:

> **(1)(A) SUMMARY OF FACTS**
>
> The plaintiff, Prepared Food Photos, Inc., alleged in a Second Amended Complaint two (2) counts against the defendants, Nofal, LLC, and Sharif Jaber, individually: Count I-Copyright Infringement as to Nofal, LLC and Count II-Vicarious Copyright Infringement as to Sharif Jaber individually (Document 19). As to the allegations in the complaint, the defendants have denied

The Joint Final Pre-Trial Report [D.E. 41] likewise identified the separate nature of Plaintiff's claims:


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

## (1)(A) SUMMARY OF FACTS

Plaintiff alleges in a Second Amended Complaint two (2) counts against Defendants: Count I-Copyright Infringement as Food Town and Count II-Vicarious Copyright Infringement as to Sharif (Document 19). As to the allegations in the complaint, the defendants have denied any and

Plaintiff likewise served ***individual*** discovery requests (interrogatories, requests for production, and requests for admissions) to ***each of*** Nofal LLC and Jaber – with each defendant ***separately answering*** those requests.[5]

The notion that Mr. Steinle was somehow unaware of separate claims against Nofal LLC and Jaber is simply not credible. Mr. Steinle clearly understood there were separate claims and that Plaintiff did not prevail against Jaber. And even if he somehow failed to read the Judgment or understand that Jaber was a prevailing party (he did not), such neglect would not be "excusable" under any interpretation. See, e.g. Easley v. Kirmsee, 382 F.3d 693, 698 (7th Cir. 2004) ("Although attorney carelessness can constitute 'excusable neglect' under Rule 60(b)(1), attorney in-attentiveness to litigation is not excusable, no matter what the resulting consequences the attorney's somnolent behavior may have on a litigant. Easley's attorney's conduct can only be classified as inexcusable inattentiveness or neglect, rather than excusable carelessness.") (internal citations omitted); CSU v. Xerox Corp., 202 F.R.D. 275, 282 (D. Kan. 2001) ("[C]ounsel's failure to read and follow the plain terms of a court order does not justify a two month delay in responding to the order."); Equilease Fin. Servs., Inc. v. Fincastle Leasing, Inc., 305 F. App'x 291, 292 (7th Cir. 2008) ("[A] mistake of law is not a ground for relief under Rule 60(b)"); Kendall v. Hoover

[5] True and correct copies of Plaintiff's discovery requests, together with Nofal LLC and Jaber's responses thereto, are attached hereto as Exhibit "B."


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

Co., 751 F.2d 171, 175 (6th Cir. 1984) ("The failure to respond to a motion for summary judgment or to request an extension of time to file a response thereto is inexcusable neglect.").

The actual, ***non-manufactured*** reason for the delay in Jaber seeking fees is Jaber himself. As made clear in Mr. Steinle's motion to withdraw, Mr. Steinle made substantial efforts to contact Jaber post-trial with respect to both new filings and Mr. Steinle's outstanding invoice(s). The Motion for Extension of Time ***does not*** assert that Jaber did not receive Mr. Steinle's correspondence or was somehow unaware of the outreach. Indeed, the Motion for Extension of Time is entirely silent in explaining Jaber's ambivalence toward his own case, choosing instead to focus on Mr. Steinle's purported understanding of the case/law. The simplest and most obvious explanation is that Jaber ***deliberately ignored*** Mr. Steinle, any rights Jaber may have had under the Judgment, and any obligations he may have had to either Mr. Steinle or the Court.

But for the ***ethically 'questionable'***[6] tactics of Mr. Klema in directly soliciting Jaber, the Motion for Extension of Time would never have been filed as Jaber would have continued ignoring Mr. Steinle, the Court, and undersigned counsel to this day. Although somewhat obfuscated, the Motion for Extension of Time reveals that it was Mr. Klema who reached out to Jaber to represent him in this matter – not the other way around. Indeed, the Motion for Extension of Time plainly states: "Upon making contact with defendant Jaber, the undersigned discussed…."[7] and "now that the undersigned successfully contacted Jaber…."[8] This behavior is, unfortunately, consistent with Mr. Klema's modus operandi as he regularly monitors PACER for filings in undersigned counsel's

---

6 See Wisconsin Rule of Professional Conduct for Attorneys 7.3 (prohibiting solicitation of prospective clients).

7 See Motion for Extension of Time, at p. 4.

8 Id. at p. 12.

cases and solicits defendants to represent them, resulting in Mr. Klema appearing in multiple of undersigned counsel's cases and ironically parroting the same 'troll' arguments he makes herein. Mr. Klema's representation of Jaber here is presumably on the same terms as those other matters where he appeals to the Court as purported pro bono counsel but instead has a contingency relationship wherein he receives a portion of any fees that may be awarded to his client(s).

But notwithstanding Mr. Klema's proclivity for 'trolling' PACER to solicit new clients, the point remains that Jaber has demonstrated ***nothing*** approaching good faith in his handling of post-trial matters. While Mr. Steinle certainly acted in good faith in attempting to communicate with his client, it is Jaber's good or bad faith that matters. ***Nothing*** in the Motion for Extension of Time supports the notion that Jaber acted in good faith or diligently to enforce his rights as a prevailing party in this action. ***Nothing*** explains why Jaber ignored Mr. Steinle, why Jaber did not himself seek new counsel upon Mr. Steinle's withdrawal (rather than wait around to be solicited by Mr. Klema), or why Jaber did not pay attention to an action he ***knew*** was not over given the Motion for New Trial (which was sent by Mr. Steinle to Jaber and likewise ignored). Jaber's delay here is his own doing and is not indicative of good faith. See, e.g. Legaspi v. Cal. Licensed Vocational Nurses Ass'n, 2008 U.S. Dist. LEXIS 79893, at *9 (E.D. Cal. Sep. 3, 2008) ("Plaintiff's conduct in litigating this case is neither negligent nor excusable. Rather, since terminating her counsel in January 2008, plaintiff has willfully ignored both communications by defense counsel and orders of the court. Her belated apologies and subsequent retention of counsel, actions taken after suffering the consequences of her conduct, are insufficient to substantiate her claim of excusable neglect."); Lincoln Diagnostics, Inc. v. Panatrex, Inc., No. 07-CV-2077, 2008 U.S. Dist. LEXIS 56722, at *11 (C.D. Ill. July 21, 2008) ("Furthermore, this court agrees with Plaintiff that


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

any lack of communication between Defendant and its counsel does not and cannot provide a basis for finding excusable neglect.").

***D. The Balance of the Pioneer Factors Do Not Support Jaber***

As set forth above, ***none*** of the Pioneer factors favor Jaber. At best, a single factor (length of delay/impact on the proceedings) is neutral while all others strongly support denial of the Motion for Extension of Time. At bottom, Jaber has nobody to blame but himself for deliberately ignoring Mr. Steinle's multiple attempts to communicate with him, ignoring the Court, and ignoring undersigned counsel's service of the Motion for Attorneys' Fees. That Mr. Klema is willing to set aside the Rules of Professional Conduct to find clients to litigate against undersigned counsel (for reasons that only Mr. Klema can explain) is not an excuse for Jaber suddenly taking an interest in this case. Jaber and his counsel were well aware – from day one – of the separate claims at issue in this case. He was likewise well aware that he prevailed on the vicarious liability claim. The substantial prejudice to Plaintiff (with the deadline to appeal long gone), coupled with Jaber's deliberate ignorance, mandates denial of the Motion for Extension of Time.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an Order: (a) denying the Motion for Extension of Time and (b) for such further relief as the Court deems proper.

Respectfully submitted,

Dated: June 24, 2025.

COPYCAT LEGAL PLLC
3111 N. University Drive
Suite 301
Coral Springs, FL 33065
Telephone: (877) 437-6228
dan@copycatlegal.com

By: /s/ Daniel DeSouza___
Daniel DeSouza, Esq.
Florida Bar No. 19291

**CERTIFICATE OF SERVICE**

I hereby certify that on June 24, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will electronically serve all counsel of record.

By: /s/ Daniel DeSouza___
Daniel DeSouza, Esq.


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

**EXHIBIT "A"**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

Case No. 2:22-cv-00642-JPS

PREPARED FOOD PHOTOS, INC. f/k/a ADLIFE MARKETING & COMMUNICATIONS CO., INC.,

Plaintiff,

v.

NOFAL LLC d/b/a FOOD TOWN MART and SHARIF JABER,

Defendants.

---

**DECLARATION OF REBECCA JONES**

Rebecca Jones does hereby declare pursuant to 28 U.S.C. § 1746:

1. I am over the age of 18 and otherwise competent to testify. I make the following statements based on personal knowledge.

2. I am the Director of Intellectual Property of plaintiff Prepared Food Photos, Inc. f/k/a Adlife Marketing & Communications Co., Inc. ("Plaintiff").

3. When Plaintiff's motion for new trial/to amend the judgment was denied by the Court, I (together with Plaintiff's other senior management) discussed with counsel whether Plaintiff would pursue an appeal of the Judgment – both with respect to the amount of damages awarded and the claim for vicarious infringement against Jaber.

4. Because Plaintiff timely filed its motion for fees against defendant Nofal LLC d/b/a Food Town Mart ("Nofal LLC") and Jaber did not file his own motion for fees, I (together with Plaintiff's other senior management) decided (in conjunction with discussions with our counsel)



COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

to forego the filing of an appeal as there was no risk (at that point) of Jaber seeking fees on the claim he prevailed on. Plaintiff chose instead to focus its efforts on seeking fees as the prevailing party against Nofal LLC.

5. If Plaintiff had any indication that Jaber would pursue fees, Plaintiff would have filed a notice of appeal and challenged the verdict in favor of Jaber. Plaintiff made a calculated decision not to appeal based on the facts known to it (i.e., that Jaber could not seek fees at that point) – its decision would absolutely have been different had Jaber timely moved for fees.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: 6/24/2025

ID 4EXW8ETpq3GXtMcnTL7qHe8A

Rebecca Jones



COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

# eSignature Details

**Signer ID:** **4EXW8ETpq3GXtMcnTL7qHe8A**
Signed by: Rebecca Jones
Sent to email: rebecca@preparedfoodphotos.com
IP Address: 96.238.9.54
Signed at: Jun 24 2025, 10:11 am PDT

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

Case No. 2:22-cv-00642-JPS

PREPARED FOOD PHOTOS, INC. f/k/a
ADLIFE MARKETING &
COMMUNICATIONS CO., INC.,

Plaintiff,

v.

NOFAL LLC d/b/a FOOD TOWN MART and
SHARIF JABER,

Defendants.

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO JABER'S MOTION**
**FOR ATTORNEY'S FEES AND COSTS UNDER THE COPYRIGHT ACT**

Plaintiff Prepared Food Photos, Inc. f/k/a Adlife Marketing & Communications Co., Inc. ("Plaintiff") hereby files this memorandum in opposition to defendant Sharif Jaber's ("Jaber") Motion for Attorney's Fees and Costs Under the Copyright Act (the "Motion f") [D.E. 83].

## INTRODUCTION

The Motion asserts that Jaber is entitled to recover $50,250.00 in attorneys' fees/costs as the prevailing party on Plaintiff's claim for vicarious liability. While Jaber did prevail at trial, the Court should exercise its discretion to deny any recovery of fees by Jaber. Alternatively, for the reasons set forth herein, the Court should substantially reduce any fees awarded to Jaber as he attempts to recover fees far beyond those actually incurred by his counsel and fails to allocate fees between himself and co-defendant Nofal LLC (who lost on Plaintiff's copyright infringement claim).


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

The Motion goes to great lengths to criticize Plaintiff for bringing this lawsuit (and others) and assumes (without reference to a scintilla of evidence) that Plaintiff's motivations in doing so were somehow suspect/evil. They were not. As the owner of an image library spanning approximately 18,000 photographs, Plaintiff has been confronted with mass infringement by grocery stores such as that owned by Nofal LLC and an abundance of others.[1] Although Plaintiff generally attempts to resolve such matters without court intervention, it will file lawsuits when, as happened here, infringers refuse to acknowledge liability or remove the subject image(s) from display.

This case is somewhat unique in that it took approximately two (2) years – until Jaber testified ***at trial*** – for Defendants to acknowledge their control of the subject Facebook page and/or that the dozens if not hundreds of photos depicted thereon were for their "Food Town Mart" store. For years, Defendants denied their display of the photograph (in their Answer, sworn interrogatory responses, responses to requests for admissions, and in their sworn deposition testimony). They even denied that photographs on the subject Facebook page depicting their store, its signs, its products, etc. absolutely did not depict the store. Jaber's testimony was, in a word, absurd. Even when confronted with a news interview where Jaber was clearly standing in front of the same sign depicted in one of the Facebook photographs, Jaber still denied that the Facebook photo was from his store. This ongoing refusal to acknowledge the Facebook page (even in the face of 30(b)(6) obligations to adequately prepare a witness) stymied Plaintiff from obtaining any evidence of profits associated with the Facebook post. Rather, Plaintiff was left to prepare for trial on the belief that Defendants were sticking to their nonsensical position (contrary to Jaber's own son's

[1] See Exhibit "A," a true and correct copy of the July 30, 2025 Declaration of Rebecca Jones.

testimony) that the Facebook page was not under their control and did not depict their store. Defendants then ambushed Plaintiff at trial, acknowledging for the first time that the Facebook page was controlled by Nofal LLC and that all the photographs thereon (including the subject infringement) were posted by Nofal LLC and depicted the store.

Having refused to amend any of his discovery responses and/or earlier denials (in his pleading and discovery), Jaber now boldly asserts that Plaintiff's vicarious liability claim was frivolous because Plaintiff did not adduce evidence of specific profits made by Jaber. But it was Jaber himself – through his perjurious testimony and denials – that stymied Plaintiff's efforts to obtain such discovery. Plaintiff was limited to the evidence available to it – evidence which Plaintiff believed conformed to the law of the Seventh Circuit that a direct financial interest is shown when the infringement acts as a draw to customers (which Amjad Hamed acknowledged in his deposition).

The Court should not reward a defendant who, through his own conduct, caused this lawsuit to be drawn out rather than resolved early on. Had Defendants simply acknowledged Nofal LLC's unauthorized display of the photograph and liability for infringement, this matter could have been resolved pre-suit and/or extraordinarily early in this lawsuit. Rather, they either lied throughout the lawsuit or failed to perform a modicum of diligence in asking either of Jaber's sons (the assistant managers of the store) whether the Facebook page was controlled by Nofal LLC.

## ARGUMENT

### I. Legal Standard

Under § 505, a court has discretion to award costs and attorneys' fees to the prevailing party in a copyright case. 17 U.S.C. § 505. "Four nonexclusive factors guide a district court's


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

decision whether to award a prevailing party its fees: (1) the frivolousness of the suit; (2) the losing party's motivation for bringing or defending against a suit; (3) the objective reasonableness of the claims advanced by the losing party; and (4) the need to advance considerations of compensation and deterrence." Live Face on Web, LLC v. Cremation Soc'y of Illinois, Inc., 77 F.4th 630, 631 (7th Cir. 2023) (citing Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 n.19 (1994)). The Seventh Circuit has explained that this list of factors is not exclusive, nor is any one factor determinative. See Timothy B. O'Brien LLC v. Knott, 962 F.3d 348, 350-51 (7th Cir. 2020). Rather what matters is that the court be "sensitive to the facts before it," and the court may "consider any factor that advances the Copyright Act's purposes," as long as it applies those factors equally to plaintiffs and defendants alike. See Live Face, 77 F.4th at 631."

## II. The Fogerty Factors Do Not Support an Award of Fees

### *A. Frivolousness or Objective Unreasonableness*

"'Objective unreasonableness' is generally used to describe claims that have no legal or factual support." Viva Video, Inc. v. Cabrera, 9 F. App'x. 77, 80 (2d Cir. 2001) (per curiam). "[T]he imposition of a fee award against a copyright holder with an objectively reasonable litigation position will generally not promote the purposes of the Copyright Act." Matthew Bender & Co. v. West Publ'g Co., 240 F.3d 116, 122 (2d Cir. 2001). There is a difference between a suit that is "without merit" and one that is "patently frivolous." See Positive Black Talk Inc. v. Cash Money Records, Inc., 394 F.3d 357, 382 n.23 (5th Cir. 2004), abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 130 S. Ct. 1237, 176 L. Ed. 2d 18 (2010). In Creations Unlimited, Inc. v. McCain, 112 F.3d 814 (5th Cir. 1997), for example, the Fifth Circuit upheld the district court's refusal to award attorneys' fees to the defendant despite


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

finding on summary judgment that the works in question "differed… in too many respects for a layman to conclude that the works were substantially similar." Id. at 816. The district court had concluded that the legal claim, "though ultimately not successful, was neither frivolous nor objectively unreasonable, either in its factual allegations or its legal undergirding." Creations Unlimited, Inc. v. McCain, 889 F. Supp. 952, 954 (S.D. Miss. 1995).

