**No. 26-1757**
**No. 26-1859**

---

# In the United States Court of Appeals
# For the Seventh Circuit

---

PREPARED FOOD PHOTOS, INC.,
f/k/a Adlife Marketing & Communications Co., Inc.
*Plaintiff-Appellee and Cross-Appellant*

v.

SHARIF JABER,
*Defendant-Appellant, Cross-Appellee*

NOFAL, LLC
*Defendant-Cross Appellee*

---

An Appeal from a final order of the
United States District Court for the Eastern District of Wisconsin
No. 2:22-cv-000642-JPS, Judge Joseph Peter Stadtmueller

---

## SUPPLEMETNAL APPENDIX OF CROSS-APPELLEES NOFAL, LLC AND SHARIF JABER

---

Griffin C. Klema, Esq.
Fla. Bar No. 100279
**Klema Law, P.L.**
420 W. Kennedy Boulevard
Tampa, FL 33606
PO Box 172381
Tampa, FL 33672
(202) 713-5292
Griffin@KlemaLaw.com
*Counsel for Defendant-Appellant Sharif Jaber*
*Counsel for Defendant Cross-Appellee Nofal, LLC*

**CIRCUIT RULE 30(d) CERTIFICATION**

All of the materials required by Seventh Circuit Rule 30(a) are included in the appendix bound with the cross-appellant's brief. All of the materials required by Seventh Circuit Rule 30(b) are included in this separately bound supplemental appendix of cross-appellees.

__/s/ Griffin Klema________
Griffin C. Klema, Esq.

**CERTIFICATE OF FILING AND SERVICE**

I certify that, pursuant to and in compliance with 7th Cir. R. 25(d), this Supplemental Appendix was filed with the Clerk of the United States Court of Appeals for the Seventh Circuit via the Case Management, Electronic Case Filing (CM/ECF) system and e-mailed (unless other service means are indicated) on September 28, 2026, to all counsel of record.

__/s/ Griffin Klema________
Griffin C. Klema, Esq.

# INDEX TO THE SUPPLEMENTAL APPENDIX OF CROSS-APPELLEES

## Supplemental Appendix


| Document Description | Dist. Ct. DE No. | Supp. App. Page No. |
|---|---|---|
| Excerpts from the trial transcript, Day 1 – Oct. 28, 2024 pages 1-2, 122-143 (full testimony of Amjad Hamed) | 57 | SA2 |
| Excerpts from the trial transcript, Day 1 – Oct. 28, 2024 pages 168-169, 173, and 183-184 (colloquy during testimony of Sharif Jaber) | 57 | SA26 |
| Reply memorandum of law in support of Defendant Jaber's motion for extension of time, Jun. 27, 2025 | 78 | SA32 |

# Docket No.

# 57

Docket No. 57

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

| | |
|---|---|
| PREPARED FOOD PHOTOS, INC., | **Volume 1** |
| Plaintiff, | Case No. 22-CV-642 |
| v. | Milwaukee, WI |
| SHARIF JABER and NOFAL, LLC doing business as FOOD TOWN MART, | October 28, 2024<br>8:33 a.m. |
| Defendants. | |

---

TRANSCRIPT OF JURY TRIAL (EXCERPT)
BEFORE THE HONORABLE J. P. STADTMUELLER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: Copycat Legal, PLLC
By: MR. DANIEL DeSOUZA
3111 N. University Dr.
Suite 301
Coral Springs, FL 33065
Ph: 877-437-6228
dan@copycatlegal.com

For the Defendants: (Present) Terschan, Steinle, Hodan & Ganzer, Ltd.
By: MR. W. TIMOTHY STEINLE
309 N. Water Street, Ste. 215
Milwaukee, WI 53202
Ph: 414-258-1010
timothy.steinle@tshglaw.com

ALSO PRESENT: MS. REBECCA JONES, Intellectual Property Director, Prepared Food Photos, Inc.

U.S. Official Court Reporter: JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by computerized stenography, transcript produced by computer-aided transcription.

# I N D E X


VOIR DIRE/JURY SELECTION: PAGE:

by the Court 11

PRELIMINARY JURY INSTRUCTIONS: PAGE:

by the Court 33

OPENING STATEMENTS: PAGE:

by Mr. DeSouza 48
by Mr. Steinle 53


## WITNESSES


ALL WITNESSES: PAGE:

For the Plaintiff:

REBECCA JONES:
Direct Examination by Mr. DeSouza 59
Cross-Examination by Mr. Steinle 104
Redirect Examination by Mr. DeSouza 117

AMJAD SHARIF HAMED:
Direct Examination by Mr. DeSouza 122

SHARIF JABER:
Direct Examination by Mr. DeSouza 144

For the Defendants:

SHARIF JABER:
Direct Examination by Mr. Steinle 187
Cross-Examination by Mr. DeSouza 197
Redirect Examination by Mr. Steinle 203

AMJAD SHARIF HAMED:
Direct Examination by Mr. Steinle 204
Cross-Examination by Mr. DeSouza 213
Redirect Examination by Mr. Steinle 225

13:17 MR. DeSOUZA: Your Honor, plaintiff calls Amjad Hamed.
13:17 MR. STEINLE: May I have permission to go get him?
13:18 THE COURT: Sure.
13:18 THE CLERK: Please raise your right hand.
13:18 (The witness is sworn.)
13:18 THE WITNESS: Yes.
13:18 THE CLERK: Thank you. Please be seated. Please state your full name and spell it for the court reporter.
13:18 THE WITNESS: Amjad Sharif Hamed, first name A-M-J-A-D, middle name S-H-A-R-I-F, last name H-A-M-E-D.

13:18 AMJAD SHARIF HAMED,

13:18 called by the Plaintiff as a witness herein, having been first duly sworn, was examined and testified as follows:

13:18 DIRECT EXAMINATION

13:18 BY MR. DeSOUZA:

13:18 Q. Good afternoon, Mr. Hamed.
13:18 A. Good afternoon.
13:18 Q. Mr. Hamed, this is not the first time that you and I are talking to each other; right?
13:18 A. No, sir.
13:18 Q. I think you had your deposition taken in this case, it was a little less than a year ago in December of last year; is that right?
13:19 A. Yes, sir.
13:19 Q. At the time of your deposition, you were living with your

parents, which I believe are -- Sharif Jaber is your father; correct?

13:19 A. Yes.