Here, Plaintiff's claim for vicarious liability was neither frivolous nor objectively unreasonable.[2] On this point, the Motion argues that Plaintiff had no evidence to impose vicarious liability on Jaber. "To prevail on a claim for vicarious copyright infringement, a plaintiff must establish that the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." GC2 Inc. v. Int'l Game Tech. PLC, 255 F. Supp. 3d 812, 824 (N.D. Ill. 2017). "For purposes of a vicarious copyright infringement claim, a financial benefit exists where there is evidence of a direct financial gain or that the availability of infringing material acts as a draw for customers." Bell v. Chi. Cubs Baseball Club, LLC, No. 19-cv-2386, 2020 U.S. Dist. LEXIS 17527, at *15-16 (N.D. Ill. Feb. 4, 2020).

The Motion principally focuses on the second element of a vicarious liability claim (a direct financial interest), arguing that Plaintiff did not adduce direct evidence of Jaber profiting from Nofal LLC's infringement of the photograph at issue. But courts in the Seventh Circuit have

[2] The Motion asserts that Plaintiff's initial claim against Jaber (in the First Amended Complaint) was frivolous because Jaber "did not operate a sole proprietorship under a d/b/a, nor was he the individual that copied the pork chop photograph." See Motion, at p. 12. The Motion ignores, however, that the original Complaint was filed against Villard Foodtown LLC whose attorney (David Bangert, Esq.) specifically contacted undersigned counsel and informed him that Jaber was the owner/operator of the "Food Town Mart" business at issue and forwarded a printout from the City of Milwaukee showing Jaber (individually) as the licensee for the business. Mr. Bangert represented that Jaber was the proper party defendant, which is why the First Amended Complaint (against Jaber) was filed. See, e.g., D.E. 18. The First Amended Complaint was then amended to add Nofal LLC as a defendant upon the appearance of Mr. Steinle who further represented that it was Nofal LLC (not Jaber individually) who owned the "Food Town Mart" business.

not required direct evidence of specific dollar amounts of profit flowing from an alleged infringement. Jaber testified at trial that Food Town Mart sold pork chops every week, including the week(s) that the Work was displayed on the Facebook Page. He likewise testified that he receives a profit from Food Town Mart's sale of its products, including pork chops. From this testimony, it was not unreasonable for Plaintiff to argue that Jaber had a direct financial interest in the infringement. Plaintiff did not need to prove a specific profit amount (as Plaintiff was not seeking disgorgement of profits) – only that Jaber profited generally. See, e.g. Major Bob Music v. Heiman, No. 09-cv-341-bbc, 2010 U.S. Dist. LEXIS 46125 (W.D. Wis. May 10, 2010) (finding owner of dance hall liable for vicarious infringement and stating "defendant encouraged infringement of plaintiffs' copyrighted songs by allowing karaoke at Gene'os, presumably to attract customers. Thus, it is appropriate to hold defendant vicariously liable because he is the owner and operator of Gene'os and derives financial benefit from it."); Broad. Music, Inc. v. Hartmarx Corp., No. 88 C 2856, 1988 U.S. Dist. LEXIS 13298 (N.D. Ill. Nov. 17, 1988) ("The subsidiaries undoubtedly play music in their stores in order to create a more attractive environment for customers. The more customers a store attracts, the greater its profit are likely to be. Hartmarx owns 100% of the stock of Jaymar-Ruby, and 92% of that of Country Miss. The more profitable are it subsidiaries (the store owners), the greater is the value of Hartmarx. Thus, we find as a matter of law that Hartmarx has an obvious and direct interest in the alleged exploitation of copyrighted materials.").

Notably, Amjad Hamed (Jaber's son) testified that the Facebook advertisement was designed to act as a draw for customers, while Jaber testified that every pork chop, chicken leg, speaker, etc. sold at the store ultimately benefits him as the sole owner of the store. Again, it was


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

not unreasonable for Plaintiff to argue that this evidence was sufficient to establish vicarious liability under the Copyright Act. See, e.g. In re Aimster Copyright Litig., 252 F. Supp. 2d 634 (N.D. Ill. 2002) ("The financial benefit element is also satisfied where; as here, the existence of infringing activities act as a draw for potential customers."); Dish Network LLC v. Datacamp Ltd., No. 22-cv-00993, 2023 U.S. Dist. LEXIS 121363 (N.D. Ill. July 14, 2023) ("The financial benefit requirement is satisfied where there is evidence of a direct financial gain or that the 'availability of infringing material acts as a draw for customers.") (internal quotation marks omitted).

That Plaintiff did not ultimately succeed on its claim for vicarious liability or establish specific profits tied to the infringing Facebook post can likewise be traced to Defendants' position throughout the ***entirety*** of this lawsuit that the Facebook page in question, and all content thereon, was not their "Food Town Mart" store. Plaintiff's efforts to prove its case were stymied by what can only be deemed perjury by Defendants in their deposition testimony (including a 30(b)(6) deposition that required Nofal LLC to educate itself on the issues) and written discovery responses. It was not until trial – two years after this case was filed – that Jaber finally admitted Nofal LLC controlled the Facebook page and the content thereon. Prior to such, Defendants denied the page was controlled by Nofal LLC, denied the photograph was used to promote the sale of pork chops by Nofal LLC, and scoffed at written discovery requests seeking the production of documents showing specific profits/sales generated from the infringing post.

In his deposition, Jaber testified that Nofal LLC does business as Food Town Mart, that he is the sole owner of Food Town Mart, and that the address for Food Town Mart is 3217 W. Villard


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

Avenue, Milwaukee, WI 53209.[3] Despite being the owner of Nofal LLC since 2017,[4] Jaber repeatedly testified in his deposition that Nofal LLC/Food Town Mart ***does not*** have a Facebook page, that the Facebook Page is ***not*** controlled by Nofal LLC, that the photographs thereon depicting the store were apparently some other location he was not familiar with, and that the assortment of products displayed thereon (such as hookahs and speakers) were ***never*** sold in the store.[5] Jaber testified that he is at the Food Town Mart store at least 5 days per week consistently since 2017 and knows what is happening at and inside the store.[6]

Following the deposition, Plaintiff sent a Subpoena to Produce Documents, Information, or Objects (the "Subpoena") to Meta Platforms, Inc. (Facebook) for production of documents identifying the subscriber information/owner of the Facebook Page. On November 13, 2023, Meta Platforms, Inc. responded to the Subpoena by producing thirteen (13) pages of documents that identify "Amjad Hamed" as the owner of the Facebook Page.

Plaintiff took Amjad Hamed's deposition on December 18, 2023. Hamed lives with his parents, one of which is Jaber.[7] Hamed had worked for Food Town Mart for the last 3 years.[8] He is employed as Food Town Mart's "floor manager," meaning that he is in charge of ordering, in charge of opening the store, closing the store, and making sure everything is in order.[9]

3 See Deposition Transcript of Sharif Jaber (the "Jaber Tr."), a true and correct copy of which is attached hereto as Exhibit "B," at 7:22 – 8:21.

4 Id. at 11:8 – 11:10.

5 Id. at 14:19 – 14:21; 15:1 – 15:2; 19:20 – 19:25; 22:20 – 23:4; 25:24 – 26:19; 30:14 – 31:2; 31:18 – 31:22; 31:23 – 32:8; 32:21 – 32:3; 33:22 – 34:7; 34:19 – 34:25.

6 Id. at 45:21 – 46:7.

7 See Deposition Transcript of Amjad Hamed (the "Hamed Tr."), a true and correct copy of which is attached hereto as Exhibit "C," at 6:13 – 6:14.

8 Id. at 7:22 – 8:11.

9 Id. at 9:24 – 10:4.


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

Interestingly, Jaber was asked during his deposition to identify each of the employees of Food Town Mart[10] and whether he could think of any person who could be running the Facebook Page.[11] Although Jaber listed himself and others as the employees of Food Town Mart, he neglected to mention that his son, Hamed, was also an employee of the store.

Contrary to his father's testimony, Hamed testified that Food Town Mart ***does*** have a Facebook page and that he is the person in charge thereof, with his brother (Nofal) running the Facebook Page prior to Hamed taking over.[12] Hamed testified that he was the person who created the subject September 28, 2020 posting on the Facebook Page which utilized the Work to advertise the sale of pork chops.[13] Hamed likewise testified (again contrary to Jaber's testimony) that Food Town Mart does sell hookahs and that the photographs of such on the Facebook Page were hookahs being sold in the store.[14] Hamed likewise testified that (again contrary to Jaber's testimony) that Food Town Mart does sell speakers and that the photographs of such on the Facebook Page were speakers being sold in the store.[15] Indeed, Hamed confirmed that ***all*** of the postings on the Facebook Page depict or relate to items for sale at the Food Town Mart store or were otherwise promoting the store.[16] Perhaps most importantly, Hamed testified that Jaber was aware that Hamed was running Food Town Mart's Facebook Page:

> Q. Was your father aware that you were running the Facebook account for the store?

---

10 Id. at 26:20 – 28:18.

11 Id. at 33:4 – 33:7.

12 Id. at 10:23 – 11:23; 15:1 – 15:16; 19:10 – 19:20.

13 Id. at 21: 19 – 22:21.

14 Id. at 31:19 – 32:8; 34:2 – 34:13; 36:23 – 38:1; 38:4 – 38:18.

15 Id. at 41:16 – 42:4.

16 Id. at 42:19 – 45:4.



COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

A. Yes, sir.[17]

As noted above, Defendants pushed their 'we don't control the Facebook page' position in their responses to Plaintiff's written discovery as well. All of their responses to Plaintiff's document requests, interrogatories, and requests for admissions denied the existence of any documents or information due to Defendants purportedly not controlling the Facebook page. Indeed, even though both Jaber and Amjad Hamed testified at trial that pork chops were sold each week by Food Town Mart, Defendants claimed no documents existed in response to a request for production seeking documents showing revenue/income from the sale of pork chops at the time the photograph was displayed on the Facebook page:

> 10. Documents sufficient to identify all revenue and/or income generated from NOFAL LLC's sale of pork chops for all times that the Work was published on its website.
>
> RESPONSE NO. 10: There are no documents in the custody and control of these defendants which satisfy Request No. 10.

At best, Defendants stonewalled Plaintiff throughout the course of this lawsuit by refusing to acknowledge control of the Facebook page until trial had commenced. That Defendants refused to participate in discovery and repeatedly perjured themselves in their testimony/discovery responses does not somehow make Plaintiff's vicarious liability claim untenable/frivolous. The jury decided this matter based on the evidence before it, yet Defendants were directly responsible for hiding material evidence (i.e., their sales numbers) from Plaintiff by maintaining the lie that they did not control the Facebook page.

---

17 Id. at 45:18 – 45:20.


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

### *B. Motivation*

Here, the Motion speculates that Plaintiff is not in the business of creating photographs but rather "purely financial" and/or "seeking wildly disproportionate settlements." As a threshold matter, there is zero evidence before the Court supporting Jaber's assertions. It is certainly true that Plaintiff has filed a large number of lawsuits with respect to protecting its library of > 18,000 photographs. But, as adeptly discussed in Malibu Media, LLC v. Doe, No. 13 C 3648, 2014 U.S. Dist. LEXIS 77929, at *6–8 (N.D. Ill. June 9, 2014) (internal quotation marks and citation omitted):

> ***It is certainly true that Malibu has filed a very large number of infringement suits in this district and in others. But that is what the holders of intellectual property rights do when they are faced with mass infringement.*** Courts in this district and elsewhere frequently get, for example, lawsuits by trademark owners against multiple websites that sell counterfeited products bearing the trademark owners' marks. By way of example, a review of the index of this district's filings reflects that Coach, Inc. which produces handbags, accessories, footwear, clothing, etc. bearing the company's trademarks, has filed 57 lawsuits in this district alone within the past four years, many of them naming dozens and indeed hundreds of entities as defendants. And a search of this district's index for suits naming "The Partnerships and Unincorporated Associations Identified on Schedule A," a term commonly used by trademark holders to sue multiple websites selling counterfeit products, reveals over 75 such lawsuits in the past year alone by various trademark holders.
>
> As best as the Court can determine, not one of these has led to criticism of the intellectual property right holder for misusing its trademark, let alone to dismissal of a case for that reason. Presumably the reason is that although cases involving the doctrine of copyright misuse refer to suing on a copyright hoping to force a settlement or even achieve an outright victory over an opponent that may lack the resources or the legal sophistication to resist effectively, the predicate for a misuse defense is an attempt to use the copyright monopoly to control something the monopoly does not protect. That element is missing from Doe's affirmative defense.


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

> The Court is hard-pressed to see why Malibu Media's large-volume litigation should be treated differently from that of Coach or other intellectual property rights holders simply because Malibu's intellectual property rights involve pornographic films.

That Plaintiff has pursued many claims for infringement is not somehow evidence of improper motivation. Indeed, with respect to Defendants in particular, it is difficult to imagine a better motive for pursuit of this lawsuit than Jaber's recalcitrance in refusing to discuss the matter pre-suit, refusing to remove the Work from the Facebook page notwithstanding multiple demands for such, and continued denials throughout this lawsuit that the Facebook page was controlled by Food Town Mart. Plaintiff has the exclusive right under the Copyright Act to display the Work, and Plaintiff was left with little choice but to pursue this lawsuit to effectuate Defendants' removal of such from the Facebook page and obtain some acknowledgment (at trial) that infringement occurred.

As discussed above, Plaintiff did not spend "considerable time on irrelevant matters" as asserted by the Motion. Plaintiff was ***forced*** to spend time/energy proving that the Facebook page was controlled by Defendants as they denied such in their Answer, denied such in their sworn responses to Plaintiff's interrogatories, denied such in their responses to Plaintiff's requests for admissions, and denied such in their sworn 30(b)(6) deposition. As noted in Plaintiff's Motion for Attorneys' Fees [D.E. 64], Defendants' attorney (Mr. Steinle) himself acknowledged the absurdity and perjurious nature of Defendants' deposition testimony, yet Defendants never amended any of their discovery responses or testimony until they showed up for trial and suddenly acknowledged control of the Facebook page. Even following Amjad Hamed's deposition testimony, Defendants never backed away from their denials. As such, Plaintiff had to spend a considerable amount of


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

time preparing for trial on the basis of proving a connection between Defendants and the Facebook page.

"To evaluate a plaintiff's motivation, courts consider the manner in which the plaintiff conducted the litigation." Harrington v. Dugar, No. 2:22-cv-08230-HDV-E, 2024 U.S. Dist. LEXIS 155470, at *8 (C.D. Cal. Aug. 27, 2024). Here, Jaber has not pointed to any litigation conduct by Plaintiff that would somehow infer an improper motive. Plaintiff timely amended its pleadings each and every time a new counsel appeared to identify the 'proper' defendant to sue, sought relevant discovery, and took depositions of only those persons who were reasonably required to prove Plaintiff's claims. Plaintiff did not file unnecessary motions or otherwise act in a way to unnecessarily increase Defendants' costs in defending this action. Had Defendants acknowledged their control of the Facebook page (at ***any*** time prior to trial), this case never would have proceeded to trial. See, e.g., Acosta v. Mega Media Holdings, Inc., No. 15-21837-Civ-COOKE/TORRES, 2017 U.S. Dist. LEXIS 30472, at *28–29 (S.D. Fla. Mar. 2, 2017) ("After considering the parties' arguments, the Court concludes that Plaintiff's suit was motivated, at least in part, by a sincere belief that Defendants committed copyright infringement and that Defendants were liable as a result of their conduct. While Defendants argue that Plaintiff's claims always lacked a legitimate basis, this was clearly not the case as evidenced at the summary judgment stage. And although Defendants focus heavily on Plaintiff's refusal to accept their settlement demand, there are no facts in the record to suggest that Plaintiff did not have a good faith reason for doing so.").

Awarding a party attorney's fees must advance the purposes of the Copyright Act, primarily to "encourage the production of original literary, artistic, and musical expression for the


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

good of the public." Fogerty, 510 U.S. at 524. This purpose is not promoted by awarding attorney's fees to a prevailing defendant "when the plaintiff has advanced a reasonable, yet unsuccessful claim." Bridgeport Music, Inc. v. Rhyme Syndicate Music, 376 F.3d 615, 628 (6th Cir. 2004) (citing Matthew Bender & Co., 240 F.3d at 122). Awarding Jaber fees here does not advance the purposes of the Copyright Act.