13:19 Q. And Sharif Jaber is the gentleman that's in the courtroom over here; correct?

13:19 A. Yes, sir.

13:19 Q. Okay. Are you still living at that same address?

13:19 A. No, sir.

13:19 Q. Okay. You've moved since then; correct?

13:19 A. Yes, sir.

13:19 Q. At the time of your deposition, you had not discussed this lawsuit substantively with your father; correct?

13:19 A. No, sir.

13:19 Q. Have you had a chance to discuss it with him since then?

13:19 A. No, sir.

13:19 Q. Okay. Now, the other defendant in this case besides Mr. Jaber is an entity named Nofal, LLC. The name Nofal, that has a meaning to you; correct?

13:19 A. Yes, sir.

13:19 Q. It's your brother's name; correct?

13:19 A. Yes, sir.

13:19 Q. I believe it's an older brother; correct?

13:19 A. Yes, sir.

13:19 Q. How much older is Nofal than you?

13:19 A. About five years.

13:19 Q. About five years?
13:19 A. Yes, sir.
13:20 Q. Okay. Do you still work at the Food Town Mart on 3217 West Villard?
13:20 A. Yes, sir.
13:20 Q. Okay. And you worked there about a year ago when we took your deposition; correct?
13:20 A. Yes, sir.
13:20 Q. True that you've worked there since it was either late 2019 or early 2020; correct?
13:20 A. Yes, sir.
13:20 Q. Food Town Mart at 3217 West Villard, that is a supermarket/grocery store; correct?
13:20 A. Yes, sir.
13:20 Q. And if I -- my math is right, you've worked there for about four years at this point, maybe a little bit more; is that right?
13:20 A. Just about, yes, sir.
13:20 Q. And when you first started, you were a stocking clerk and you became a floor manager by the time that I talked to you last year; correct?
13:20 A. Yes, sir.
13:20 Q. About how long were you a clerk versus the floor manager for?
13:21 A. I don't remember off the top of my head.

13:21 Q. Okay. Was it pretty quick that you graduated to floor manager?

13:21 A. Maybe about year and a half, two years.

13:21 Q. Okay. And for the entire time that you've worked at the store, it's been known as the Food Town Mart; correct?

13:21 A. Yes, sir.

13:21 Q. Is there still a sign today at the store that says Villard Food Town?

13:21 A. Yes, sir.

13:21 Q. Okay. So when I -- when I drive in to the shopping center to the grocery store, there's a sign outside that says Villard Food Town?

13:21 A. Yes, sir.

13:21 Q. There also a sign that says Food Town Mart on the outside?

13:21 A. Yes, sir.

13:21 Q. Okay. But to your knowledge, at least internally, you believe the store is called Food Town Mart, notwithstanding the sign that says Villard Food Town; correct?

13:21 A. Yes, sir.

13:22 Q. Okay. The name Villard Food Town, that to your knowledge was the name prior to it being Food Town Mart; correct?

13:22 A. As far as I know, yes, sir.

13:22 Q. But regardless of the name, whether it's Villard Food Town or Food Town Mart, the store has always operated at that same address on Villard Avenue; correct?

13:22 A. 3217 West, yes, sir.
13:22 Q. I keep saying "Villard." Is it "Villard"?
13:22 A. It's "Villard," yes, sir.
13:22 Q. Okay. Well, I'll do my best.
13:22 A. No problem.
13:22 Q. As the floor manager -- and are you still the floor manager of the store?
13:22 A. Yes, sir.
13:22 Q. Okay. Has your position changed at all in the year since I last talked to you?
13:22 A. No, sir.
13:22 Q. Okay. So then as floor manager, I'm correct, then, that you're generally in charge of things like ordering products, opening the store when you're there, closing the store when you're there; is that right?
13:22 A. Somewhat, yes, sir.
13:22 Q. And generally making sure that things are in order at the store?
13:22 A. Uh-huh.
13:22 Q. Yes?
13:22 A. Yes, sir.
13:23 Q. Okay. And you -- you have a boss at the store; correct?
13:23 A. Yes, sir.
13:23 Q. Sharif Jaber, the defendant in this case, is your boss; correct?

A. Yes, sir.
Q. He's the boss of everyone at the store; correct?
A. Yes, sir.
Q. And Mr. Jaber does come to the store; correct?
A. Yes, sir.
Q. At least five times a week?
A. Yes, sir.
Q. And when he's there, he's there for seven, eight hours a day?
A. Yes, sir.
Q. Generally a full-time employee, essentially he's there at the store; correct?
A. I mean, it all really depends on the day and what progresses through; but, yeah, roughly about.
Q. And some -- and some weeks it's seven days a week; correct?
A. Yeah.
Q. Okay. And when your father is -- I'm sorry, your father is generally familiar with the layout of the store; correct?
A. Yes, sir.
Q. Okay. I mean, you've seen him walking around the store before; correct?
A. Yes.
Q. And to your knowledge, your father has owned this store since 2017; is that right?
A. As far as I know, yes, sir.

13:24 Q. And to your knowledge, your father was working at this store prior to 2017?
13:24 A. Yes, sir.
13:24 Q. Food Town Mart, the store, it sells the types of things you would find in a normal grocery store; correct?
13:24 A. Yes, sir.
13:24 Q. So things like food, meat, toiletries, things like that; correct?
13:24 A. Yes, sir.
13:24 Q. And that has stayed consistent since the time that you started working there, whether it was late 2019 or early 2020; right?
13:24 A. Yes, sir.
13:24 Q. Sir, Food Town Mart has a Facebook page; correct?
13:24 A. Yes, sir.
13:24 Q. And the Facebook page that it has is called Food Town Mart; correct?
13:24 A. Yes, sir.
13:24 Q. Are you aware of that same Facebook page being called anything else during the times you worked there?
13:24 A. During the time I worked there, no.
13:24 Q. Okay. Now, when you started working there, the Facebook page was already existing; correct?
13:24 A. Yes, sir.
13:25 Q. Okay. And your older brother Nofal, who you said is about

five years older than you, he was one that was in charge of the Facebook page before you started working there; correct?
A. Yes, sir.
Q. Is that yes, sir?
A. Yes, sir.
Q. Okay. When your older brother stopped working at the store, you took over control of the Facebook page; correct?
A. Well, yeah, he showed me how to post on the Facebook page, and there is a Facebook page for Food Town.
Q. Well, when he stopped working at the store, other than transitioning it over to you, he generally stopped being in control of the Facebook page; correct?
A. Not completely.
Q. He still did a couple of posts here and there?
A. Here and there. I mean, I would talk to him for advice on how to post and go about things. Sometimes I didn't think I needed advice, and I would post myself.
Q. And prior to your brother leaving the employment of Food Town Mart, he occupied a similar position to your job as floor manager; correct?
A. Yes, sir.
Q. Generally doing the same thing; opening store, closing store, making sure things are in order; correct?
A. Yes, sir.
Q. Mr. Hamed, I want to show you what's already been admitted

into evidence as Plaintiff's Exhibit 10 on the screen here. Do you see that on the screen?