### *C. Compensation and Deterrence*

Considerations of compensation and deterrence do not weigh in favor of a fee award here. None of the other Fogerty factors weighs in favor of awarding fees, and Plaintiff brought this lawsuit with the good faith belief that its copyright rights had been violated and were ongoing. See, e.g. Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc., 2017 U.S. Dist. LEXIS 124082, at *5 (S.D.N.Y. Aug. 4, 2017) ("[A]s already noted, Plaintiff's conduct in this litigation was not objectively unreasonable, frivolous, or driven by an improper motive, and thus does not warrant the deterrent effect of fees."). Here, neither Plaintiff nor those similarly situated should be 'deterred' from pursuing claims against infringers who thumb their noses against a copyright owner's rights (i.e., refuse to remove a copyrighted work from display despite repeated demands for such). Here, Jaber seeks to punish Plaintiff for filing copyright lawsuits, yet Jaber does ***nothing*** to analyze the facts of those cases, the legitimacy of Plaintiff's claims, or the reason(s) for the filing of any such claim (including this one). It is far easier for Jaber to take a simplistic approach of blaming Plaintiff (the victim of copyright theft) for filing lawsuits than for Jaber to acknowledge his own conduct in ignoring Plaintiff's pre-suit correspondence and either lying about the Facebook page or failing for 2 years to ask his sons (the managers of the store) about such.


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

## III. Unreasonableness of Jaber's Fees and Costs

Finally, ***if*** the Court chooses to award fees, there are several issues mandating a significant reduction in the fees sought and a distinct lack of evidence that Jaber incurred and/or paid for ***any*** of such fees.

### *A. Reasonable Hourly Rates*

As a threshold matter, the Motion acknowledges that Jaber's original counsel (Mr. Jaber) agreed to represent Defendants in this matter at a discounted rate of $250 per hour, yet the Motion seeks to recover fees at a rate of $400 per hour. Here, the Motion acknowledges that the Seventh Circuit itself has held that "[t]he best evidence of the value of the lawyer's services is what the client agreed to pay him." See Assessment Techs. of WI, LLC v. Wire Data, Inc., 361 F.3d 434, 438 (7th Cir. 2004). But the Motion goes on to argue (without any case supporting such) that a district court is not limited to the fees contracted between lawyer and client and can instead award ***more*** than the lawyer billed on an hourly basis. Jaber seemingly seizes upon language in Assessment Techs. of WI, LLC that the contracted fees "should be" the ceiling, arguing that the Seventh Circuit did not use the word "must." Id. at 439 (7th Cir. 2004) ("[T]he negotiated fees should be the ceiling.). Jaber ignores, of course, that the Seventh Circuit re-visited the same issue in 2016, plainly holding (ironically in a case where the lawyer contracted to provide services at $250 per hour yet sought reimbursement at approximately $400 per hour as Jaber does here):

> In Assessment Techs. of WI, LLC v. WIREdata, Inc., 361 F.3d 434, 438-39 (7th Cir. 2004), we held that in a copyright case "the best value of the lawyer's services is what the client agrees to pay him," and therefore agreed with the Third Circuit in Lieb v. Topstone Industries, 788 F.2d 151, 156 (3d Cir.1986), that the contract between a party and his lawyer ***places a ceiling*** on what a court can award the lawyer in such cases.


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

Bell v. Lantz, 825 F.3d 849, 854 (7th Cir. 2016) (emphasis added). That Mr. Steinle had a longstanding relationship with the Jaber family and agreed to a discounted rate does not somehow give the Court discretion to award a higher rate and therefore a windfall to Jaber. The Motion does not cite a ***single*** case from within the Seventh Circuit that would allow an award of fees higher than what was contracted for between a lawyer and his client. As a result, *at most* the Court can award $31,150.00 in fees to Jaber with respect to Mr. Steinle and Ms. Herda's 124.6 hours of time.

### *B. The Motion Does Not Apportion Fees Between Jaber and Nofal LLC*

The Motion argues that Jaber is entitled to recover the ***entirety*** of the amounts billed by Mr. Steinle's firm in defending this lawsuit on behalf of ***both*** Jaber ***and*** Nofal LLC. There are two (2) problems with the Motion's logic here. First, Jaber has not presented any evidence that he (rather than Nofal LLC) paid any of Mr. Steinle's fees or is obligated to do so. To the extent Nofal LLC paid any of the fees, Jaber is not entitled to reimbursement for such as those fees were paid by a non-prevailing party that is clearly not entitled to recover its fees. Second, and derived from the first point, is that the Motion does not identify any fees incurred that would not otherwise have been incurred in defending Nofal LLC against Plaintiff's claim for copyright infringement. Only Jaber prevailed against Plaintiff. Nofal LLC did not.

"Only prevailing plaintiffs are entitled to recover their fees. Thus, where an attorney represents multiple parties and not all prevail, the court should exercise discretion to reduce the fee to reflect a reasonable amount of time spent on the prevailing party's case." Dong Yuan v. Hair Lounge Inc., No. 18-CV-11905 (AT) (BCM), 2023 U.S. Dist. LEXIS 111963, at *8-9 (S.D.N.Y. June 28, 2023); see also Ottaway v. Rev Rec. Grp., Inc., No. 1:16cv162, 2020 U.S. Dist. LEXIS 266797, at *11 (N.D. Ind. Oct. 16, 2020) ("Where there are multiple defendants in a

litigation, it is within the discretion of the trial court to apportion an award of attorneys' fees amongst them.”). Substantially all of Mr. Steinle’s fees – whether for attending trial, attending depositions, and/or responding to written discovery requests – would have been incurred regardless of whether Jaber was a defendant in this lawsuit or not. Indeed, the only time conceivably incurred on behalf of Jaber alone would be time spent responding to Plaintiff’s discovery requests which were served on each of Jaber and Nofal LLC on the same date. But Mr. Steinle’s time records make no effort to separate out time spent in reviewing or responding to such discovery requests, describing such as review of “discovery requests” or response to “discovery requests” generally.

| | | | Rate | HOURS |
|---|---|---|---|---|
| 06/28/2023 | WTS | Review Plaintiff's First Discovery Requests . Draft correspondence to Mr. Jaber. | 250.00 | 0.80 |
| 08/16/2023 | WTS | Conference with Mr. Jaber regarding Request to Admit. Draft responses to Request to Admit. Draft correspondence to Attorney Cruz with responses. | 250.00 | 1.20 |
| 08/17/2023 | WTS | Conference with Mr. Jaber. Draft responses to Interrogatories and Request for Production of Documents. Review correspondence from plaintiff's counsel regarding deposition dates. | 250.00 | 2.10 |
| | | LEGAL SERVICES | | 4.10 |

Thus, if the Court does award fees, and assuming the Court agrees that Jaber is limited to the $250 per hour he contracted for, then he should be entitled to no more than 50% of the fees billed by Mr. Steinle’s firm, i.e., no more than $15,575.00. But given that substantially all of the fees by Mr. Steinle’s firm would have been incurred regardless of Jaber’s involvement, and because Jaber has not produced any evidence of his payment of $1.00 in fees, Plaintiff’s position is that fees should be apportioned (if at all) 90% to Nofal LLC and 10% to Jaber. This would result in, at most, an award of fees in the amount of $3,115.00 to Jaber. While Plaintiff does not believe any

fees should be awarded (as described above), the Court should (if awarding fees) reduce it accordingly by apportioning between Jaber and Nofal LLC.[18]

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an Order: (a) denying the Motion; (b) alternatively, if granting the Motion, reducing the fees awarded in accordance with the arguments proffered herein; and (c) for such further relief as the Court deems proper.

Respectfully submitted,

Dated: July 30, 2025.

COPYCAT LEGAL PLLC
3111 N. University Drive
Suite 301
Coral Springs, FL 33065
Telephone: (877) 437-6228
dan@copycatlegal.com

By: /s/ Daniel DeSouza___
Daniel DeSouza, Esq.
Florida Bar No. 19291

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will electronically serve all counsel of record.

By: /s/ Daniel DeSouza___
Daniel DeSouza, Esq.

[18] Plaintiff does not otherwise object to the reasonableness of the amount of time spent by Mr. Steinle's firm or challenge individual billing entries as excessive.

Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

Case No. 2:22-cv-00642-JPS

PREPARED FOOD PHOTOS, INC. f/k/a ADLIFE MARKETING & COMMUNICATIONS CO., INC.,

Plaintiff,

v.

NOFAL LLC d/b/a FOOD TOWN MART and SHARIF JABER,

Defendants.

**DECLARATION OF REBECCA JONES**

Rebecca Jones does hereby declare pursuant to 28 U.S.C. § 1746:

1. I am over the age of 18 and otherwise competent to testify. I make the following statements based on personal knowledge.

2. I am the Secretary of plaintiff Prepared Food Photos, Inc. f/k/a Adlife Marketing & Communications Co., Inc. ("Plaintiff").

3. Plaintiff is in the business of licensing high-end, professional photographs for the food industry. Importantly, Plaintiff is the sole content provider to its sister company, Bad-Adz Digital, and its customers rely on Plaintiff's photographic library in creating their own grocery ads/other advertisements.

4. Plaintiff's library of photographs was created over a 15 – 20-year period of time.

5. In November 2021, Plaintiff discovered one of its copyrighted photographs (of pork chops) displayed on the "Food Town Mart" Facebook page being used to advertise an apparent



COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

sale by such store.

6. Upon discovery, Plaintiff requested that its outside counsel (CopyCat Legal PLLC) send a pre-suit demand letter to the store in hopes that a letter from a law firm would not be ignored.

7. On January 20, 2022, our counsel (CopyCat Legal PLLC) spoke to Sharif Jaber telephonically who denied that the Facebook page had any connection to his store. Based on what appeared to be a misrepresentation by Mr. Jaber, Plaintiff directed its counsel to file this lawsuit.

8. It is my understanding that the photograph remained displayed on the Facebook page until sometime after this lawsuit was filed (i.e., at least 4 months after counsel had spoken to Mr. Jaber).

9. Given Defendants' denial that the Facebook page was controlled by them and the fact that the subject photograph remained on the Facebook page, Plaintiff was left with little choice but to pursue this lawsuit or drop the matter altogether.

10. Jaber speculates in his Motion that Plaintiff's motive in filing this lawsuit and others is purely financial and/or to force parties into disproportionate settlements. This is grossly inaccurate.

11. In filing this lawsuit and others, Plaintiff is motivated by the need to protect its intellectual property for the benefit of its paying customers and to prevent infringers (such as Nofal LLC) from claiming that Plaintiff has somehow waived its rights by not pursuing infringers. This is especially true where infringers (such as Nofal LLC) refuse to remove Plaintiff's intellectual property from their websites/social media notwithstanding multiple demands for such.

I declare under penalty of perjury under the laws of the United States of America that the


COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

foregoing is true and correct.

DATED: 7/30/2025 ____________________.

ID rVpXz4kCV7TB8fTkKngTi55K

Rebecca Jones



COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301 • CORAL SPRINGS, FL 33065
TELEPHONE (877) 437-6228

## eSignature Details

| | |
|---|---|
| **Signer ID:** | **rVpXz4kCV7TB8fTkKngTi55K** |
| Signed by: | Rebecca Jones |
| Sent to email: | rebecca@preparedfoodphotos.com |
| IP Address: | 96.238.9.54 |
| Signed at: | Jul 30 2025, 12:17 pm PDT |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
Case No. 2:22-cv-00642-JPS

PREPARED FOOD PHOTOS, INC.
f/k/a ADLIFE MARKETING &
COMMUNICATIONS CO., INC.,
Plaintiffs,

v.

NOFAL LLC d/b/a FOOD TOWN MART
and SHARIF JABER,

Defendants.
_______________________________/

VIDEOCONFERENCE DEPOSITION
OF
CORPORATE REPRESENTATIVE
SHARIF JABER

Taken on behalf of the Plaintiff via videoconference

DATE TAKEN: Tuesday, September 26, 2023
TIME: 1:01 p.m. - 2:26 p.m.

Held remotely via videoconference

Examination of the witness taken before:
Jamie D. Mackrell, Court Reporter
Daughters Reporting, Inc.
101 Northeast 3rd Avenue
Suite 1500
Fort Lauderdale, Florida 33301



APPEARANCES VIA VIDEOCONFERENCE:

ON BEHALF OF THE PLAINTIFF:
COPYCAT LEGAL PLLC
DANIEL DESOUZA, ESQUIRE
3111 North University Drive
Suite 301
Coral Springs, Florida 33065
954-603-1340
ddesouza@desouzalaw.com

ON BEHALF OF THE DEFENDANT:
TERSCHAN, STEINLE, HODAN & GANZER LTD
W. TIMOTHY STEINLE, ESQUIRE
309 North Water Street
Suite 215
Milwaukee, Wisconsin 53202
414-258-1010
timothy.steinle@tshglaw.com

ALSO PRESENT:
Lauren Hausman, Esquire
Christine Zaffarano, Esquire
Meghan Medaeter



INDEX

Testimony of SHARIF JABER

| | Page |
|---|---|
| Direct Examination by Mr. DeSouza | 5 |
| Certificate of Oath | 59 |
| Certificate of Reporter | 60 |

----



EXHIBITS

PLAINTIFF

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition | 6 |
| 2 | Complaint | 15 |
| 3 | Facebook page | 20 |
| 4 | 4/1/2020 Facebook post | 23 |
| 5 | 9/28/2020 Facebook post | 25 |
| 6 | 11/12/2019 Facebook post | 35 |
| 7 | U-haul article | 43 |
| 8 | Google Maps photo | 49 |

Videoconference deposition of SHARIF JABER taken remotely before Jamie D. Mackrell, Court Reporter and Notary Public in and for the State of Florida at Large, in the above cause.

THE COURT REPORTER: Please raise your right hand.

Do you swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, I do.

THE COURT REPORTER: Thank you.

Thereupon --

SHARIF JABER,

having been first duly sworn or affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DESOUZA:

Q. I was going to say good afternoon, Mr. Jaber, but I'm not sure what time it is in Milwaukee.
A. Morning.
Q. Well, then good morning to you.
A. Good morning.
Q. So, Mr. Jaber, we are here today in connection with a deposition in the case of Prepared Food Photos versus Nofal LLC and you individually as Defendant. Are



you aware of that?
A. Yes, I do.
Q. What is your understanding of what this lawsuit is about? What's at issue in this lawsuit?
A. I don't think there is a lawsuit against me. I don't have any --
Q. I'm sorry. I didn't hear you. Let me close my door. It's a little loud.
I apologize. So, Mr. Jaber, I asked you what do you believe this lawsuit is about and I didn't quite catch your answer.
A. I don't believe that there is a lawsuit, and I'm not involved in any -- the fault of anything.

MR. DESOUZA: Okay. Let's do this, I'm going to mark as Exhibit 1 for today's deposition a copy of the Notice of Deposition of Nofal LLC. Let me see if I can share that for you.

(Exhibit No. 1 was marked for identification.)

BY MR. DESOUZA:

Q. Mr. Jaber, do you see that up on the screen?
A. Yes.
Q. Exhibit 1 is a copy of the Notice of Deposition of Nofal LLC, and it's dated August 21, 2023. Correct?
A. Yes.
Q. Okay. And in this document it goes on for



several pages. But starting on Page 5, do you see that there is a list of deposition topics, and it goes from 1 through 32? Do you see that?
A. Uh-huh.
Q. I'm sorry, sir. You are going to have to give me a verbal answer. Yes? No?
A. Yes. Yes.
Q. Only because it's hard for the court reporter to take down nods or mm-hmms or uh-uhs.
A. No. Yes, I will. I see that.
Q. Thank you. Have you ever seen this document prior to today?
A. Yes.
Q. When do you recall first seeing this document?
A. I think when you just sent it to me a couple of months ago.
Q. Now, this is a Notice of Deposition of Nofal LLC. Do you have some connection to that company?
A. Yes.
Q. Okay.
A. Owner.
Q. What is Nofal LLC? What does it do for business?
A. It's a grocery store.
Q. Is it named -- is the grocery store named Nofal?
A. It's named Food Town Mart.