13:26 A. Yes, sir.

13:26 Q. Okay. Exhibit 10, sir, is a Facebook page. And the URL, if you see in the very lop left, it's facebook.com/ villardfoodtown, do you see that?

13:26 A. Yes, sir.

13:26 Q. Okay. And -- but the display name of the account, the one that shows to people shows as Food Town Mart. Do you see that?

13:26 A. Yes, sir.

13:26 Q. The photo we're looking at at the top there of the store, is that the store on 3217 Villard?

13:26 A. Yes, sir.

13:26 Q. Okay. And that's what it looks look today, perhaps minus that red sign on the -- on the right of the store?

13:27 A. Minus the red sign and it's been painted.

13:27 Q. Okay. It's been painted since this photo was put up there; correct?

13:27 A. Yes, sir. And the US Cellular sign is not up there.

13:27 Q. All right. This Food Town Mart Facebook page that we're looking at here, this is Food Town Mart's Facebook page; correct?

13:27 A. Yes, sir.

13:27 Q. And this is the page that you have been responsible for maintaining since you took over the job from your brother;

correct?
13:27 A. Yes, sir.
13:27 Q. And prior to you, this was the Facebook page that your brother was responsible for; correct?
13:27 A. Yes, sir.
13:27 Q. The -- if we scroll down just a little bit -- and I'm going to make this bigger because I can't see it from here, my eyes are bad -- if you see at the very bottom, you see there's a date captured by FireShot 26 September, 2023, sir?
13:28 A. Yes, sir.
13:28 Q. All right. So I'm going to represent to you that this screenshot was created in September of '23; okay? Is that okay with you?
13:28 A. Okay. Yes, sir.
13:28 Q. Okay. Now, the most recent post that's showing here on this Facebook account appears to be July 3rd, 2022. Do you see that?
13:28 A. Yes, sir.
13:28 Q. Okay. Who was -- who was in charge of this Facebook page in July of 2022?
13:28 A. Well, I was.
13:28 Q. You said you were?
13:28 A. Yes, sir.
13:28 Q. Okay. Now, this says, "Fresh chicken wings on sale $2.49 a pound." Do you see that?

13:28 A. Yes, sir.
13:28 Q. Okay. And you were the one that created that post; correct?
13:28 A. Yes, sir.
13:28 Q. And if we look over here, like on the information for the store, it has an address there; correct?
13:28 A. Yes, sir.
13:29 Q. And that's the 3217 West Villard that the store is actually located at; correct?
13:29 A. Yes, sir.
13:29 Q. And there's also a phone number underneath that (414) 462-4300. Do you see that?
13:29 A. Yes, sir.
13:29 Q. That's the phone number for the store; correct?
13:29 A. Yes, sir.
13:29 Q. Okay. Let me go ahead and take that down for you.
13:29 Now, I'm going to put up on the screen another document that's already been admitted as Plaintiff's Exhibit 5. Do you see that on the screen, sir?
13:29 A. Yes, sir.
13:29 Q. Okay. Now, this is the same facebook.com/villardfoodtown account; correct?
13:29 A. Yes, sir.
13:29 Q. But if you scroll to the bottom, this screenshot says it was created on November 22nd, 2021. Do you see that?

A. Yes, sir.
Q. Okay. And we have here -- kind of the middle of the screen, we have a Facebook post of September 28th, 2020. Do you see that?
A. Yes, sir.
Q. You were in control of the Facebook page in September, 2020 when this post was made; correct?
A. Me and my brother were, yes, sir.
Q. Some combination of you and your brother; correct?
A. Yes, sir.
Q. But you yourself are the one that created this post; correct?
A. Yes, sir.
Q. And you were a Food Town employee at the time that this post was created; correct?
A. Yes, sir.
Q. This posting, if you look, it looks like there's three different types of meat that are being discussed in the post; correct?
A. Yes, sir.
Q. And the post has prices for each type of meat, 2.29 a pound pork chops and so on; correct?
A. Yes, sir.
Q. And the information for how much the meat is being sold per pound, that's not information that you independently knew;

correct?
13:31 A. No, sir.
13:31 Q. You had to get that information from someone; correct?
13:31 A. Yes, sir.
13:31 Q. And there's only two people that you can think of that information could have come from; right?
13:31 A. Yes, sir.
13:31 Q. One would have been the butcher that was employed at the store; correct?
13:31 A. Yes, sir.
13:31 Q. And the other would have been your father, who is the manager of everything; correct?
13:31 A. Yes, sir.
13:31 Q. Okay. But you don't recall whether it was the butcher or your father that told you pork chops 2.29 a pound, spare ribs 1.99 a pound, you don't remember who gave you the information; correct?
13:31 A. I don't remember who gave me the prices, no, sir.
13:31 Q. Now, the photo that's at issue in this lawsuit is the pork chops, the boneless pork chops. It looks like there's four of them in the picture. Do you see that?
13:31 A. Yes, sir.
13:31 Q. Now, whether it's this photo or the other two photos, you would have gone through the same process to find that photo online and post it onto the Facebook page; correct?

13:31 A. Yes, sir.
13:32 Q. Okay. And that process -- to the extent it wasn't a photo you took yourself, the process was you went on Google, you did a search for fresh pork chops or boneless pork chops, it was displayed on Google Images, and you chose an image you liked and put it on the Facebook page; correct?
13:32 A. Yes, sir.
13:32 Q. And that's the same for the photo of chicken, the same for the photo of spare ribs; correct?
13:32 A. Yes, sir.
13:32 Q. And just to clarify, you did not take the photograph of the four pork chops at the top there; correct?
13:32 A. No, sir.
13:32 Q. Right. So that's not something you created with your own camera, you went and you found that on Google by doing a search and then put it on the Facebook page; correct?
13:32 A. Yes, on Google Images.
13:32 Q. Okay. And you don't know exactly what website that photo was ultimately hosted on, correct, like whether it was my client's website or some other website, you just know that it showed up on Google Images; right?
13:33 A. Yes, sir.
13:33 Q. Your father, who is the manager of the store, never gave you any instructions with respect to how to run this Facebook page; correct?