Q. All right. So it's Nofal and it does business as Food Town Mart?
A. Yes.
Q. And you said you are the owner of Nofal, correct?
A. Yes.
Q. Are there any other owners?
A. No.
Q. Do you understand what a limited liability company is?
A. Yes.
Q. Am I correct in saying that you are the sole or only member of Nofal LLC?
A. Yes.
Q. Has that always been the case?
A. Yes.
Q. Other than yourself, is there anybody else that has any control of Nofal LLC?
A. No.
Q. What's the location of the Food Town Mart grocery store?
A. 3217 West Villard.
Q. 3217 West Villard. Does it sell anything besides groceries there?
A. No.
Q. All right. Sir, do you understand that you are

testifying today not only as an individual defendant but also as the corporate representative of Nofal LLC?
A. Yes.
Q. And do you understand that you have been designated today to testify with respect to each of the 32 topics that are listed in this deposition notice for Nofal LLC?
A. Yes.
Q. Do you happen to have a paper copy of that there with you, or just the electronic copy on the screen?
A. No. Electric copy on the screen.
Q. Okay. To your recollection, and I'm happy to scroll through these if you want me to, but are there any topics in this depo notice that you are not prepared to provide testimony on?
A. No.
Q. So if I ask questions on the subject matter of these topics you should be prepared to answer those questions, correct?
A. Yes, sir.
Q. What did you do to prepare for this deposition? And, you know, if you had discussions with your attorney, you can just tell me I talked to my attorney. I don't want to know the substance of those conversations. Okay?
A. Yes, I did. I spoke with my attorney about it.



Q. Other than talking to your attorney, did you do anything else to prepare for this deposition?
A. No.
Q. Did you read any documents?
A. I don't have no documents.
Q. Well, did you read any documents to prepare for this deposition, whether you have them or not?
A. No.
Q. Did you read the complaint in this lawsuit?
A. Yes.
Q. Did you read the answer that both you and Nofal LLC filed?
A. Yes.
Q. Do you understand that my client, Prepared Food Photos, is making an allegation of copyright infringement in this lawsuit?
A. Yes.
Q. Do you understand that my client is alleging that somebody took one of its photos and posted it on a Facebook page without their permission?
A. No.
Q. You don't understand that that's the allegation at issue in this lawsuit?
A. No.
Q. Well, what is your understanding of what this



lawsuit is about?
A. It's about some photos. I don't know what photo it is.
Q. Okay.
A. I don't know what kind of photo are you talking about, because I didn't take no photos. I did not do any advertising.
Q. How long have you been the owner of Food Town Mart in Milwaukee?
A. From 2017.
Q. What did you do prior to 2017?
A. I was working at a different grocery store.
Q. Well, let's talk about 2017. You were not the owner of Food Town Mart, and then you became the owner of Food Town Mart, correct?
A. I bought it in November of 2017.
Q. Who did you buy it from?
A. From Villard Food Town.
Q. So did you buy Nofal or did you buy Food Town Mart? What did you buy in 2017?
A. I buy Nofal Food Town Mart. It's the same company.
Q. So you bought the LLC, Nofal LLC, which was doing business as Food Town --
A. No. No. No.



Q. No. Okay. All right. Tell me what you bought. Because I'm trying to figure it out.
A. I bought Villard Food Town and it become -- I change the name to Food Town LLC -- Food Town Mart, Nofal LLC.
Q. Who did you buy Villard Food Town from?
A. From Frank.
Q. Frank. What's Frank's last name?
A. Same last name.
Q. Same Jaber last name, correct?
A. Yes.
Q. Is there a family relation between you and Frank Jaber?
A. Yes. My brother.
Q. Was there a purchase agreement when you bought Villard Food Town?
A. Yes.
Q. A written purchase agreement? I'm sorry.
A. Yes.
Q. And you have owned this grocery store ever since November 2017, correct?
A. Yes.
Q. Okay. And how soon after you bought it in November of 2017 did you change the name to Food Town Mart?
A. The same day I purchase.

Q. Walk me through this. I'm assuming the store has like signage on the outside that said Villard Food Town in 2017, right?
A. Yes.
Q. And then after you bought it, did you change the sign from Villard Food Town to Food Town Mart?
A. No.
Q. So the sign still said Villard Food Town?
A. Yes.
Q. Does it still say that today?
A. Yes.
Q. If you changed the name from Food Town Mart why didn't you change the sign?
A. You couldn't -- by the city ordinance today, you got to take the sign down and it's an old sign. It's way up in the sky. It's 50 feet high, and I'm not willing to spend one hundred thousand dollars on a sign.
Q. That's fair. So the sign as of today still says Villard Food Town, correct?
A. Yes.
Q. Whether it's Villard Food Town or Food Town Mart, how do you advertise your grocery store?
A. I don't advertise.
Q. Do you have a website?
A. No, I don't.



Q. Have you ever had a website for --
A. No.
Q. -- Food Town Mart or Villard Food Town?
A. No. For Food Town Mart I never had -- I don't have any website. I do not advertise at all.
Q. Well, do you do ads?
A. No, I don't do it.
Q. Weekly ads or --
A. No, sir. I don't do no ads.
MR. STEINLE: Sharif, if I may please ask, for the court reporter, please wait until he finishes his question. Again, just we'll get through this, but just please wait until he finishes his question.
MR. DESOUZA: Yes. It's hard for her to take down both of us if we're talking at the same time, Mr. Jaber. Okay?
THE WITNESS: All right.
BY MR. DESOUZA:
Q. What about social media? Has Villard Food Town or Food Town Mart ever had a Facebook page?
A. No.
Q. What about a Twitter page?
A. No.
Q. Instagram?
A. No.



Q. Any type of online presence whatsoever?
A. No.
MR. DESOUZA: I'm going to go ahead and mark as Exhibit 2 for today's deposition a copy of the complaint in this lawsuit.
(Exhibit No. 2 was marked for identification.)
BY MR. DESOUZA:
Q. Do you see that on the screen, sir?
A. Yes.
Q. And I'm assuming this is the complaint that you were served with that notified you of this lawsuit. Is that right?
A. Yes.
Q. Did you know about this lawsuit prior to this complaint being filed, the Second Amended Complaint?
A. No.
Q. Did your brother ever reach out to you, Frank Jaber, and let you know that a lawsuit had been filed against Villard Food Town?
A. No.
Q. Are you aware that Villard Food Town's attorney is the one that identified you as the owner of the store and the one responsible for this infringement?
A. No.
Q. Do you have a good relationship with your brother



at this point, Frank Jaber?
A. Yes.
Q. Do you talk to him often?
A. Yes.
Q. How often?
A. Weekly.
Q. But you're telling me your brother never told you that a lawsuit was filed against his company with respect to the Food Town Mart?
A. We don't talk about business.
Q. This is the lawsuit that was filed, the complaint that was filed against you and Nofal. You understand that, correct?
A. Yes.
Q. Now, paragraph 12 of this complaint states that this photograph is at issue in this lawsuit, and it appears to be a photograph of pork chops. You see that, right?
A. Yes.
Q. And the complaint goes on to say -- let's look at it here. It says that Nofal owns and operates a full-line grocery store located in Milwaukee, Wisconsin under the trade name Food Town Mart and/or Foodtown Mart. Do you see that?
A. Yes.
Q. That's a correct statement, right?

Page 17

A. Uh-huh.
Q. Sorry. You've got to say --
A. Yes.
Q. Thank you. Then the next paragraph, 16 of the complaint, says that you, Mr. Jaber, are the manager and sole member of Nofal LLC. That's a correct statement as well, correct?
A. Yes.
Q. Okay. What about the next sentence that says Jaber has exclusive control over the business activities of -- I don't know where Little Pine comes from, but let's cancel that question. Okay? Is that okay with you if I just cancel that question?
MR. STEINLE: Yes. If you want to withdraw the question, fine. Yes.
BY MR. DESOUZA:
Q. Okay. Thank you.
Mr. Jaber, do you have exclusive control over the business activities of Nofal LLC?
A. Yes.
Q. Now, the next paragraph says Nofal LLC advises/markets its products primarily through its website, which has this villard-food-town.business.site address here. You see that, correct?
A. Yes.

Page 18

Q. Have you ever had any affiliation with that URL, that villard-food-town website?
A. No.
MR. STEINLE: I'm just going to object to the form of the question. The answer can stand. We filed an answer and affirmative defenses to the complaint addressing these paragraphs, but his answer could stand.
BY MR. DESOUZA:
Q. So, Mr. Jaber, you don't know that website, correct?
A. No, I don't.
Q. You've never seen that website before?
A. No.
Q. And your testimony is that Food Town Mart or Villard Food Town, under your ownership, has never had a website?
A. No.
Q. Are you aware that there is a Villard Food Town website that's out there?
A. I don't know.
Q. You are not aware of whether your own business that you have owned since 2017 has a website on the internet?
MR. STEINLE: Object to the form. But that's an

Page 19

incorrect statement. He's told you -- he testified he doesn't have a website.
BY MR. DESOUZA:
Q. Okay. Well, are you aware that there is a Villard Food Town website on the internet available as of today, sir?
MR. STEINLE: Object. It's asked and answered. Go ahead.
A. Sir, I'm computer illiterate. I do not know how to open the computer and get on the computer. So there is no need for your question, because I don't know anything about computer. That's the bottom line.
BY MR. DESOUZA:
Q. Okay. Now, this complaint, sir, says that on September 28, 2020. You see that in paragraph 18, correct?
A. Yes.
Q. Now, that was during your ownership of Food Town Mart, correct?
A. Correct.
Q. It says that Nofal published the work on its business Facebook page, and it provides that URL.
And you say, no, that didn't happen because Nofal or Food Town Mart has never had a Facebook page, correct?
A. No, sir. I repeat, I do not ever advertise.

Page 20

Q. Other than this lawsuit, have you ever had anyone accuse either you or Nofal or Food Town Mart of copyright infringement --
A. No.
Q. -- of using a photograph without permission?
A. No.
MR. DESOUZA: Okay. All right. So here is what I'm going to do, I'm going to mark Exhibit 3.
(Exhibit No. 3 was marked for identification.)
BY MR. DESOUZA:
Q. Sir, I have put up on the screen what we have marked as Exhibit 3 to today's deposition. This is a copy of a Facebook page. There is a URL at the top of the page. It is facebook.com/villardfoodtown. And this is just a screenshot. If you see at the very bottom of the page, that was captured today on September 26, 2023. Do you see that?
A. Yes.
Q. Okay. Now, looking at the picture, at the top of page there, do you see the way it says "Villard Food Town" kind of on a red sign on the right of the screen?
A. Yes.
Q. Is that sign there on the store today?
A. No.
Q. And then I see "You're Someone Special" written

in big letters on the top of the store. Do you see that?
A. Yes.
Q. Is that there today?
A. Yes.
Q. Was that Villard Food Town sign in red there previously?
A. Yes.
Q. When was that taken down?
A. Maybe a year after I took over. Two years. Year and a half. I can't remember right now. I took it down. I was trying to take the other sign down and they want a hundred thousand dollars. I cannot take it down.
Q. All right. Now, do you see this photograph that's in the circle over here?
A. Yes.
Q. It looks like it says "Villard Food Town" on a yellow sign. Is that right?
A. Yes.
Q. Is that the large sign that you are saying is still there today?
A. Yes.
Q. Looking at the picture that says "You're Someone Special" on it, what's different about the way the store looks today than viewable in this photograph in Exhibit 3?
A. It doesn't have the Villard Food Town name on



it. I took the name off that, but I don't take the sign off.
Q. So that's the only change looking at this photo to today, correct?
A. Yes.
Q. Now, let me just look at this Facebook page, sir. It does say Food Town Mart here, correct, right at the top of the page?
A. That's what it say.
Q. Now, it has an address right here where my mouse is of 3217 West Villard Avenue, Milwaukee, Wisconsin, correct? Do you see that?
A. Yes.
Q. That's the address of your store, correct?
A. Yes, that's my address.
Q. Okay. And the most recent post on Facebook that is displayed on this screen is July 3, 2022. Do you see that?
A. Yes.
Q. And it says "fresh chicken wings on sale, $2.49 a pound," right?
A. Yes.
Q. Does that appear to be a picture from your store?
A. No, sir.
Q. That's not?



A. No.
Q. Okay. So you have no idea who has this Facebook account, correct?
A. No, sir. I don't have.
Q. Okay. Well, let's go ahead and take that down.
Now, you said that your store has never done ads, correct?
A. Yes.
Q. You don't do weekly ads. You don't do any type of ads whatsoever, correct?
A. Yes.
(Exhibit No. 4 was marked for identification.)
BY MR. DESOUZA:
Q. So let me show you what I'm going to mark as Exhibit 4. Exhibit 4 is a copy of a Facebook post. As you can see it, on the right side it says April 1, 2020, correct?
A. I can't see, but --
Q. Well, I want to make sure that you are seeing the same thing that I'm seeing, sir.
A. No, I can not see it.
MR. DESOUZA: Tim, can you perhaps help him with it? Because it's on the top right side. I want to make sure that you guys can see what I see. It might be behind the Zoom video stuff.



MR. STEINLE: I don't see it either.
MR. DESOUZA: Jamie, I'll solicit your input.
THE COURT REPORTER: I can see it. It's just very small. Maybe you want to enlarge it for them.
MR. DESOUZA: How about now guys?
MR. STEINLE: Can you see that date now, Sharif?
THE WITNESS: Yes.
MR. STEINLE: It's right there on the top, April 1, 2020.
THE WITNESS: Yes. Uh-huh.
BY MR. DESOUZA:
Q. Now, Mr. Jaber, you owned Food Town Mart on April 1, 2020, correct?
A. Yes.
Q. Now, this Facebook account for Food Town Mart is posting what appears to be some type of advertisement "Mix or Match 10 for $10," correct? Do you see that?
A. Yes.
Q. Has Food Town Mart ever offered for sale a promotion 10 for $10?
A. No, sir.
Q. And this is not an ad that you have ever used for your store, correct?
A. No. No, sir.
Q. Let me ask you a question. Are you aware of

another Food Town Mart in the Milwaukee, Wisconsin area?
A. Yes. There is three.
Q. Is there any other one at the 3217 address that you operate your store at?
A. No, sir.
Q. Okay. Do you know who owns --
A. Huh?
Q. Do you know who owns these other Food Town Marts, these other three that you say?
A. I don't know the names. I know there's other people who own food towns.
Q. Well, other people in your family perhaps? Other Jabers?
A. No.
Q. So as far as you know, the only Food Town Mart owned by a Jaber is the Food Town Mart on 3217, correct?
A. Yes.
Q. Okay. Do you know who owned that store prior to your brother Frank?
A. No.
MR. DESOUZA: Let's go ahead and mark Exhibit 5.
(Exhibit No. 5 was marked for identification.)
BY MR. DESOUZA:
Q. Exhibit 5 is another Facebook screenshot from the same facebook.com/villardfoodmart account. You see that on



the screen, correct?
A. Yes.
Q. Now, this exhibit is showing a post on this Facebook account from September 28, 2020 of those same pork chop photos that are at issue in our lawsuit. Appears to be the same pork chops, correct?
A. Yes.
Q. And here is "fresh chicken drumsticks, $0.99 a pound; fresh pork spareribs $1.99 a pound; fresh boneless cut pork chops $2.29 a pound," correct?
A. Yes.
Q. And is it your testimony, sir, under oath that these are not sales that you were having, or advertised prices that you were having at your Food Town Mart at this time frame?
A. No, sir.
Q. Sir, do you have any idea who owns this Facebook account?
A. No.
Q. How many employees do you have, or did you have in the September 2020 time frame?
A. Six.
Q. Okay. Are you one of those six or --
A. Yes.
Q. So who are the other people?



A. Some employees.
Q. Okay. Give me their names.
A. Mack McLaughlin.
Q. You are going to have to spell that for the court reporter.
A. M-A-C-K, McLaughlin. Okay. I got the Mexican guys. They're not working with me right now. One of them is Fernando and Jose. I got cashiers. I got Tommy White. And I got a Michelle -- I forgot her last name. I forgot her last name. I can't remember.
Q. Okay. Mr. Jaber, tell me what does Mack McLaughlin do for you?
A. He kind of stock everything, order if I need to order. You know, he's --
Q. Does he have a position with the store? Like is he manager? Assistant manager?
A. Assistant manager.
Q. What about Fernando and Jose? What do they do?
A. Butchers.
Q. Butchers. The cashiers, I assume their job is limited to running the cashier machine?
A. Yes.
Q. Checking people out?
A. Yes.
Q. What about Tommy -- was it White or While?



A. White.
Q. What does he do?
A. That's a her.
Q. Her.
A. She is a cashier and stocker.
Q. So I'm sorry. It's Tammy, not Tommy, correct?
A. No, it's Tommy.
Q. And she is a cashier?
A. And a stocker.
Q. What about Michelle? What does she do?
A. A cashier.
Q. All these people that you named, were they all with you in September 2020?
A. Yes.
Q. Anybody that you had employed back then that's not employed with you today?
A. Only one that's left is Mack. That's the only one that work with me right now.
Q. That's the only one that's still there today?
A. Yes.
Q. Have you had discussions with Mack with respect to the existence of this Facebook page?
A. No.
Q. Did you try to discuss with any of your former employees where this Facebook page came from?