13:33 A. My father doesn't even know that we have -- well, he didn't know that he -- we had this Facebook page.

13:33 Q. You said your father didn't know that you had the Facebook page?

13:33 A. No, sir. I didn't -- I never told him that I was posting on Facebook. I never discussed with him what I'm posting on this Facebook page.

13:33 Q. Okay. Mr. Hamed, in the deposition that you took last year, do you remember being sworn in the same way you were sworn in today giving an oath to tell the truth, whole truth, nothing but the truth?

13:33 A. Yes, sir.

13:33 Q. And you testified truthfully in that deposition, correct?

13:33 A. Yes, sir.

13:33 Q. You didn't lie about anything; correct?

13:33 A. No, sir.

13:33 Q. Okay. Mr. Hamed, I want to show you your deposition, okay. So if you see, this is a document that says, "Videoconference Deposition of Amjad Sharif Hamed," and the date is December 18th, 2023?

13:34 A. Yes, sir.

13:34 Q. Okay. I'll represent to you this is your deposition, Mr. Hamed. And this is just a record of everything that I asked you and everything that you testified to; okay?

13:34 A. Yes, sir.

13:34 Q. I want to show you lines -- for your Honor, it's 45/18 to 45/20.
13:34 Mr. Hamed, in your deposition I asked you, "Was your father aware that you were running the Facebook account for the store?"
13:34 A. At that time, he did know.
13:34 Q. I'm sorry. Your answer was, "Yes, sir"; correct?
13:34 A. Yes, sir. At that time, he did know. This was after he got a lawsuit for a Facebook page.
13:34 Q. So after the lawsuit was filed, your father knew that this was the Facebook page for Food Town Mart; correct?
13:35 A. After the lawsuit came out, he asked me. I told him I had posted that picture. He didn't know what it was or what was going on because he didn't know that we had a Facebook page.
13:35 Q. Through today, your father has still not given you any instructions as to how to run the Facebook page or what to post or what not to post; correct?
13:35 A. No, sir. My dad barely knows how to get onto his phone.
13:35 Q. He barely knows how to get on a computer?
13:35 A. On a computer, to anything technical, technology.
13:35 Q. Okay. You're familiar with what a hookah is; correct?
13:35 A. Yes, sir.
13:35 Q. And at least over the course of the last four years, you've sold hookahs at the Food Town Mart store; correct?
13:35 A. Yes, sir.

13:35 Q. And I apologize, let me just clarify. You said you're familiar with what they are. Hasn't really come out as to what they are. A hookah is a smoking device; correct?

13:36 MR. STEINLE: I object, Judge. I don't know what relevance hookahs has to this lawsuit before this Court.

13:36 MR. DeSOUZA: Your Honor, if I may, Mr. Jaber testified repeatedly that they've never sold these items in the store.

13:36 MR. STEINLE: No, Judge --

13:36 THE COURT: It presupposes that he knows what they are. You haven't had that demonstrated. You know, you're trying to impute knowledge when the witness may not have the knowledge and the details. It's no different than being unfamiliar with technology, whether it's Facebook or computer or cell phone.

13:36 BY MR. DeSOUZA:

13:36 Q. Mr. Hamed, you testified what a hookah is; correct?

13:36 A. Yes, sir.

13:36 Q. Okay. And your -- is your father familiar with the products that are sold at the store?

13:37 MR. STEINLE: I object. How does he know what his father thinks or knows?

13:37 THE COURT: Yeah. You can ask his father when he testifies, Mr. DeSouza.

13:37 MR. DeSOUZA: Okay.

13:37 BY MR. DeSOUZA:

13:37 Q. Mr. Hamed, there is an inventory list that is kept at the store; correct?

13:37 A. Yes, sir.

13:37 Q. All the products that you sell and have sold for the last four years that you've worked there; correct?

13:37 A. Yes, sir.

13:37 Q. And that inventory list shows what you have in stock, what you don't have in stock; correct?

13:37 A. Yes, sir.

13:37 Q. You have access to the inventory list; correct?

13:37 A. Yes, sir.

13:37 Q. Your father has access to that inventory list; correct?

13:37 A. Yes, sir.

13:37 Q. And products that you sell at the store are generally, if they're in stock, they're kept out on the shelves somewhere in the store; correct?

13:37 A. Yes, sir.

13:37 Q. Okay. Walk me through the layout of the store. I walk into the front door of the store, and I'll -- I'll go ahead and put Plaintiff's Exhibit 10 up again. Is -- am I correct that the front door of the store is right over here where my mouse pointer is, towards the left?

13:38 MR. STEINLE: Your Honor, I'm going object again. I don't know what the layout of the store has to do with posting

of a picture on a Facebook page.

13:38 THE COURT: Yeah, I agree. Let's move on to get before the jury relevant evidence, Mr. DeSouza. Everybody has taken their time, whether it's the judge, my staff, these jurors, and we're only here to deal with that which is relevant.

13:38 MR. DeSOUZA: I understand, your Honor. I'm just trying to establish for some of these photos that Mr. Jaber testified about as not being his store for Mr. Hamed to tell us where in the store these items would be located. It's a brief --

13:38 THE COURT: Well, again, whether it's hookahs or cell phones or computer software folios, he may not personally be aware of these items. And they have nothing to do with this photo posted on Facebook, so let's move on.

13:39 BY MR. DeSOUZA:

13:39 Q. Mr. Hamed, since you started working there and since your brother gave the job to you for dealing with the Facebook account, have you removed any photographs from the Facebook page?

13:39 A. No, sir.

13:39 Q. Okay. Are you aware the photograph that we were looking at before -- and I'll pull it up again, it was Exhibit 5 -- this photograph was -- you agree this photograph was posted by you on September 28th, 2020; correct?