Page 29

A. They not -- they are not employed by me now and I don't have no connection with them.
Q. Okay. So you haven't reached out to any of those former employees to say --
A. No, sir.
Q. -- hey, what's this Facebook page?
A. No.
Q. What about your brother? Have you discussed with your brother why does Villard Food Town have a Facebook page?
A. No.
Q. Other than your attorney, have you had conversations with anyone about --
A. No.
Q. -- why is it that my store seems to have a Facebook page?
A. No, sir.
Q. Okay. Let's do this -- I'm not going to mark it as an exhibit right now. I'm going to put the internet itself up on the screen.
So on my screen, do you see my internet window right now?
A. Yes.
Q. And you see we're on the facebook.com/villardfoodtown site? Do you see that here at

Page 30

the top, Facebook.com/villardfoodtown?
A. Right now it's too small.
Q. On your screen, sir, we are looking at a Facebook page, and you should see that photo of the store as it existed around the time you bought it, correct?
A. Yes.
Q. Okay. Do you have a Facebook account yourself?
A. I don't have. Never do the Facebook advertise.
Q. I didn't ask whether you advertise on Facebook. I asked whether you have a Facebook account yourself.
A. For myself? Yes, I do.
Q. So you have used Facebook before, correct?
A. Yes.
Q. Now, on this Facebook page that we have up on the screen, you see we see that same July 2022 "chicken wings on sale for $2.49 a pound," correct?
A. Yes.
Q. And as we scroll down, we have another one for "4/20 sale; small trays 4 for $20 dollars; bongs for 42 percent off, hookahs for 25 percent off." Do you see that?
A. Yes.
Q. Do you sell hookahs at the Villard Food Town store?
A. No.

Page 31

Q. Have you ever sold hookahs?
A. No.
Q. Are you aware of what the Food Town Smoke Shop is?
A. No.
Q. Well, you are there at the plaza where the Food Town Mart is on a daily basis, correct?
A. Yes.
Q. Is there any business located there that sells hookahs or smoke shop things?
A. In the area, yes, there is. But not -- not in the plaza.
Q. Not in the plaza?
A. Uh-huh.
Q. Okay.
A. There's some on Teutonia, and there's some on Villard.
Q. Scroll down to a post from April 28, 2021. It appears to be a video of -- I don't know. It says "cookies" but it's lit up. Does this appear to be taken inside your store?
A. No, sir.
Q. Okay. What about this video that's 27 seconds long from April 14 of 2021? Does this appear to be taken inside the Food Town store?

Page 32

A. No, sir.
Q. And you have never sold hookahs at your store, correct?
A. Not at the time I own it.
Q. Well, so from November of 2017 through today, you have never sold hookahs at the Food Town Mart store in Milwaukee, correct?
A. No, sir.
Q. You have a license with the City of Milwaukee to sell hookahs, don't you --
A. No, sir.
Q. -- or sell smoke shop related items?
A. No, sir.
Q. You sell cigarettes and tobacco related items at the store, correct?
A. Cigarettes and cigar, yes, but not no smoke shop. Smoke shop is different than tobacco.
Q. What about mobile phones? Have you sold mobile phones at the Food Town Mart?
A. No, sir.
Q. What about speakers? Have you ever sold speakers?
A. Not at the time I own it, sir.
Q. Can you think of any reason why someone would be posting in March of 2021 on a Food Town Mart Facebook page

that speakers are back in stock at 3217 West Villard Avenue, Milwaukee, Wisconsin?
A. I have no idea.
Q. Can you think of any person who could be running this Facebook page other than someone connected to your store?
A. No, sir.
Q. Have you made any effort whatsoever to investigate who is running this Facebook account?
A. No. I don't -- I never investigate because I don't know how to go through -- like I say, I'm not computer literate, so I never went in to find out --
Q. Sir, as you sit here today, are you concerned that there is a Facebook page out there supposedly for Food Town Mart with dozens if not hundreds of posts purporting to be your store at 3217? Does that cause you any concern?
A. Yes.
Q. Okay. Why?
A. Because I seen like the name is my store name and my address. So I should be worried if there is somebody using my name.
Q. Okay. Now, up on the screen there is a post from January 30, 2021 from Food Town Mart saying -- congratulating today's hookah raffle winners. Do you see that?



A. Yes.
Q. And you got two people standing in front of shelves in a store, correct?
A. Uh-huh.
Q. What they are standing in front of, does that appear to be your store at 3217?
A. No.
Q. Okay. And if we have photographs from inside your store that appear to show a similar layout and look, you don't believe that's your store?
MR. STEINLE: Object to the form. Go ahead and answer it.
A. No.
BY MR. DESOUZA:
Q. Okay. Have you ever hired any company to do advertising on behalf of the Villard Food Town or Food Town Mart?
A. No.
Q. This ten-second video here from August 20, 2020, it appears to be showing video from inside a store. You see the video, correct?
A. Yes.
Q. Does this appear to be the inside of the Food Town Mart store?
A. No.



Q. Okay. What about this photograph in May 17, 2020, "hand sanitizer back in stock"? Do you believe this is not the inside of your 3217 store?
A. No, that's not.
Q. Let me take this down for a moment, sir.
A. Talk about hair and some speaker and --
Q. I'm sorry. What was that, sir?
A. No. Nothing. That's okay. Go ahead.
Q. Well, no. I mean, if you are speaking it's on the record, and I need to know what it is you said so that the court reporter --
A. I said you got a picture of hair shop and speakers and phones and -- I'm a grocery store. I do not sell any of this. I don't know where you get this picture from, but I do not sell any of these products. I sell grocery. I sell produce, watermelon, tomatoes, potatoes -- I do not sell this stuff. I do not sell hair products. I do not -- I'm just straight grocery.
MR. DESOUZA: All right, sir. Let's go ahead and mark Exhibit 6.
(Exhibit No. 6 was marked for identification.)
BY MR. DESOUZA:
Q. Do you see that on the screen, sir, what we marked as Exhibit 6?
A. Yes.



Q. It's another one of these Facebook pages, where if you see at the top it's the same facebook.com/villardfoodtown? Do you see that?
A. Yes.
Q. Now, Food Town Mart on November 12, 2019 looks like it posted an article from FOX6NOW.COM with an article titled "I'm really frustrated: Food Town Mart owner says he'll have to close due to smell coming from nearby plant." Do you see that?
A. Not really. Where is this -- where does it say that?
Q. Smack dab in the middle of the screen. "I'm really frustrated: Food Town Mart owner says he'll have to close due to smell coming from nearby plant." Do you see that?
A. Yes.
Q. Now, do you recall being interviewed by Fox News in 2019 about some smell or pollution issue?
A. Yes.
Q. Okay. Now, I will represent to you that that link that this FOX6NOW.COM opens up as to this page.
A. Okay.
Q. So this is a Fox article. "Frustrated Food Town Mart owner says he'll have to close due to smell coming from nearby plant". And it looks like there is a video on

Page 37

the article. And, sir, I'm not very good with faces, but that appears to be you in the video capture, correct?
A. Yes, that's me.
Q. So what was going on at the time here that you were interviewed with Fox?
A. There was a garbage plant that opened across the street from me, and I lost half of my business and I was ready to close.
Q. Okay. So you were interviewed by Fox, correct?
A. Yes.
Q. And in this article it looks like we got that big yellow sign. That's the yellow sign that's above the store, correct?
A. Yes.
Q. Let me go ahead and stop sharing that for a moment.
Sir, do you see this on my screen, the Fox article? The same one we were just looking at in Exhibit 6.
A. Okay.
Q. You see that, correct?
A. Yes.
Q. Give me one moment here. I'm going to hit play on this, but I don't know if it's going to play sound on your end, but tell me if you hear the sound.

Page 38

Are you able to hear that on your end?
A. No.
Q. Give me one moment here. Let's try that again.
(Video was played.)
BY MR. DESOUZA:
Q. Can you hear that now?
A. Yeah.
(Video was played.)
BY MR. DESOUZA:
Q. Let me just pause for a moment there. You are watching the same video as I am as part of this Fox6 News article, correct?
A. Yes.
Q. And currently paused on the screen it appears to be you being interviewed by some reporter, correct?
A. Yes.
Q. Let's keep going on the video.
(Video was played.)
BY MR. DESOUZA:
Q. Now, if I heard correctly, I think you just spoke in this interview and said "I owned this business for almost 15 years." Did I hear that correct?
A. Yes.
Q. So how can you reconcile that with your statement earlier today that you bought this business in 2017?

Page 39

Because if my math is correct, 2017 to November 2019 is not 15 years.
A. Yes. I meant my brother and me own that business at that time for 15 years.
Q. Well, you didn't tell me earlier that you had any ownership in the business for 15 years --
A. I don't have ownership. I'm just saying it's a matter of saying that my brother used to own it and then I own it and we have been there for 15 years.
Q. Okay. Well, let's keep going in the video, sir. Actually, I'm going to make the video bigger. I don't know if it shows up big on your screen. Is it big on the screen now? Occupying the screen?
A. Yes. It's big.
Q. It's big. Okay. Great. So let's keep going.
(Video was played.)
BY MR. DESOUZA:
Q. Let me pause there. Have you seen this video before, sir?
A. Yeah.
Q. Yes, you have? You saw the video?
A. Uh-huh.
Q. Any understanding as to why this Facebook account is posting this news article of you being interviewed on its Facebook account?

Page 40

A. I saw this video on the news. I don't see it on the Facebook.
Q. Right. And I'm only asking you do you have any understanding why the Facebook account is posting your news interview?
A. No.
Q. Okay.
(Video was played.)
BY MR. DESOUZA:
Q. Okay. That was you again, sir, right?
A. Yeah.
Q. All right. Sir, I paused the video. It looks like it's about a minute and 45, a minute and 46 seconds into the video. And this is your store, correct?
A. Yes.
Q. I guess you got the sign at the back there that says "check cashing and bill payment center." Is that right?
A. Yes.
Q. Is that a part of your store that you have there?
A. Yes.
Q. Sir, I'm not too familiar with products in a grocery store, but do you see there these blue and green items up on the shelves over here?
A. Yes.

Page 41

Q. Those are hookahs, aren't they?
A. No. That's gift box.
Q. I'm sorry. You have gift boxes with pipes that run up and down them --
A. Yes.
Q. -- up into the sky like that?
A. Yes.
Q. I mean, sir, you are under oath. You want me to believe that those are gift boxes?
MR. STEINLE: Object to the form. It's argumentative. He answered the question.
BY MR. DESOUZA:
Q. Sir, you understand what being under oath means, correct?
A. Yes.
Q. You understand what the concept of perjury is?
A. Yes.
Q. You know that's a crime, correct?
A. Yes.
Q. So knowing that, your testimony is, looking at this screen capture on the screen, and I will be very specific now, at the very front here we have got these red boxes of Stove Top with what appear to be jars of oil next to them, correct?
A. Uh-huh.

Page 42

Q. Yes?
A. Yes.
Q. Now, there's a back wall with some white cabinets back here, correct?
A. Yes.
Q. Or white panels on the wall. And then underneath that, on the top shelf there is a series of blue items on the shelf, correct?
A. Correct.
Q. Your testimony is these blue items on the shelf are gift boxes, correct?
A. Correct.
Q. Tell me what goes into a gift box that has what appears to be cords and pipes sitting next to the gift box.
A. It's a display. It's a glass display to go in the gift box.
Q. It's a glass display to go into a gift box, correct?
A. Yes.
MR. DESOUZA: All right. Let's take a five-minute restroom break.
MR. STEINLE: Very well.
(A recess was taken from 1:58 p.m. until 2:04 p.m.)
BY MR. DESOUZA:
Q. Mr. Jaber, at some point in 2017 did you start

Page 43

selling U-haul equipment in the 3217 Food Town Mart store?
A. Yes.
Q. Do you still sell the U-Haul equipment there today?
A. I rent them. I don't sell them.
Q. Oh. You rent U-haul equipment. I apologize.
You started renting U-haul equipment to the public when?
A. In November 2017.
MR. DESOUZA: Okay. Let me go and mark Exhibit 7 to today's deposition.
(Exhibit No. 7 was marked for identification.)
BY MR. DESOUZA:
Q. It's a little small on my screen. I'm just trying to make it bigger so you can see it.
All right. Exhibit 7 is a u-haul.com internet article from September 25, 2017 that says "U-haul is pleased to announce Villard Food Town has signed on as a U-Haul neighborhood dealer to serve the Milwaukee community." Do you see that?
A. No, not really.
Q. Do you want me to make it bigger for you?
A. Okay.
Q. How about now, sir? Do you see that?
A. Yeah.

Page 44

Q. Did I read that first paragraph correctly?
A. Repeat it.
Q. Well, it says that Villard Food Town has signed on to be a U-haul partner, correct?
A. That's what this is saying, yeah.
Q. And it's September 2017. I think you said November, but does this help refresh you that it was in September?
A. No. That's for all, you know -- for the other people when they own the store.
Q. Okay. Well, your name is in this article, isn't it? Do you see right here, sir? "Villard Food Town owner, Sharif Jaber, is proud to team with the industry to do-it-yourself -- the industry leader in do-it-yourself moving."
A. I had started working at Villard Food Town before I bought it. I had to work in there to see what the situation is.
Q. Well, why is this article identifying you as the owner if you were just working there?
A. I don't know, sir.
Q. Did you ever tell anyone you were the owner of Villard Food Town in September of 2017?
A. No, sir.
Q. Are you aware that the Villard Food Town Facebook

page that we have been looking at in June of 2017 was posting U-haul rental ads as well?
A. No.
Q. Do you rent U-haul trucks at the store?
A. Yes.
Q. Okay. And how long have you been doing that since?
A. Since 2017.
Q. Could it be since June of 2017?
A. No, sir.
Q. I just want to close the loop on something here, sir. You testified that you don't have ads for the store, but I don't think I asked you -- you don't have paper ads for the store, correct?
A. No.
Q. Like if someone walks into your store, there is no paper like, you know, here is what's on sale for this week, or here is what's on sale today, correct?
A. From what we make? We don't make ads for the sale.
Q. Well, whether you make it or not. I mean, you are at the store every day, correct?
A. Yes.
Q. Seven days a week? Five days a week? How long are you there?



A. Five days.
Q. And has it been that way pretty consistently since 2017?
A. Yes.
Q. So you know what's going on inside your store, correct?
A. Yes.
Q. Okay. So over the last six years that you have been at the store, you don't recall there being like paper ads for things that are on sale at the store, correct?
A. Uh-huh.
Q. I don't know what uh-huh means. Yes, there are paper ads, or no, there are not?
A. Yes.
Q. Yes, there are paper ads?
A. Yes.
Q. Okay. Who does your paper ads?
A. That's a national grocery company that where we buy from them, they send there once in a while. They don't do it occasionally. I do not print these ads. I do not print the ads.
Q. Do the ads on them, on the paper, have either "Villard Food Town" or "Food Town Mart" written on them?
A. It should.
Q. They should?



A. Yes.
Q. Okay. Who is this national grocery company that does the ads?
A. AWG. Affordable Wholesale Grocery.
Q. Is that where you get your grocery items from? From AWG?
A. Yes.
Q. Where are those ads located when I walk into the store? Is it like right when I first walk in or --
A. Yes.
Q. -- is it by the cashiers?
A. No. It's right when you walk in.
Q. You have like a little --
A. A stand.
Q. -- stand there with ads?
A. Uh-huh.
Q. Go ahead and describe the store for me, sir. Because I have never been there. I walk in. What am I looking at? What's the layout of the store as I walk in?
A. The cash register. Then you go inside the store.
Q. Do you know how many square feet the store is roughly?
A. 19,000.
Q. 19,000 square feet. So I walk in, cash



register -- I guess, where are the U-haul trucks? Let's discuss those.
A. Outside in the parking lot.
Q. The U-haul trucks are outside. It looked like there was check cashing or other stuff, correct?
A. Yes.
Q. Where is that? So I walk into the store, is it to my right? To my left?
A. It's to your right.
Q. And then on that right side as I continue on, what do I have? I've got like meat? Groceries? What's over there?
A. Displays.
Q. Displays for what?
A. For different items. For different things.
Q. Well, I guess -- you know, my grocery store, I got the bakery on one side. I got the meats on the other side. Is yours laid out similarly?
A. Yeah. It's laid out similar.
Q. Okay. So I go past the check cashing. On the far right of the store, what's over there?
A. The meat department.
Q. The meat department. Okay. And where is the bakery department?
A. It's next to the check cashing.