A. Yes, sir.
Q. Are you aware that if one goes to the Facebook page today that post is no longer there, the September 28th, 2020 post?
A. Yes, sir.
Q. You're aware that it's not there?
A. Yes, sir.
Q. Okay. Do you know who removed that post from the Facebook page?
A. There's only two people that run that page. It's me and my brother.
Q. And if you didn't do it?
A. Then it would be him.
Q. Okay. Did you discuss that with your brother as to the removal of that post?
A. No, sir.
Q. Do you know when that post was removed?
A. No, sir.
Q. Is it fair to say that one would have to ask your brother when it was removed and why to know the answer to those questions?
A. He's the one that removed it. You would have to ask him, yes, sir.
Q. Okay. Now, do you see, sir, that in this post which you agree you're the one that put up, the Facebook account at the time -- and, again, if you scroll to the bottom, you'll see

this was in November of 2021, okay?
A. Yes, sir.
Q. Do you see that the account that posted this was named Villard Food Town at the time?
A. I do see that, yes, sir.
Q. Okay. And it's the same facebook.com/villardfoodtown account up here; correct?
A. Yes, sir.
Q. Now, we looked at another screenshot that said Food Town Mart, which you agree is the actual name of the store; correct?
A. Yes, sir.
Q. Okay. Again, do you know why the account changed from Villard Food Town to Food Town Mart at some point after November, 2021?
A. No, sir.
Q. Did you make that change?
A. No, sir.
Q. And, again, if that change was made, the only two people that are in charge of the account or have access to it are you and your older brother; correct?
A. Yes, sir.
Q. So same question, if you don't know, we'd have to ask your brother; correct?
A. Yes, sir.
MR. DeSOUZA: Okay. I have no further questions for

Mr. Hamed, your Honor.

13:41 THE COURT: Thank you.

13:41 Mr. Steinle, do you wish to question the witness now or during your case?

13:41 MR. STEINLE: In that this was an adverse examination, your Honor, I -- I intend to call Mr. Hamed at the time of my case in defense. And if I could reserve the right to -- I don't have any questions in clarification of the --

13:42 THE COURT: Sure.

13:42 MR. STEINLE: -- adverse examination. But I would reserve the right to call him on direct examination in any case.

13:42 THE COURT: That's certainly agreeable.

13:42 MR. STEINLE: So at this point, I don't have any clarification questions.

13:42 THE COURT: All right. Amjad Hamed, you may step down. You may be called whether later today or tomorrow.

13:42 THE WITNESS: Thank you, your Honor.

13:42 (The witness is excused.)

13:42 THE COURT: Mr. DeSouza, you may call your next witness.

13:42 MR. DeSOUZA: Yes, your Honor. Plaintiff calls Sharif Jaber as our next witness.

13:43 THE CLERK: Please raise your right hand.

13:43 (The witness is sworn.)

market its business. You said in August of 2023, "deny"; correct?

14:13 A. Correct.

14:13 Q. Now, as you sit here today, all of these admissions that I have just looked at, you agree with me that they should be admit, to your knowledge as of today; correct?

14:13 MR. STEINLE: I object, lack of foundation. The -- the document itself, the request to admit, contains photographs of items other than the pork chop which is the subject matter this lawsuit. And if he's going to try to question and impeach this individual, he should show him the images on the request to admit which include items that are not even part of this lawsuit. So I would object that lack of foundation. That's my objection.

14:13 THE COURT: And equally important, Mr. Steinle, is the fact that the first interrogatory started with an introductory phrase, "As of September 20th, 2020," not 2023, three years later. The way the question was phrased asked the witness to provide an answer as to what he knew at the time the photo was posted. That's a lot different than learning subsequent to being hailed into court with a lawsuit.

14:14 MR. DeSOUZA: Your Honor, I will say that none of these requests for admissions that I have showed him thus far concern any photograph other than the photograph at issue. Mr. Steinle is referring to RFAs that start in the 30s or in the

40s. I have not asked him about that. I do not intend to ask him about that. I am simply asking whether he agrees or does not with these denials as we are looking at them.

14:14 THE COURT: Well --

14:14 MR. DeSOUZA: And I can cover them individually.

14:15 THE COURT: -- the problem is the denials were as of a particular date. And as any reasonable litigant and judge and lawyer understands, the dynamic of litigation is such that answers that may be unknown at one point in the litigation become better understood at some point later. But that does not serve to impute to a party in a lawsuit knowledge as of a particular date when they learned of it subsequently.

14:15 BY MR. DeSOUZA:

14:15 Q. Mr. Jaber, if we just look at No. 15 on the screen, do you see that? Do you see No. 15 together with the response?

14:15 A. Yes.

14:16 Q. Okay. The question for No. 15 does not say, "Admit that as of September, 2020," it simply says, "Admit that the Facebook page," which is the Facebook page we've been discussing, "is utilized to market and/or advertise Nofal, LLC's business." Do you see that?

14:16 A. Yes.

14:16 Q. Okay. In August of 2023, you denied that; yes?

14:16 A. Yes.

14:16 Q. As you sit here today, do you believe that is a true

inaccurate answer today based or your knowledge today; correct?

MR. STEINLE: Same objection that we talked about with the requests for admissions, Judge. Are we talking about September 28, 2020, or are we talking about the time that he completed the interrogatory?

MR. DeSOUZA: I just asked him his knowledge as of today, does he believe --

THE COURT: Well, the problem is, it's not Nofal, LLC or Sharif Jaber. It's his sons, so they're independent. That's what this whole case is about. This is not rocket science.

MR. DeSOUZA: Your Honor, the sons are employees of the store under Mr. Jaber's -- as the boss of the store, these are employees that work for him.

THE COURT: That's well and true, but they could be doing this quite independent of any employment relationship. That's the problem.

BY MR. DeSOUZA:

Q. Mr. Jaber, Food Town Mart is a for-profit business; correct?

A. Yes. It's for profits, yes.

Q. Okay. You sell meat at the store, yes?

A. Yes.

Q. There's a meat department?

A. Yes.

14:34 MR. DeSOUZA: Well, whether it does or not, your Honor, the law on copyright infringement is who published or who displayed it. The uncontroverted testimony is that employees of Nofal, LLC -- not of the Villard Food Town or any prior owner -- employees of the defendant in this lawsuit caused the photograph to be displayed on a site. It does not have to be on your site. It could be a third-party site. It could be Yelp. It could be any different type of third-party site.

14:35 If you cause the work to be displayed and you are an employee -- and obviously in terms of respondeat superior, you're an employee of Nofal. They did not testify that they are an employee of any other entity. And he testified very clearly he published this on behalf of Nofal, LLC. So it's a red herring to say, well, the Facebook page was created in -- you know, prior to 2017. It doesn't matter. What matters is who's the one that caused it to be displayed, and it cannot be -- it cannot be that an employee of some other company caused it to be displayed when the uncontroverted testimony is it was the employee of this store.