Q. Next to the check cashing. Where do I buy like cigarettes and stuff?
A. In the front by the cashier.
Q. I think I asked you about phones. You guys don't sell phones there, correct?
A. No.
Q. Have you ever sold phones there?
A. Not when since I own it. They used to be selling phones in there.
(Exhibit No. 8 was marked for identification.)
BY MR. DESOUZA:
Q. Okay. Let me show you what we'll mark as Exhibit 8. Do you see this up on your screen, sir?
A. Yes.
Q. Are you familiar with Google Maps? Do you know what that is?
A. Uh-huh.
Q. Yes? You do?
A. Yes.
Q. Okay. Does this appear to be a photograph of the outside of the Food Town store?
A. Yes.
Q. Okay. Do you see here at the -- it's a little small. Let me make it bigger for you.
Do you see at the top right of the screen it



says "Google street view, September 2019"?
A. Okay.
Q. You see that, correct?
A. Yes.
Q. Okay. If you are not selling phones at the store, sir, why in September 2019 are all of these flyers up? For iPhone 6S? 4 free LG Style 4? Free LG Style 4? Four lines for $100?
Can you explain why these signs are up in your store in September 2019?
A. I sell phone cards up to date -- I still sell the phone cards up to date. I don't sell phones.
Q. So what do you sell?
A. Phone cards. I sell it in the check cashing place.
Q. Are you selling plans?
A. Huh?
Q. Are you selling phone plans? Like service?
A. No.
Q. Okay. Well, why am I looking at signs that say four lines for $100, or a free LG Style 4, or an iPhone 6X for $49.99? Those are all phones.
A. I told you, we used to sell phones before I own it.
Q. Well, sir, this is a photograph from September of



2019, which last I checked, is two years after you took ownership of the store.
A. Okay.
Q. Can you explain why in September 2019 the store is advertising phones for sale if you are not selling them?
MR. STEINLE: Object to the form, and foundation. Go ahead and answer if you can.
A. I could bring you to today, we are in '23, we still have the sign on my windows. I could prove that for you.
BY MR. DESOUZA:
Q. Okay. So you just haven't bothered to take signs down from prior to when you bought.
A. No, sir.
Q. I'm assuming these signs are not like the more expensive top sign. It's not going to cost a hundred thousand dollars to take a piece of paper out of your window, correct?
MR. STEINLE: Object to form.
A. I just don't take them. They are still up in the windows.
BY MR. DESOUZA:
Q. Okay. Let me take that down, sir.
I know you said it's infrequent that AWG produces these ads for your store, correct?



A. Yes. And they haven't advertised in the last two years. They haven't put an ad in the last two years.
Q. Well, I guess let me ask you that then. In the last two years, have you had any paper ads displayed in your store?
A. No, sir.
Q. Okay. So we'd have to go back two years previously to when AWG was doing this to maybe see what an ad was, correct?
A. Yes.
Q. Okay. Now, you told me it's a grocery store. And it obviously sells groceries, meat, deli, dairy, that type of stuff, correct?
A. Yes.
Q. And I think you told me it sells tobacco products, cigarettes --
A. Cigar, yes.
Q. You haven't sold any other tobacco related products besides cigarettes and cigars, correct?
A. What you mean by related products?
Q. Well, what about vaping equipment or --
A. No. I sell vapes.
Q. Okay. So you sell vapes. Do you sell the liquid for the vapes?
A. Yes.

Q. Do you sell the -- I'm not a smoker. So do you sell the pipes for the vapes?
A. Yes. You are asking me -- do you want me to answer you as of now, or as in the past?
Q. Well, let's start with today. As of today --
A. Today, I don't sell any liquid or any of them vapes. I sell the disposable vapes.
Q. Why did you stop selling vapes and liquid? Was it the PACT Act, or was it something else?
A. That's my decision, sir.
Q. I just didn't know. Was it government regulation that caused you to stop selling it?
A. Well, I no answer for that.
Q. Well, you are going to answer because I asked the question. So go ahead and answer the question please.
MR. STEINLE: Just answer the question. If you chose not to, answer the question.
BY MR. DESOUZA:
Q. Why did you stop selling vape equipment?
A. Because I don't want to.
Q. Okay. Besides just "I don't want to," was there some change in government regulation that caused you to stop selling?
A. No.
Q. Okay. So that was -- and look, I don't smoke.



So how would you describe what you used to sell? Is it like glass pipes or -- what are we talking about in terms of vaping equipment?
A. The vape. The machines where you put the liquid. You answer me and I answer you. The liquid. I used to sell them with the machine and I don't sell them no more.
Q. So the machine was like a plastic or glass pipe that you put the liquid into and you smoke it, correct?
A. No, sir.
Q. What is the machine? What does it look like? Again, I'm not a vaper.
A. It's a device.
Q. Okay. Like probably like six inches? Eight inches? That type of thing?
A. Two inches.
Q. Okay. And when did you stop selling those?
A. About a year ago, year and a half ago.
Q. That's about the same time you stopped selling the vaping liquid as well?
A. Yes.
Q. And since then you have been selling disposable vapes, correct?
A. Yes.
Q. So that's cigarettes you still sell, cigars you



still sell, and disposable vapes you still sell, correct?
A. Yes.
Q. Have you ever sold pipes? Like for smoking marijuana? Pipes for smoking other type of tobacco? No?
A. Yes.
Q. Yes, you have?
A. Uh-huh.
Q. Are you still selling those today?
A. Yes.
Q. Where are those located? Is that the --
A. Behind the counter.
Q. Behind which counter? The cashier counter?
A. No. The check cashing place.
Q. Have you made any material changes to the inside of the store in the last three years?
A. Yes.
Q. What have you done to change the inside of the store in the last three years?
A. I bought new equipment.
Q. What do you mean by that? What type of equipment?
A. I bought new shelves, new displays, and new counters, new shelving, new coolers. I did a lot for my store.
Q. All of that in the last three years or so?



A. Yes.
Q. Okay. As of today, you don't sell hookahs, correct?
A. No hookahs.
Q. And three years ago you didn't sell hookahs, correct?
A. No hookahs. I sell the gift box.
Q. I don't understand what you mean by a gift box. Can you describe this to me?
A. It's a glass thing make like the hookah suction, but you cannot use it to smoke.
Q. So it's a glass box that looks like a hookah?
A. Yes, but you cannot use it to smoke because it doesn't have the pipe or the water holder.
Q. If I were to buy a pipe or water holder separately, would I be able to use it as a hookah?
A. No, sir. It's not a hookah.
Q. Well, it's purely decorative? Like it's just for putting on the shelf as a decoration? Is that what it is?
A. It's for -- yeah, for decoration.
Q. Could I transform it into a hookah and actually use it?
A. No, sir.
Q. How long have you been selling these decorative glass boxes that are shaped like hookahs?

A. Four years.
Q. For four years now?
A. Yes.
Q. And you still sell them today, correct?
A. Yeah.
Q. You sell them in different colors?
A. Yes.
Q. Is blue one of the colors you sell?
A. Blue. Yellow. Green.
MR. DESOUZA: Sir, I have no further questions for you today.
MR. STEINLE: Counsel, what I'd like to discuss with you on the record is I understand there were a number of exhibits. I think eight exhibits. I trust that I will be getting copies of the exhibits.
MR. DESOUZA: Yes. I will send the court reporter to Daughters Reporting an email with all eight exhibits, and I will copy you on that email as well.
MR. STEINLE: Thank you.
Madam Court Reporter, may I please have a copy of the transcript? I'd like a digital copy, but I don't want anything condensed.
MR. DESOUZA: Do you guys do read or waive out there in Wisconsin?



MR. STEINLE: We do, but 99 out of 100 we just waive. So we will waive.
(Videoconference concluded at 2:28 p.m.)



CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF BROWARD )

I, Jamie Mackrell, certify that Sharif Jaber appeared before me via videoconference on the 26th of September, 2023, and were duly sworn.

WITNESS my name and official seal this 26th of September, 2023.

Jamie Mackrell
Court Reporter
Notary Public State of Florida
Commission #HH 173501
Expires: September 6, 2025



REPORTER'S DEPOSITION CERTIFICATE

State of Florida )
County of Broward )

I, Jamie Mackrell, Court Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the aforementioned witness was by me remotely via videoconference first duly sworn or affirmed to testify the whole truth; that I was authorized to and did report said deposition in stenotype; and that the foregoing pages numbered 1 to 58, inclusive, are a true and correct transcription of my shorthand notes of said deposition.

I further certify that said proceeding was taken at the time and place hereinabove set forth and that the taking of said deposition was commenced and completed as hereinabove set out.

I further certify that I am not an attorney or counsel of any of the parties, nor am I a relative or employee of any attorney or counsel of party connected with the action, nor am I financially interested in the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or direction of the certifying reporter.

IN WITNESS WHEREOF, I have hereunto set my hand this 28th of September, 2023.

Jamie Mackrell
Certified Court Reporter

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
Case No. 2:22-cv-00642-JPS

PREPARED FOOD PHOTOS, INC.
f/k/a ADLIFE MARKETING &
COMMUNICATIONS CO., INC.,
Plaintiffs,

v.
NOFAL LLC d/b/a FOOD TOWN MART
and SHARIF JABER,

Defendants.
_______________________________/

VIDEOCONFERENCE DEPOSITION
OF
AMJAD SHARIF HAMED

Taken on behalf of the Plaintiff via videoconference

DATE TAKEN: Monday, December 18, 2023
TIME: 11:00 a.m. - 12:00 p.m.

Held remotely via videoconference

Examination of the witness taken before:
Jamie D. Mackrell, Court Reporter
Daughters Reporting, Inc.
101 Northeast 3rd Avenue
Suite 1500
Fort Lauderdale, Florida 33301



APPEARANCES VIA VIDEOCONFERENCE:

ON BEHALF OF THE PLAINTIFF:
COPYCAT LEGAL PLLC
DANIEL DESOUZA, ESQUIRE
3111 North University Drive
Suite 301
Coral Springs, Florida 33065
954-603-1340
ddesouza@desouzalaw.com

ON BEHALF OF THE DEFENDANT:
TERSCHAN, STEINLE, HODAN & GANZER LTD
W. TIMOTHY STEINLE, ESQUIRE
309 North Water Street
Suite 215
Milwaukee, Wisconsin 53202
414-258-1010
timothy.steinle@tshglaw.com



INDEX

Testimony of AMJAD SHARIF HAMED

| | Page |
|---|---|
| Direct Examination by Mr. DeSouza | 5 |
| Certificate of Oath | 48 |
| Certificate of Reporter | 49 |
| Errata sheet | 50 |
| Read letter | 51 |

- - - -



EXHIBITS

PLAINTIFF

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Meta Platforms Business Record | 13 |
| 2 | Facebook page screenshot | 17 |
| 3 | Facebook page screenshot | 21 |
| 4 | Second Amended Complaint | 28 |
| 5 | photo | 30 |
| 6 | photo | 33 |
| 7 | photo | 36 |
| 8 | photo | 38 |
| 9 | photo | 42 |
| 10 | photo | 44 |

Page 5

Videoconference deposition of AMJAD SHARIF HAMED taken remotely before Jamie D. Mackrell, Court Reporter and Notary Public in and for the State of Florida at Large, in the above cause.

THE COURT REPORTER: Please raise your right hand.

Do you swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

THE COURT REPORTER: Thank you.

Thereupon --

AMJAD SHARIF HAMED,

having been first duly sworn or affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DESOUZA:

Q. Good morning, Mr. Hamed.
A. Good morning.
Q. Is that the proper way to pronounce your last name? Is it Hamed?
A. Yes, sir.
Q. Thank you. Could you tell us your full name, please?
A. First -- full name is Amjad Sharif Hamed.

Page 6

Q. Your middle name is Sharif, S-H-A-R-I-F?
A. Yes, sir.
Q. And what is your current address, Mr. Hamed?
A. My current address is 2041 East Drexel Avenue.
Q. In what city?
A. Oak Creek, Wisconsin 53154.
Q. How long have you lived there?
A. About seven years now.
Q. Do you live there with anybody else?
A. Yes.
Q. Who?
A. I live there with my parents and my brothers.
Q. Is one of your parents Sharif Jaber?
A. Yes.
Q. Now, we are here in connection with a lawsuit that was brought by my client, Prepared Food Photos, and one of the Defendants in that lawsuit is Sharif Jaber. Is that your father?
A. Yes, he is.
Q. Okay. Have you had a chance to discuss this lawsuit with your father?
A. No, sir.
Q. Okay. Has he told you anything about this lawsuit?
A. No, sir.

Page 7

Q. Has he told you what it's about at all?
A. All he told me was that about -- when it first started, he told me that we were getting sued for the pictures on Facebook of some fresh chicken.
Q. Okay. Has he told you anything else about either the lawsuit or this deposition?
A. No, sir.
Q. Okay. Am I correct that you recently got married just a few weeks ago?
A. Yes, sir. About a couple months ago.
Q. Congratulations on that.
A. Thank you, sir.
Q. Do you have any plans to move out of your parents' house now that you are married?
A. Pretty soon I'll be looking into it.
Q. But you don't have any immediate plans or location to go to at the moment?
A. No, sir.
Q. Okay. Have you ever had a deposition taken before?
A. No, sir.
Q. Okay. Where do you currently work, Mr. Hamed?
A. I work at Food Town.
Q. Food Town?
A. Yes, sir.

Page 8

Q. When you say Food Town, that's a supermarket?
A. Yes, sir.
Q. Are you there now? Are you there at the Food Town?
A. I'm here now. I'm upstairs in the office.
Q. Okay. What's the address of the Food Town that you are at?
A. 3217 West Villard Avenue, Milwaukee, Wisconsin 53209.
Q. How long have you worked at Food Town?
A. Approximately three years.
Q. When I say Food Town, just to make sure we're clear, we are talking about the address of 3217 West Villard. Okay?
A. Yes, sir.
Q. Are you aware of any other Food Town Marts that are in the Milwaukee area?
A. Food Town Marts? I don't know if they are all called Food Town Mart, but I know there is another Food Town in the area.
Q. Is it called Villard Food Town to your knowledge?
A. There is one called Villard Food & Liquor.
Q. Got it. Is that one located somewhere near where you guys are?
A. It's about 20 blocks down from here.

Q. To your knowledge, does anyone in your family own that business?
A. No, sir.
Q. The business that you have worked at, the Food Town business, has it always had the same name as long as you worked there?
A. As long as I worked here it should, yes.
Q. I've seen Food Town Mart and I have seen Villard Food Town. Are those both names for the same business?
A. Well, Villard Food Town was the name before I started working here.
Q. So it was Villard -- I'm going to keep saying Villard, but that's just the way my pronunciation is. It was Villard Food Town previously, correct?
A. Yes.
Q. Now it is Food Town Mart?
A. Yes.
Q. Do you recall when that change occurred?
A. I don't remember.
Q. Okay. But to your knowledge, whether it was Villard Food Town or Food Town Mart, it has always operated at that same address of 3217 West Villard, correct?
A. Yes.
Q. What is your position with the Food Town Mart?
A. I'm the floor manager.



Q. Floor manager?
A. I'm in charge of ordering, in charge of opening the store, closing the store on my days that I work, making sure that everything is in order.
Q. And has that stayed the same roughly when you started working there three years ago?
A. No. When I first started I was a shelf stocker for a little while.
Q. You said it's been about three years. Does that go back to roughly 2020?
A. Yeah, 2020.
Q. Do you recall when in 2020 you started with Food Town Mart?
A. I do not remember exactly when.
Q. Okay. But just to narrow it down, you're pretty sure it was 2020, not 2019 when you started?
A. Am I pretty sure? Could've been maybe at the end of 2019, beginning of 2020. I'm not sure, to be honest with you.
Q. Okay. To your knowledge, does Food Town Mart have a website?
A. Do we have a website? No.
Q. What about social media? Things like Facebook or Twitter? Instagram? Any of that?
A. I know we have a Facebook.



Q. It has a Facebook?
A. Yup.
Q. What's the Facebook for Food Town Mart?
A. I believe it's called Food Town Mart.
Q. It's called Food Town Mart?
A. Yes, sir.
Q. To your knowledge, how long has Villard Food Town, Food Town Mart had this Facebook page?
A. To my knowledge, I mean when I started working here it was already up there.
Q. One of the Defendants in this lawsuit is named Nofal LLC, doing business as the Food Town Mart. Do you recognize that name, "Nofal"?
A. Nofal?
Q. Yes.
A. Yes, I do.
Q. Does it have any meaning? Does it relate to some person?
A. It's my brother.
Q. It's your brother. Is your brother's name Nofal?
A. Yes, it is.
Q. And is he an older brother or younger brother?
A. My older brother.
Q. Do you have any idea why the business is owned by Nofal LLC?