14:36 THE COURT: If the employer is unknowing of the posting, how -- what is the principle of law that makes the employer liable?

14:36 MR. DeSOUZA: The employer is liable for actions of its employees in the scope of their employment, your Honor.

14:36 THE COURT: Oh, now you've hit the operative word, scope of their employment. Where is there in this case any allegation, much less proof that what was done here was within the scope of their employment?

14:36 MR. DeSOUZA: And your Honor --

14:36 THE COURT: And particularly when it's unbeknownst by the employer?

14:36 MR. DeSOUZA: Well, the employer says unbeknownst, your Honor. It's a factual dispute issue as to whether he knew or not and when he knew it. At one point he testified I knew in February, 2023. Yet in October of 2023, in August of 2023, he's saying, no, I didn't.

14:37 THE COURT: Oh, but that was as of the date of the posting. That's clearly what the import of both those questions and the answers were.

14:37 MR. DeSOUZA: There is -- there is one question, your Honor, that says, "Admit that as of September 28th, 2020." Everything else very clearly says, "You used the photo, you used on your website," there is denial. Mr. Jaber has now said I admit we used the photo, which would be on the website. Whether the employer knew about it or not is not the question, your Honor.

14:37 The question -- and I would agree, if one of the employees got in a car, went to a bar, and got into a fight and injured someone, it's clearly not within the scope of that person's

# Docket No.

# 78

Docket No. 78

**UNITED STATES DISTRICT COURT**
**EASTER DISTRICT OF WISCONSIN**

**Case No. 22-cv-642-JPS**

PREPARED FOOD PHOTOS, INC.,

Plaintiff,

v.

SHARIF JABER and
NOFAL, LLC,
d/b/a Food Town Mart,

Defendants.

---

**DEFENDANT SHARIF JABER'S REPLY IN SUPPORT OF HIS MOTION FOR EXTENSION OF TIME NUNC PRO TUNC TO FILE HIS MOTION FOR ATTORNEY'S FEES [DE 76]**

Defendant Sharif Jaber, pursuant to Civil L. R. 7(c) and the Court's order shortening the time for this reply, [DE dated June 17, 2025],[1] responds to plaintiff Prepared Food Photos, Inc.'s ("PFP") opposition memorandum, [DE 77].

**TABLE OF CONTENTS**

Page


**INTRODUCTION** ........ 2
**ARGUMENT** ........ 3
**1. PFP concedes *Pioneer* factors two and four** ........ 3
**2. PFP cannot refute the evidence for why the deadline was missed** ........ 4
**3. Plaintiff's argument on *Pioneer* factor four should be rejected as further copyright trolling bullying tactics** ........ 6
**4. PFP relies on out-of-district cases that are inapposite** ........ 9
**CONCLUSION** ........ 9


[1] This docket entry text is not numbered.

## INTRODUCTION

Plaintiff's rhetoric and baseless personal attacks are not well taken.[2] As to the substance of its opposition, Prepared Food Photos asserts, without any foundation in fact, that the arguments in Jaber's motion were "manufactured," Opp'n, DE 77 at 10. Hardly. It took great courage and humility for Attorney Steinle to disclose truthfully that he erred by not immediately recognizing Jaber was a prevailing party as a consequence of Nofal, LLC's loss. Plaintiff's opposition is unavailing, and the Court should grant Jaber's motion.

---

[2] The undersigned has become accustomed to this practice of Mr. DeSouza, whose latest attack is that the defendants' counsel employs "ethically 'questionable' tactics" and accusing the undersigned of solicitation. Opp'n, DE 77 at 10. Given the unsupported accusations in plaintiff's opposition memorandum, the undersigned submits a declaration respecting his engagement in this case to refute same. Mr. DeSouza's approach is not isolated. His prior unprofessional *ad hominem* attacks of multiple different defense attorneys include the following:

- Mr. DeSouza writing to the undersigned: "see if you can act like a normal human being." Ex. A to Decl. of Klema, DE 41-2 at 41 Broden v. Private Business Jets, LLC, no. 24-cv-10880 (D. Mass. Mar. 22, 2025);
- "sharp rhetoric" and "irrelevant ad hominem attacks at Defendant … and its counsel." Def.'s Response, Eclipse Sportswire v. The Sports Mall, LLC, no. 8:22-cv-1433-KKM-NHA (M.D. Fla. Nov. 22, 2024);
- "casting strikable aspersions on the skills of the Biltmore's counsel and mis-stating law." Def.'s Reply, Sadowski v. The Biltmore Hotel LP, no. 1:24-cv-23583 (S.D. Fla. Oct. 28, 2024);
- "Besides further knowingly false statements, plaintiff's counsel continues his *ad hominem* attack unabated." Def.'s Reply, Harrington v. Island Villa Rental Props., Inc., no. 4:23-cv-10080 (S.D. Fla. Feb. 29, 2024);
- "*ad hominem* attacks on the undersigned reflect an attempt to distract from [his] own ethical violations." Def.'s Reply, Affordable Aerial Photography, Inc. v. Home Junction, Inc., no. 2:22-cv-14296 (S.D. Fla. Jan. 17, 2023).

And at least two courts have raised concerns with his litigation tactics. See Order, DE 55, Affordable Aerial Photography, Inc. v. Ditommaso, No. 22-cv-80030 (S.D. Fla. Nov. 9, 2023) (characterizing Mr. DeSouza's "exclu[sion of] the factual context" as "conduct unbecoming of a forthright litigant in federal court" and that "the omission borders on deceitful"); Eclipse Sportswire v. The Sports Mall, LLC, no. 8:22-cv-1433-KKM-NHA (M.D. Fla. Nov. 7, 2024) (finding that Mr. DeSouza "took a factually unreasonable position" on behalf of his client).

## ARGUMENT

Prepared Food Photos (1) concedes Pioneer factors two and four, (2) cannot refute Steinle's explanation for why the deadline was missed (factor three), and (3) its argument respecting prejudice to it (factor one) is simply a transparent admission of how it uses litigation to bully defendants. (4) It also relies on non-binding, unreported out of circuit district court decisions.

In the final analysis, the Court would not abuse its discretion to extend the time for Jaber to file a fees motion.