A. I do not know.
Q. Do you know if Nofal LLC is owned by your brother?
A. I do not know.
Q. To your knowledge, the store itself, the Food Town Mart there on West Villard Avenue, is that owned by your father?
A. To my knowledge, yes, it is.
Q. To your knowledge, do you know whether it's owned by any other person?
A. I don't know.
Q. Do you have an email address that you've used over the last few years?
A. Yes, I do.
Q. What email address have you used over the last few years?
A. My first name, period, my last name, the numbers 313 at yahoo.com.
Q. Okay. Have you ever used amjad.hamed23@yahoo.com?
A. That was a long time ago. I forgot the password, so that's what made me make this new one.
Q. Okay. Do you know what email address your brother has used?
A. I do not know.

Q. Have you ever seen an email address nofal.hamed@ymail.com?
A. Personally? No, sir.
Q. What about falfal0@gmail.com?
A. No.
Q. Is your brother's last name Hamed as well?
A. Yes, it is.
(Exhibit No. 1 was marked for identification.)
BY MR. DESOUZA:
Q. All right. I'm going to mark this as Exhibit 1 for today's deposition. Do you see that on your screen, sir?
A. Yes, sir.
Q. This document I'm identifying it as Exhibit 1 for today's deposition. Mr. Hamed, I will just represent to you that this is a document that we received from Facebook. We sent a subpoena to Facebook asking Facebook to give us information about the ownership of this Facebook account, the Villard Food Town or Food Town Mart Facebook. You see it says "Account Identifier: Villard Food Town." Do you see that?
A. Yes.
Q. And that Facebook says the registered email address -- there is two of them. One was that yahoo email address. Another is one is Facebook email address. Do you



see those?
A. Yes, sir.
Q. And you told me that amjad.hamed23@yahoo.com is an email address that you've previously used, correct?
A. Yes, it is.
Q. And when did you stop using that email address?
A. When I forgot the password.
Q. Do you recall about how long ago that was? Last year? Two years ago?
A. I don't know. No. I don't remember, to be honest with you.
Q. Okay. Also you see where it says "credit cards," and it has a Visa credit card?
A. Yeah. Uh-huh.
Q. The last four digits are 3797. Do you see that?
A. Yes.
Q. Do you recognize that credit card number?
A. Personally, I do not. Could've been mine from a while ago. I just don't remember.
Q. But as of today, you don't believe you have a credit card that ends in 3797?
A. No, sir.
Q. And you don't know whether that's your credit card, or perhaps some other member of your family, correct?
A. Yes.



Q. Was there ever a point in time, Mr. Hamed, that you were in control of posting content to the Villard Food Town Facebook page?
A. Yes.
Q. Okay. I'm going to take this down. Tell me how that came about. How did you go from a guy who's stocking shelves to a guy who's in control of the Facebook account?
A. My older brother, when he used to work here, he was the one in charge of it. When he did stop working here, he gave me control of it. He logged it in for me, and I went from there.
Q. Okay. Do you recall if that was towards the beginning of when you started to going back to sometime in 2020, or sometime more recent?
A. It wasn't more recent. It was probably around that time when I first started.
Q. What did your brother Nofal do for the company? Was he floor manager before you started, or was he something else?
A. Well, he was pretty much -- yeah, pretty much did what I do now. He was in charge of everything.
Q. What does your father do for the company? Whether it's day-to-day or whether it's overall, if you could help me out.
A. Yeah. He is the one that -- he would be our



boss. So he is the one that comes in, he makes the orders for the store. He is the one that's in charge of the accounting, the money, and stuff like that.
Q. What does Villard Food Town or Food Town Mart sell? Is it general grocery products?
A. We sell some -- the things that you would find in a general grocery store, food, meat, toilet paper, paper towel, cleaning products, juices, sodas, things like that.
Q. Has that changed at all since you started there three years ago?
A. No, sir.
Q. Like is there products that you used to sell that you don't sell now, or different lines of business today than when you first started?
A. No, sir.
Q. I believe your father had a deposition in this case, and he testified that there is -- I think you offer check cashing there; is that correct?
A. Yes, we do.
Q. Is there any other services besides check cashing that you offer there at the store?
A. Bill payments, money orders.
Q. All right. And I think your father said that you sell cellphones or cellphone plans; is that right?

A. Yes.
Q. Okay. Which is it? Is it both? Do you sell the phones and the plans?
A. Yeah. The phones with the plans.
Q. Phones with the plans. Do you know who the service provider is? Is it Boost Mobile? Verizon?
A. Boost Mobile.
Q. It's always been Boost Mobile, correct?
A. As far as to my knowledge, yes. Might have been something before, but I don't know.
Q. Well, right. Let me just make sure I clarify. I'm assuming, but tell me if I'm wrong, you really only know about the goings-on at the store since you started sometime in 2020; is that right?
A. Yes, sir.
Q. You didn't have any real involvement in the store prior to 2020, correct?
A. To my knowledge, no.
Q. Okay. Right. So to the extent I'm asking you questions, sir, it's really just based on what you know. I don't want you to guess as to what was happening before you. Okay?
A. All right.
(Exhibit No. 2 was marked for identification.)
BY MR. DESOUZA:



Q. So I'm going to go ahead and mark this as Exhibit 2. This is a screenshot of the Food Town Mart Facebook account. Do you see that on the screen, sir?
A. Yes, sir.
Q. This is just a screenshot of the top of the Facebook page, and you see it says "Food Town Mart," correct?
A. Yup.
Q. And it looks like there is a profile photo that says "Villard Food Town." Is that the old sign there was at the property?
A. Yes.
Q. And this photo, looks like of the exterior of the business, that is the business at 3217 West Villard, correct?
A. Yes, sir.
Q. And here at intro it says "grocery store with full line grocery and fresh meat. We accept food stamps and WIC, check cashing, a" -- you see that, right?
A. Yes.
Q. Did you write any of this contents that's on Facebook?
A. No, sir.
Q. So those descriptions were there before you took over the Facebook account, correct?



A. Yes, sir.
Q. And do know if the name on the Facebook account had changed from Villard Food Town to Food Town Mart at some point as well?
A. I don't know.
Q. To your knowledge, from your knowledge of the Facebook account, has it always said Food Town Mart as the account?
A. Yes, sir.
Q. Now, if you see on this exhibit, the last post that was made by Food Town Mart was July 3, 2022. Do you see that?
A. Yes, sir.
Q. And it looks like it's just advertising that "we have fresh chicken wings on sale," correct?
A. Yes.
Q. Who is the person who's actually making these posts? So someone's logging into the Food Town Mart account posting about the chicken wings that were on sale?
A. I posted it.
Q. That was you?
A. Yes, sir.
Q. Was there any other person that had access to the Facebook account to make those postings during the time that you were working there?



A. Yes.
Q. Okay. Who else?
A. My brother, Nofal.
Q. Okay. But he stopped working for the company at some point, correct?
A. Yes.
Q. Do you recall when that was?
A. I don't remember.
Q. Okay. But other than -- well, let me back that up. When your brother left the company, did he also stop making postings on the Food Town Mart Facebook page?
A. No, sir. He kept -- because I would ask him for some advice sometimes on how to post, because he was the one in charge before I was.
Q. So even after your brother left, he may have still posted some of the Food Town Mart postings, correct?
A. Yes, sir.
Q. Do you know, as you sit here, any particular posting that your brother did rather than you after the time that you took over?
A. No, sir.
Q. And if you see on this page it says the address is 3217 West Villard, and you told me earlier that address hasn't changed since you have been working there, correct?
A. Yes, sir.

Q. Okay. Let me take that down.
Now, when this first arose, this issue first arose with my client, your father told you it concerned some posting of a food item on the Facebook page, correct?
A. Yes, sir.
Q. Did he tell you what the photo was of?
A. Fresh chicken.
Q. I'm sorry. What?
A. I think it was fresh chicken.
Q. Fresh chicken?
A. Chicken wings, something along those lines, yeah.
(Exhibit No. 3 was marked for identification.)
BY MR. DESOUZA:
Q. I'm going to go ahead and show you what we'll mark as Exhibit 3 for the deposition. Do you see that up on the screen, sir?
A. Yes, sir.
Q. I believe that Exhibit 3 is another one of these posts by the Villard Food Town Facebook account, and it's dated September 28, 2020. Do you see that?
A. Yes, sir.
Q. And there are three photos there. Looks like one is of pork chops, one is of ribs, and one is of chicken legs, correct?



A. Uh-huh.
Q. I'm sorry, sir. I know it's your first deposition, but for the court reporter's benefit, if you could avoid the uh-huh. You have to give me a yes or a no just so she can write it down. Okay?
A. Yes.
Q. So it's three photos there that appear to be one of pork chops, one of some type of ribs, and one of chicken wings, correct?
A. Yes, sir.
Q. This September 28, 2020 posting, do you believe you were in control of the Facebook page at that time?
A. Yes, sir.
Q. Do you know whether this is a posting that you made to the Facebook account, or that your brother --
A. Yes, sir. I posted this, yes.
Q. You posted this?
A. Yes.
Q. And as of September 28, 2020, you were employed by the Food Town Mart, correct?
A. Yes, sir.
Q. Do you know whether you were floor manager as of that point, or some other position?
A. At that point, I'm not sure. I can't remember back that far.



Q. Now, how do you go about getting the information for posting that chicken drumsticks are 99 cents a pound, the spareribs are 1.99 pound? Does someone give you that information to post, or are you coming up with this information yourself?
A. No. Someone was giving me information.
Q. Who would be giving you that information?
A. Either the butcher that works here, or my father.
Q. In this particular posting, do you recall whether it was the butcher or your father that gave you the information to post?
A. I don't remember.
Q. Did your father give you any instructions in terms of running the Facebook page in terms of what you could do, what you couldn't do, anything like that?
A. No, sir.
Q. How did you go about getting the photographs for purposes of making these postings, this one in particular?
A. On Google.
Q. Just tell me if I'm right. You go on Google, do a search for pork chops, or chicken wings, something like that?
A. Yes, sir.
Q. And then you would look at the images that come



up, and find one that looks good, and use that photo on the Facebook page; is that right?
A. Yes, sir.
Q. Okay. Do you know, as you sit here, whether you ever went to the actual websites, or did you just look at the Google image result?
A. I just searched up the Google images, and then I copy and paste.
Q. So for the images that are in this posting, this September 28, 2020 posting, do you know what website the images were actually posted on?
A. No, sir.
Q. Do you understand what I mean by that when I say the website they were posted on?
A. You mean like Google?
Q. Well, you do a search on Google, and it shows you a number of thumbnails for pork chops or chicken, correct?
A. Yeah.
Q. Do you understand that those images are not actually on Google's website, but Google is showing you where they are on some other website online? It might be on this website. It might be on that website. Do you understand that?
A. The only pictures I found were on Google images.
Q. So you found it on Google images, and then you

clicked on the image, correct?
A. Yes.
Q. And did you click through to go to whatever website Google was directing you to? So, for example, if the pork chop photo was on porkchoplovers.com, did you actually go to the end website and find the photo there, or did you just copy from Google images?
A. As far as I remember, I just copied it through Google images.
Q. How did you go about copying the photos from Google images? Did you just take a screenshot? Did you do something else?
A. It was either a screenshot or I press -- or you could press -- I believe you could press and hold and save the photo through Google.
Q. Okay.
A. Through your phone.
Q. Did your father ever give you any instructions about how to find photographs for the Facebook page, or where to find photographs for the Facebook page?
A. No, sir.
Q. Did your brother ever give you those instructions?
A. No.
Q. To your knowledge, was your process of finding



photographs the same as your brother's process?
A. No, sir.
Q. Other than you and your brother, are you aware of anyone else who during your time of working there has access to or control of the Facebook page?
A. No, sir.
Q. So I guess to ask it a different way. Any one of the postings from the time you started working at Food Town Mart through today would have had to be made by either yourself or your brother, correct?
A. Yes, sir.
Q. Okay. I'm going to take that down for a moment.
If we could just go back to Exhibit 2 for a moment, Mr. Hamed. You see that the last post is July 3, 2022, correct?
A. Yes, sir.
Q. Is there any reason why there hasn't been any updates to the Facebook page since July 3, 2022?
A. No, sir. I just -- I'm not really a technical guy who knows how to do these kind of things on the phones. To me, it wasn't making an impact while I was posting or advertising for people to see. It wasn't making an impact on our sales. So to me it really didn't matter whether I posted on Facebook or if I didn't, it's still the same.



Q. Do you still have the ability to log into the Facebook account as of today?
A. Yes, sir.
Q. Have you logged into the Facebook account since July 3, 2022?
A. Yes, sir.
Q. And to your knowledge, have you removed any photographs from the Facebook page since July 3, 2022?
A. No, sir.
Q. Has your father asked you to remove any photographs from the Facebook page since July 3, 2022?
A. Not that I recall.
Q. If your father -- let me just clarify. Your father is essentially the boss at the Food Town Mart, correct?
A. Yes, sir.
Q. And if your father had asked you to remove any of the photographs from the Facebook page, you would have done so, correct?
MR. STEINLE: Object to the form.
A. Yes.
MR. STEINLE: Answer can stand.
BY MR. DESOUZA:
Q. I'm sorry. You said "yes," correct?
A. What was that?



Q. Mr. Hamed, you said yes to my question; is that right?
A. Yes.
MR. DESOUZA: Okay. Just for your purposes, Mr. Hamed, since you haven't done this before. Sometimes lawyers will make an objection to a question. For the most part, they are legal objections just for purposes of the judge for later on. You would still answer the question. Mr. Steinle is just preserving for later. Okay?
THE WITNESS: Okay.
(Exhibit No. 4 was marked for identification.)
BY MR. DESOUZA:
Q. Okay. Mr. Hamed, I'm going to show you what we'll mark as Exhibit 4. This is a copy of the Second Amended Complaint in this lawsuit. Basically that's fancy lawyer talk for this is the document by which my client is suing Nofal LLC and your father, Mr. Jaber. Okay?
A. Okay.
Q. So I'm going to scroll down. According to this document at least, the photograph at issue in this lawsuit is this photograph of pork chops. Do you see that?
A. Yes, sir.
Q. Paragraph 12 of the Complaint, right?
A. Uh-huh.

Q. And that is one of the photographs that we just saw in Exhibit 3, correct?
A. Yes, sir.
Q. In fact, if I scroll down where it describes the alleged use by Nofal LLC, it shows us that same September 28, 2020 Facebook post, correct?
A. Yes, sir.
Q. As you sit here today, other than somewhere on Google images, do you have any idea as to the specific website that the pork chop photo was on?
A. No, sir.
Q. Do you have any idea as you sit here today what specific search you put into Google images to find that photo?
A. Fresh pork chops.
Q. Okay. As you sit here today, you don't know whether it was your father or the butcher at the store that asked you to make this September 28, 2020 posting, correct?
A. I don't recall.
Q. Is it the same butcher today as it was back in 2020?
A. No, sir.
Q. Do you recall the name of the butcher back at the time this posting was made in September of 2020?
A. No, sir.



Q. Okay. Well, I'm assuming by virtue of the fact that we are looking at raw pork chops and chicken, that Food Town Mart does sell raw meat, correct?
A. Yes, sir.
Q. Are you familiar with what a hookah is?
A. A what?
Q. Are you familiar with what a hookah is? H-O-O-K-A-H?
A. Yes, sir.
Q. What is a hookah?
A. A smoking device I believe it would be called. Something you could smoke tobacco out of.
Q. Is it usually like a glass item?
A. Not the whole thing. There is glass pieces to it.
Q. Okay. Are you aware of whether Food Town Mart has ever sold hookahs in the store?
A. No, sir.
Q. I'm sorry. You said "no, sir"?
A. Yeah. Yes.
(Exhibit No. 5 was marked for identification.)
BY MR. DESOUZA:
Q. Let me go ahead and mark this as Exhibit 5. Do you see Exhibit 5 on the screen, sir?
A. Yes, sir.