### 1. PFP concedes Pioneer factors two and four

Prepared Food Photos concedes that two of the Pioneer factors favor extending the time for Jaber to file his fees motion: doing so "will not materially extend these proceedings" (factor two), Opp'n, DE 77 at 7, and "Mr. Steinle certainly acted in good faith" (factor four), id. at 11. It also concedes that Jaber is a prevailing party. See generally id. Thus, half of the Pioneer factors weigh in favor of a finding of excusable neglect.

As to its assertion that *Jaber* acted in bad faith by not responding to Attorney Steinle, Opp'n, DE 77 at 10, that is speculation which the attached declaration of Jaber refutes. Following the trial, Jaber was upset that a lawsuit like this, yielding a $200 judgment, had cost him tens of thousands of dollars to defend. Decl. of Jaber, attached as Exhibit A, at ¶ 4. He understandably did not want to incur more fees when all he was being told by Attorney Steinle was that the plaintiff was also seeking its fees, in addition to the fees he had to pay him. Id. at ¶ 3. More fundamentally, even if he had responded to Mr. Steinle's requests for payment, Jaber could not have pursued a matter about which he was uninformed. Decl. of Jaber, ¶¶ 2, 6. To the extent PFP takes issue with Jaber's conduct, his lack of responding to Attorney Steinle is understandable in light of the incurred, and still growing cost of defense.

Also, PFP's further argument about Jaber not obtaining new counsel is a *non sequitur* because the deadline for filing a fees motion had already passed by the time the Court allowed Attorney Steinle to withdraw. Given Prepared Food Photos' concessions on two of the Pioneer factors, equity weighs in Jaber's favor.

**2. PFP cannot refute the evidence for why the deadline was missed**

As to Pioneer factor three, Prepared Food Photos simply dislikes Attorney Steinle's explanation for his factual oversight, basing its argument on speculation rather than meeting the substance of Steinle's sworn statements.[3] While PFP might understandably be frustrated by prior defense counsel's error and Jaber's belated request to file a fees motion, that is often the reaction to neglect sought to be corrected as excusable. Mr. Steinle did not say, contrary to plaintiff's argument, that he "did not understand there were separate claims" Opp'n, DE 77 at 7, but rather that he "overlooked the fact that Mr. Jaber, in his individual capacity, had actually succeeded," as a direct consequence of the closeness of and practical oneness of Jaber and Nofal, Decl. of Steinle, DE 76-1 at ¶¶ 6, 9. That is a mistake of fact, not one of law.

And that fact is also reflected in the record, at a time when Jaber's fee motion would soon become due and when Steinle was still attempting to counsel Jaber on the suit's final steps. See Defs.'s Opp'n to Plf's Mot. for New Trial, DE 59 at 5-6 (repeatedly referring to "Food Town Mart" as the target of PFP's claim for vicarious liability, and arguing "the sale of pork chops does not lead to the conclusion that there is a "financial benefit" **to Food Town Mart**") (emphasis supplied). His argument in the defendants' opposition corroborates his explicit declaration respecting the oversight. It is not a manufactured argument, but bottomed on the undeniable truth

[3] Indeed, this seems to be the same persuasive tactic it took in seeking to overturn the jury's verdict. But speculation is not legal argument.

reflected in Attorney Steinle's own drafting and his subsequent declaration. Prepared Food Photos does not and cannot plausibly challenge those facts. Characterizing Steinle's error as lack of knowledge or his declaration as "argument," Opp'n DE 77 at 8, simply ignores the humility and regret displayed by him. "[A] trial court has discretion to consider the equities and then determine whether a missed filing deadline attributable to an attorney's negligence is (or is not) 'excusable neglect.'" Robb v. Norfolk & W. Ry. Co., 122 F.3d 354, 359 (7th Cir. 1997). The Court ought to exercise that discretion and find the oversight excusable.

Moreover, consistent with what is self-evident from the Steinle declaration, Jaber confirms that he received no counsel from his prior attorney respecting his ability to seek attorney's fees, and therefore he did not deliberately ignore any rights which he was unaware that he had. Decl. of Jaber, ¶¶ 3-6. What Attorney Steinle's declaration attests is that he misconceived of the existence of Jaber as a prevailing party as a consequence of the fact that his other client, owned by Jaber, had lost. Consequently, he did not communicate that fact to Jaber. Id. at ¶ 3. Unsurprisingly, Jaber did not respond to repeated requests for payment on outstanding invoices when he was completely unaware that Prepared Food Photos might be liable to pay his attorney's fees. Id. at ¶ 5. And so Jaber relied in good faith on the advice (and lack thereof) of his attorney respecting recovery of attorney's fees in this action. Id. at ¶ 2. Thus, Jaber's reluctance to run his attorney's clock is not dispositive of *Steinle's* neglect respecting the missed deadline—though the failure of communication impacted the possibility that Steinle may have learned of his error sooner by talking through the fees issue cooperatively with his client. Nevertheless, Jaber timely instructed his new counsel to proceed with a fees motion as soon as he became aware that he could. Id. at ¶ 6.

Consistent with Pioneer, "'excusable neglect' [can] include '*omissions through*

*carelessness and mistake*.'" Robb, 122 F.3d at 359 (quoting In re Bulic, 997 F.2d 299, 302 (7th Cir.1993)) (emphasis supplied by Robb). Steinle's oversight combined with Jaber's reluctance to communicate and incur further fees is the irrefutable explanation for why the deadline was missed. Prepared Food Photos is in no position to assert otherwise. Those facts, in the Court's discretion, can amount to excusable neglect.

### 3. Plaintiff's argument on Pioneer factor four should be rejected as further copyright trolling bullying tactics

The only Pioneer factor Prepared Food Photos genuinely disputes is the first, claiming that Prepared Food Photos forewent an appeal because Jaber had not filed a fees motion. Opp'n, DE 77 at 5-7. But any such appeal would likely have been of dubious merit, if not wholly frivolous. Its own decision not to pursue a dead-on-arrival appeal is not prejudice. That restraint is actually *commendable*, not prejudicial. While Jaber similarly cannot dispute the sworn statements of Rebecca Jones respecting her discussion with counsel about whether to pursue and appeal, the real question is whether that amounts to prejudice. On the facts here, it does not.