Q. Exhibit 5 is another screenshot. It appears to be actually a screenshot from your Facebook page sharing a post from Food Town Mart dated January 6, 2021. Is that right?
A. Yes, sir.
Q. Okay. This photo that we are looking at in Exhibit 5, does that appear to be the inside of the Food Town Mart store on 3217 West Villard?
A. Yes, sir.
Q. Because I've never been there. I'm here in Florida. What area of the store am I looking at based on this photo?
A. I mean, the corner part of the store when you walk in. It's like the first time that you -- not the first thing, but once you walk in through the door, there's the registers. You just keep going straight, there will be a section for the check cashing spot. It would be around that area.
Q. Okay. And in this post it says "glow-in-the-dark hookah. Limited time supply. First come first serve." Correct?
A. Yes, sir.
Q. Is this an item that was being sold at the Food Town Mart, at least back in January of 2021?
A. Most likely.



Q. Well, let me ask it a different way. You wouldn't have posted on the Facebook page with a first come first serve if it wasn't being sold at the store, correct?
A. Yes, sir.
Q. And I've never smoked at all in my life, certainly not out of a hookah. But does this appear to be a hookah that was for sale at the Food Town Mart store?
A. Yes, sir.
Q. And there's some other products here. There's like a cylinder sitting on top of the desk. Do you see that?
A. Yes, sir.
Q. On top of the counter?
A. Yup.
Q. What is that, if you can recognize it? I don't know what those are.
A. That's the hookah tobacco.
Q. That's the tobacco for purposes of the hookah?
A. Yes, sir.
Q. And it looks like there are other round cylinders inside the glass cabinet; is that right?
A. Yes, sir.
Q. Those would all be hookah tobaccos?
A. Yes, sir.
Q. Okay. Thank you. That last Exhibit 5 that we

just looked at in January of 2021, do you know whether that would be you or your brother that would have posted that?
A. I don't recall.
Q. But one or the other, correct?
A. Yes, sir.
Q. How often does your father come to the store, to the Food Town Mart there?
A. Five days a week.
Q. Five days a week? I'm sorry. You said five days a week, yes?
A. Sometimes seven. Some days five. Some weeks -- depends on the week.
Q. When he is there, is he generally there full-time, like he is putting in a full day?
A. He puts in about seven or eight hours.
Q. Okay. Does your father just stay in the one part of the store, or does he walk all around?
A. Depending on the day. Depends on how busy we are. Depends if he needs to be inside the office or if he needs to be up in front of the store.
Q. But certainly you would think your father is familiar with the layout of the store, the products that it sells, correct?
A. Yes, sir.
(Exhibit No. 6 was marked for identification.)



BY MR. DESOUZA:
Q. Okay. Mark this as Exhibit 6. Exhibit 6 is another screenshot it appears of a post you shared from Food Town Mart also on January 16, 2021. Do you see that?
A. Yes, sir.
Q. What am I looking at in Exhibit 6, if you could tell me?
A. That's a glass hookah.
Q. It's another glass hookah?
A. Yes, sir.
Q. Was this a product that was being sold out of the Food Town Mart in January of 2021?
A. Most likely, yes, sir.
Q. Are these decorative hookahs, or is this something that I could actually smoke the tobacco product out of it?
A. It depends on how you want to use it. You can use it as a decoration. You can use it to smoke tobacco out of.
Q. Have you ever heard of these hookahs referred to as gift boxes?
A. Yes, sir.
Q. In what context would I call this a gift box?
A. What context? I don't know what you mean by that.



Q. Well, you agree that if I wanted to smoke this tobacco product using this hookah I could, correct?
A. Yes, sir.
Q. So it has a function if I want it to function as a hookah, correct?
A. Yes, sir.
Q. In what way could I call this a gift box? I mean, is this something that I could put stuff inside of? How would I call this a gift box?
A. Because people use it as a decoration. People give it to other people as a decoration for their homes. You can give it to somebody as a gift for Christmas, for their birthday.
Q. I guess, so we are on the same page, maybe I'm thinking of something different when I say gift boxes than what you are thinking. Okay?
A. Okay.
Q. We both agree you can give this item as a gift to someone else, correct?
A. Yes.
Q. Okay. Now, when I say gift box, I typically think of an item that I can put other things inside of. And I guess other than tobacco, can you think of anything else that people would put inside this to make it a gift box?



A. I think you could put a lot of things, because hookahs are pretty much an open concept. You could put anything you want in there.
Q. Okay. I'm going to go ahead and take that down. So we know in January of 2021 there were at least two different types of hookahs that the store was selling, correct?
A. Yes, sir.
Q. What about today? Does the store still sell hookahs today?
A. Today? No.
Q. When did it stop selling hookahs to your knowledge?
A. I don't recall.
Q. What about the tobacco for the hookahs, does it still sell that?
A. Yes, sir.
Q. Do you know why the store stopped selling hookahs at some point?
A. I do not know.
(Exhibit No. 7 was marked for identification.)
BY MR. DESOUZA:
Q. I'm going to mark this as Exhibit 7, sir. Exhibit 7 is another screenshot. It's dated January 30, 2021. Do you see that?

A. Yes, sir.
Q. And this is saying "congratulations to today's hookah raffle winners." Do you see that?
A. Yes, sir.
Q. To your knowledge, are these two people that won like a raffle for hookahs from the Food Town Mart store?
A. Yes, sir.
Q. Do you know who took this photo? Was it you? Was it somebody else?
A. I took these photos.
Q. You took these photos. Got it.
A. Yes, sir.
Q. Given that you took the photos, I assume you recognize the background behind these two individuals, correct?
A. Yes, sir.
Q. Okay. Were these photos taken at the Food Town Mart at 3217 West Villard?
A. Yes, sir.
Q. I guess behind this lady, you see there's these red signs that are hanging up in the background. Do you see those?
A. Yes, sir.
Q. Are those signs still there today at the Food Town Mart?



A. Yes, they are.
(Exhibit No. 8 was marked for identification.)
BY MR. DESOUZA:
Q. I'm going to share with you, sir, what we'll mark as Exhibit 8 to today's deposition. This is an April 14, 2021 post on Food Town Mart. Do you see that?
A. Yes, sir.
Q. And here in April of 2021 it's saying "new hookahs just arrived only at Food Town on Villard," correct?
A. Yes, sir.
Q. So do you agree with me that as of April 14, 2021 Food Town Mart was still selling hookahs, correct?
A. Yes, sir.
Q. And, again, these would all be photographs of hookahs that were actually being sold at the store, correct?
A. Yes, sir.
Q. Was your father aware that the store was selling these hookahs in this area of the store?
MR. STEINLE: I object to the form. Answer it if you can.
BY MR. DESOUZA:
Q. Let me ask you a different question.
The counter where all of these photos are taken,



this is somewhere that it's prominently on display in the store, correct?
A. It's in a corner of the store.
Q. Does your father ever work in that corner of the store?
A. No, sir.
Q. Have you ever seen him in that corner of the store?
A. Maybe walking past it, but never staying there.
Q. Okay. The hookahs that were being sold at the store, were they kept up on the shelves you see behind them? Where were they kept?
A. They were kept on that counter.
Q. So anyone walking by if they were looking in that direction could see the hookahs, correct?
A. If you stop and look, yes.
Q. How long --
A. They --
Q. I'm sorry. Go ahead.
A. They weren't hidden, but they weren't really the most visible. That corner is not really the hottest corner.
Q. As floor manager, are you responsible for keeping track of what sells or doesn't sell at the store?
A. Yes, sir.



Q. Is there like an inventory list that you can see what has sold and hasn't sold?
A. Yes.
Q. And would the hookahs be one item there that is listed, like we've got 200 hookahs in stock and we sold 30 of them, something like that?
A. Maybe back then, because we haven't sold hookahs in a while.
Q. At whatever time you were selling them, they would have been on the inventory list?
A. Yes, sir.
Q. And that would be similar to any other items in the store, like cereal, or cans of produce, anything like that?
A. Yes, sir.
Q. Who has access to that inventory list?
A. I do.
Q. Does your father have access to it as well?
A. If he wants to get into it, yes, he can.
Q. How is it kept? Is it on Excel? Is it paper? Is it Quick Books? How do you keep track of the inventory?
A. It's on an application on the computer in the store.
Q. Do you know what the application is called?
A. What's that?

Q. Do you know what the application is called?
A. Not directly. I do not know.
Q. But it's electronic where you log in and you can see what's in stock and what's sold?
A. Yes, sir.
MR. DESOUZA: Okay. Let me go ahead and take that down for you, sir.
By the way, Mr. Hamed, I don't think we are going to be here for very long today, but if you need to take a break, if you need to go to the restroom, you know, let me know. We can always take a five-minute break just to stretch our legs out. Okay?
THE WITNESS: Yes, sir. Okay.
BY MR. DESOUZA:
Q. Have you ever sold speakers at the Food Town Mart store?
A. Yes, sir.
Q. Yes, you have?
A. Yes, sir.
Q. What type of speakers?
A. All different kinds, wireless, Bluetooth speakers.
Q. Are those sold in the same location generally as the hookahs are kept?



A. Yes, sir.
Q. Do you still sell speakers today at the store, or at least recently?
A. Yes, sir.
(Exhibit No. 9 was marked for identification.)
BY MR. DESOUZA:
Q. Let me go ahead and share what we'll mark as Exhibit 9 for today's deposition. Do you see that up on the screen, sir?
A. Yes, sir.
Q. All right. What am I looking at in Exhibit 9?
A. This is a speaker attached to a hookah.
Q. And this is another item that was for sale at the Food Town Mart store?
A. Yes, sir.
Q. And as best as you can tell, the background to this hookah is the store at 3217 West Villard, correct?
A. Yes, sir.
Q. Any of the photos on the Food Town Mart Facebook page -- and let me go ahead and do this. I'm going to share with you my screen. Up on the screen right now is the actual Food Town Mart Facebook page live on the internet. Do you see it up here with the address up here?
A. Yes, sir.
Q. Okay. Now, obviously there are a lot of posts on



this page going from July 2022 through whenever they go back to, correct?
A. Yes, sir.
Q. For any of the photographs that are showing items for sale, whether they are chicken, or hookahs, or speakers, at least going back until you started working there, those would all be photographs of things for sale at the store at 3217 West Villard, correct?
A. Yes, sir.
Q. And to the extent that there are text postings -- for example, on April 20, 2022 there is this 4/20 sale posting, correct?
A. Yes, sir.
Q. Those text postings also relate to items for sale at 3217 West Villard, correct?
A. Yes, sir.
Q. To your knowledge, you have never utilized the Food Town Mart Facebook page to advertise for some other business, correct?
A. No, sir.
Q. So each of the postings on the Facebook page in some way was for purposes of advertising the business at 3217 West Villard, correct?
A. Yes, sir.
MR. DESOUZA: So I know I volunteered to give



you a break, Mr. Hamed, but I'm actually going to take a quick five-minute break. I just want to go through my notes and see what if anything else I need to ask you today before I let you get back to work. Okay?
THE WITNESS: Okay.
(A recess was taken from 11:50 a.m. until 11:54 a.m.)
(Exhibit No. 10 was marked for identification.)
BY MR. DESOUZA:
Q. Mr. Hamed, I took you to the actual Facebook page just before. But for purposes of the record, I'm going to go ahead and mark as an exhibit -- what we'll mark as Exhibit 10. Exhibit 10 is a screenshot of the Facebook page, again the Food Town Mart Facebook page, the photos tab. Do you see that?
A. Yes, sir.
Q. So these are all photographs that have been put up or posted by the Food Town Mart Facebook account. Okay?
A. Yes, sir.
Q. And do these all appear to be, at least going back to when you started working there, photographs that either you or your brother would have posted on the Food Town Mart account?
A. Yes, sir.
Q. And again, to the extent we are looking at

photographs of cell phones, or tobacco products, or grocery products, or speakers, these are all products that were being sold at the 3217 West Villard address, correct?

A. Yes, sir.

Q. You mentioned earlier that either your father or the butcher, to the extent you were posting photographs of food items or raw meat items, would have been the person to instruct you to put that up on Facebook, correct?

A. Yes. They would let me know when there is a sale, and then I would post it.

Q. Did your father or the butcher tell you to go put that up on Facebook?

A. No. They told me that there is a sale. I found the pictures, and I put it up.

Q. Okay. Was the butcher aware that you were running the Facebook account for the store?

A. Yes, sir.

Q. Was your father aware that you were running the Facebook account for the store?

A. Yes, sir.

Q. Has your father ever asked you to put any of the content up on the Facebook page?

A. No. I usually put it on myself.

Q. Did you ever show your father the content that you put up on the Facebook? Like, "hey, dad, here is what



I'm putting up there"?

A. No, sir.

Q. But he was aware that the Facebook page existed, correct?

A. Well, as far as I know, yes. He's --

Q. Well, your brother was aware that the Facebook page existed because he was publishing content on there, correct?

A. Yes. My dad's not a tech savvy guy. He's not a guy that knows how to go through all these things, so he wouldn't.

Q. Well, he wasn't putting the content on there, right?

A. No, sir.

Q. But he was telling you when there was sales or other items that were noteworthy, correct?

A. Yes, sir.

MR. DESOUZA: Okay. Mr. Hamed, I think we're done for the day. In and out in an hour.

Unless Mr. Steinle has any questions to ask you, I think we'll be done for the day.

MR. STEINLE: I don't have any questions, Counsel. But if I could ask to have copies of the exhibits, please. I'm presuming the court reporter doesn't have them, but you have them. So if you --



MR. DESOUZA: Yes. I will send all the exhibits to both Daughters Reporting and to you at the same time.

MR. STEINLE: Madam Reporter, did you do the last one? Do you have my contact information?

COURT REPORTER: I'm not sure. I took Sharif's depo.

MR. STEINLE: Same deposition order too.

COURT REPORTER: Dan, are you ordering?

MR. DESOUZA: Yes, I am.

Mr. Hamed, thank you for your time.

THE WITNESS: Thank you.

COURT REPORTER: Is he reading or waiving for the record?

MR. DESOUZA: Tim, I don't know that you are formally here representing him. But, Mr. Hamed, under the law, you have a right to either read the transcript before it's put into final form to see if there was any errors that were made, or you can waive that right and say I don't want to look at it again, I'm good. You just have to indicate for the court reporter which one you want to do.

THE WITNESS: I'd like to take a look at it.

(Videoconference concluded at 12:00 p.m.)



CERTIFICATE OF OATH

THE STATE OF FLORIDA
COUNTY OF BROWARD

I, the undersigned authority, certify that the witness, AMJAD SHARIF HAMED, appeared before me via videoconference on the 18th of December, 2023.

Signed this 18th of December, 2023.

JAMIE D. MACKRELL, CSR
Notary Public - State of Florida
Commission No. HH173501
Expires: September 8, 2025

REPORTER'S CERTIFICATE

I, Jamie D. Mackrell, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing transcript, Pages 1 to and including 47, is a true and correct transcription of my stenographic notes of the statement given by AMJAD SHARIF HAMED via videoconference, on the 18th of December, 2023, commencing at 11:00 a.m.

I FURTHER CERTIFY that I am neither attorney nor counsel for, nor related to or employed by, any of the parties to the action in which this statement is taken; and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

Dated this 5th of January, 2024.

________________________

JAMIE D. MACKRELL, CSR
Notary Public - State of Florida
Commission No. HH173501
Expires: September 8, 2025



ERRATA SHEET

In RE: PREPARED FOOD PHOTOS et al vs. NOFAL LLC et al
CASE NO.: 2:22-cv-00642-JPS
DEPONENT: AMJAD SHARIF HAMED

Page No:____ Line No.: ___ Change to:___________
Reason for change:______________________________

Page No:____ Line No.: ___ Change to:___________
Reason for change:______________________________

Page No.:___ Line No.: ___ Change to:___________
Reason for change:______________________________

Page No.:___ Line No.: ___ Change to:___________
Reason for change:______________________________

Page No.:___ Line No.: ___ Change to:___________
Reason for change:______________________________

Page No.:___ Line No.: ___ Change to:___________
Reason for change:______________________________

Under the penalties of perjury, I declare that I have read the foregoing document and that the facts stated are true.

________________________________________________

date Name



January 5, 2024
amjad.hamed313@yahoo.com

IN RE: Deposition of Amjad Sharif Hamed
Taken on: December 18, 2023
Prepared Food Photos et al vs. Nofal LLC et al

Dear Amjad Sharif Hamed,
This letter is to advise you that the deposition taken in the above-referenced case has been transcribed. Please contact our office 954-755-6401 to make arrangements to read and sign.

The original of this transcript has been forwarded to the ordering party and your errata, once received, will be forwarded to all ordering parties for inclusion in the transcript.

Sincerely,

________________________

Jamie Mackrell, Court Reporter
Daughters Reporting Inc.
101 Northeast 3rd Avenue
Suite 1500
Fort Lauderdale, Florida 33301
daughtersreporting@gmail.com

cc: ddesouza@desouzalaw.com