What is conspicuously absent from plaintiff's opposition is whether the contemplated appeal was forewent on its merits, besides Jaber not filing a timely fees motion. Presumably Prepared Food Photos' attorney provided counsel on the likelihood of success on appeal as part of that decision-making process. For it now to suggest that the *sole* basis of it forgoing an appeal was the absence of Jaber's fees motion is likely only a half truth. There is not prejudice when an appeal would be frivolous.

The standard of review for a jury's verdict makes it exceedingly difficult to overturn: "As long as there is a reasonable basis in the record to support it," the Seventh Circuit "will not overturn a jury's verdict." Robinson v. Burlington N. R. Co., 131 F.3d 648, 656 (7th Cir. 1997). Prepared Food Photos would have been required to show the "verdict is against the **clear weight** of the

evidence." Morris v. BNSF Ry. Co., 969 F.3d 753, 764 (7th Cir. 2020) (emphasis supplied); cf. also United States v. Groves, 470 F.3d 311, 323-24 (7th Cir. 2006) (in criminal cases, "[i]n reviewing a [] challenge to the sufficiency of the evidence … [w]e do not reweigh the evidence or make credibility determinations"). There was simply no clear evidence that the *only* conclusion a reasonable jury could have reached was that Jaber *personally* and *directly* profited from his son's one-time Facebook post apart from Nofal's general revenue from selling pork chops. See Meyer v. Holley, 537 U.S. 280, 286 (2003) ("in the absence of special circumstances it is the corporation, not its owner or officer, who is the principal or employer, and thus subject to vicarious liability"). Prepared Food Photos was, for better or worse, "stuck with [the] verdict," Opp'n, DE 77 at 7, that it chose to pursue through trial because the likelihood of it retrying its case on a remand after a successful appeal was effectively zero. It was not prejudiced for its own decision not to take meritless appeal of an adverse verdict irrespective of what Jaber did or did not do.

Similarly, appealing the Court's subsequent order denying PFP's Rule 59 motion would have also been extremely remote given the standard of review: abuse of discretion. Whitehead v. Bond, 680 F.3d 919, 927 (7th Cir. 2012). If plaintiff's potential appeal had any reasonable chance of success, then perhaps it could claim prejudice. But on the facts here, any such appeal was bordering on frivolous. See Refac Int'l, Ltd. v. Hitachi, Ltd., 921 F.2d 1247, 1250 (Fed. Cir. 1990) (finding Refac's appeal frivolous because its "attack is primarily on fact findings or discretionary matters, all of which are amply supported by the record").

For Prepared Food Photos to claim that it forewent an appeal as a result of Jaber not seeking his attorney's fees, Decl. of Jones, DE 77-1 at ¶¶ 4-5, is simply an admission that it would have used a frivolous merits appeal as a weapon to bully Jaber out of pursuing his fees—just as it uses the prospect of a fee award in its favor, pre-suit, to bully defendants to pay excessive settlements.

A troll's strategy is the same as between the trial and appellate courts: Demand "modest [relief] for which there is no legal basis, in the hope that the 'rational'" defendant will accede to "it rather than incur a greater cost, and legal expenses, in challenging" it. Klinger v. Conan Doyle Est., Ltd., 761 F.3d 789, 791-92 (7th Cir. 2014). Pre-suit, PFP's demand was financial (pay an excessive sum or we'll cause you to incur substantial fees in defense of a low value suit), whereas post-judgment its hypothetical demand would have been tactical (don't seek fees or we'll file a dubious appeal). Both situations animate the judicial machinery that only the plaintiff/appellant has the power to cease, and thus uses an unstated threat of defense costs on its opponent to obtain its desired ends. In the words of an early patent troll using the same technique: "It only makes sense to use the cost of litigation as a bargaining leverage to force a settlement on terms favorable to the party that can litigate the matter to death without worrying about the cash flow." Refac Int'l, 921 F.2d at 1250. That was and continues to be PFP's strategy. It is a copyright troll because the shoe fits. See McDermott v. Monday Monday, LLC, 17-cv-9230, 2018 WL 1033240 (S.D.N.Y. Feb. 22, 2018) (defining a copyright troll as a litigant that is "more focused on the business of litigation than on selling a product or service or licensing their copyrights to third parties" and finding the plaintiff's "litigation strategy … fits squarely within the definition of a copyright troll" where it filed hundreds of lawsuits that were "disposed of before any merits-based litigation").

Furthermore, as PFP is aware, other districts have longer timeframes for attorney fees motions. E.g., S.D. Fla. L. R. 7.3(a)(1) (providing a 60-day deadline for filing a fees motion). And so the mere happenstance that PFP sued in the Eastern District of Wisconsin rather than another district where it would not have the opportunity to strategically file a meritless appeal to use as a bargaining chip belies its claimed prejudice. Had Jaber timely filed a fees motion and PFP appealed, he almost certainly would have been forced to incur still further attorney's fees to

vindicate his trial court win. PFP has suffered no prejudice.

### 4. PFP relies on out-of-district cases that are inapposite

Finally, Prepared Food Photos urges the Court to rely on out of district decisions, including from California, Pennsylvania, Kansas, and Illinois. These are not binding, and are also not persuasive. PFP also cites a pre-Pioneer case (also out of circuit) that simply affirmed the district court's order disallowing the plaintiff's Rule 60(b) motion on the basis of the same standard that governs the instant motion: abuse of discretion. See Opp'n, DE 77 at 9-10 (citing Kendall v. Hoover Co., 751 F.2d 171, 175 (6th Cir. 1984)).

PFP's non-binding authorities stand in contrast to those cited by Jaber which provide this Court with "wide latitude in determining whether [Jaber and his counsel's] explanation for missing a deadline amounts to … 'excusable neglect,'" Nartey v. Franciscan Health Hosp., 2 F.4th 1020, 1024 (7th Cir. 2021).

## CONCLUSION

"[T]here is not a 'hard and fast' rule in [the Seventh] circuit which bars a trial judge from exercising discretion to determine whether attorney negligence in missing a filing deadline may be deemed 'excusable neglect.'" Robb, 122 F.3d at 361. The Court should find excusable neglect, grant Jaber's motion for extension of time, and allow him to file his motion for attorney's fees.

__/s/ Griffin Klema________
Griffin C. Klema, Esq.
Fla. Bar No. 100279
Attorney for Defendants
**KLEMA LAW, P.L.**
420 W. Kennedy Boulevard
Tampa, FL 33606
Telephone: 202-713-5292
E-mail: Griffin@KlemaLaw.com